**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**August 29, 2018**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

MATTHEW LANE DURHAM,

    Defendant - Appellant.

No. 16-6075

_____

**Appeal from the United States District Court**
**for the Western District of Oklahoma**
**(D.C. No. 5:14-CR-00231-R-1)**
_____

Stephen Jones (Ashley Morey with him on the brief), Jones, Otjen, Davis & Bloyd, Enid, Oklahoma, for Defendant - Appellant.

Steven W. Creager, Assistant United States Attorney (David P. Petermann, Assistant United States Attorney, and Mark Yancey, United States Attorney, with him on the brief), Oklahoma City, Oklahoma, for Plaintiff - Appellee.

_____

Before **HARTZ**, **MATHESON**, and **MORITZ**, Circuit Judges.
_____

**MATHESON**, Circuit Judge.
_____

TABLE OF CONTENTS

I. BACKGROUND ..................................................................................................2

  A. Factual Background ......................................................................................2

  B. Procedural Background ................................................................................6

II. DISCUSSION ...................................................................................................8

  A. Issue One: Constitutionality of 18 U.S.C. § 2423(c) under the
     Foreign Commerce Clause ...........................................................................8

    1. Section 2423(c) and Congress's Efforts to Combat Sex Trafficking ....9

      a. Provisions of the statutory scheme....................................................10

      b. Early efforts to combat sex trafficking ...........................................12

      c. Legislative history leading to passage of § 2423(c) ........................14

        i. Enactment of § 2423(b) ...............................................................14

        ii. Enactment of § 2423(c) .............................................................15

    2. The Commerce Clause ........................................................................18

      a. ICC case law....................................................................................19

        i. Channels.......................................................................................19

        ii. Instrumentalities .........................................................................20

        iii. Substantial effect........................................................................20

b. FCC case law...............................................................22

3. Congressional Authority Broader Under the FCC than the ICC .........24

   a. History....................................................................25

   b. Text .......................................................................26

   c. Purpose .................................................................28

   d. The dissent's view ................................................29

     i. *Japan Line* and the scope of FCC power ......................30

     ii. Sovereignty of other nations.......................................32

     iii. Summary .................................................................36

4. The *Lopez* Categories in the Foreign Commerce Context...................36

   a. The ICC's three categories as a starting point.................37

   b. The substantial-effect category is applicable here ..........38

   c. Evolution of the third *Lopez* category ............................38

   d. Adapting the third *Lopez* category to the FCC...............42

5. Constitutionality of § 2423(c) ..........................................43

   a. Section 2423(c)'s legislative history supports rational basis...........44

   b. Section 2423(c) is an essential part of a broader statutory scheme .45

   c. Section 2423(c)'s jurisdictional element supports rational basis.....48

   d. *Raich* supports rational basis for § 2423(c)....................48

e.  Rational basis standard ..................................................................52

6.  Legal Landscape.........................................................................54

7.  Conclusion ................................................................................56

B.  Issue Two:  *Brady* Claim.................................................................57

1.  Additional Procedural Background ...................................................57

a.  Trial testimony....................................................................57

b.  Supplemental motion for new trial ................................................60

2.  Analysis ...................................................................................64

a.  Standard of Review................................................................64

b.  Legal Background ................................................................64

c.  No prejudice for a *Brady* violation................................................65

C.  Issue Three:  Mr. Durham's Statements about Child Pornography
and Homosexuality................................................................67

1.  Standard of Review ......................................................................68

2.  Additional Factual Background........................................................68

a.  Evidence about child pornography and homosexuality ....................68

b.  District court rulings...............................................................69

3.  Legal Background ........................................................................71

a.  Rule 404(b)........................................................................71

iii

b.  Rules 401 and 402 ...........................................................71

c.  Rule 403 ......................................................................71

4.  Analysis .............................................................................72

a.  Rule 404(b)...................................................................72

b.  Rules 401 and 402 ........................................................73

c.  Rule 403 ......................................................................74

D.  Issue Four:  Prosecutorial Misconduct .....................................75

1.  Standard of Review ...........................................................75

2.  Additional Factual Background............................................76

a.  The Government's cross-examination of Mr. Durham ....................76

b.  The Government's closing argument .............................................77

3.  Additional Procedural Background .......................................77

4.  Legal Background .............................................................78

5.  Analysis .............................................................................79

a.  Preservation.................................................................79

i.  Alleged misconduct during cross-examination of Mr. Durham....79

ii.  Alleged misconduct during closing argument............................80

b.  Plain error—substantial rights .......................................80

i.  Alleged misconduct during cross-examination of Mr. Durham....81

ii. Alleged misconduct during closing argument ............................81

E. Issue Five: Cellphone Videos Authentication ........................................83

    1. Standard of Review ...................................................................84

    2. Additional Background ..............................................................84

      a. Pre-Trial ...........................................................................84

      b. Trial.................................................................................87

    3. Legal Background ....................................................................88

    4. Analysis ...............................................................................89

F. Issue Six: Victims' Medical Records ....................................................90

    1. Standard of Review ...................................................................91

    2. Additional Background ..............................................................91

    3. Legal Background ....................................................................92

      a. Invited error.......................................................................92

      b. Authentication ...................................................................92

      c. The hearsay rule and pertinent exceptions .....................................92

      d. Unfair prejudice..................................................................93

    4. Analysis ...............................................................................93

G. Issue Seven: Substantive Reasonableness of Sentence .........................96

    1. Standard of Review ...................................................................96

2. Additional Factual Background ..........................................................97

3. Legal Background ...........................................................................100

4. Analysis .......................................................................................101

H. Issue Eight: Cumulative Error ...........................................................103

III. CONCLUSION .................................................................................105

Matthew Durham appeals his convictions and sentence on four counts for illicit sex with minors in Kenya after travelling there from the United States. This opinion addresses the following eight issues presented for appellate review.

1. Is 18 U.S.C. § 2423(c), the statute on which the convictions were based, unconstitutional on its face and as applied to Mr. Durham because it exceeds Congress's power under the Foreign Commerce Clause in Article 1, Section 8, Clause 3 of the Constitution? We hold that § 2423(c) is constitutional because Congress could rationally conclude that travel abroad followed by illicit sex with a minor, in the aggregate, substantially affects foreign commerce.

2. Did the district court err when it denied Mr. Durham's supplemental motion for a new trial alleging that the Government suppressed exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963)? We affirm because Mr. Durham has not shown that nondisclosure of the evidence prejudiced his case.

3. Did the district court err under Federal Rules of Evidence 401, 403, and 404(b) when it allowed admission of Mr. Durham's statements about his struggles with child pornography and homosexuality? We affirm. The district court did not abuse its discretion in determining the evidence was intrinsic, relevant, and not unduly prejudicial.

4. Did the district court err when it denied Mr. Durham's motion for a new trial alleging that the Government made improper statements about his struggle with homosexuality during cross-examination of Mr. Durham and during closing argument? We affirm under plain error review because Mr. Durham cannot show that the prosecutor's statements affected his substantial rights.

5. Did the district court err in admitting cellphone video recordings because they were not properly authenticated? We affirm. The district court did not abuse its discretion because the Government presented sufficient foundation evidence for authentication.

6. Did the district court err when it admitted the victims' entire medical records? We affirm because Mr. Durham invited any error and because his arguments alleging lack of authentication, inadmissible hearsay, and unfair prejudice do not show that the district court erred in admitting the records.

7. Did the district court abuse its discretion and impose a substantively unreasonable sentence when it sentenced Mr. Durham to 480 months in prison? We affirm because Mr. Durham cannot overcome the presumption that the district court reasonably weighed the sentencing factors under 18 U.S.C. § 3553(a) or show that its sentencing decision exceeds the bounds of permissible choice.

8. Should the convictions be reversed because the errors, considered cumulatively, deprived him of a fair trial? Mr. Durham cannot show that any errors that may be eligible for cumulative error review cumulatively affected his substantial rights.

Exercising jurisdiction under 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291, we therefore affirm Mr. Durham's convictions and sentence.

## I. BACKGROUND

### A. *Factual Background*

On May 1, 2014, Mr. Durham, then 19 years old, arrived in Kenya on his fourth Christian missionary trip there. ROA, Vol. 12 at 1818 (TT 1204); ROA, Vol. 10a at 25.[1] In Kenya, he volunteered at the Upendo Children's Home ("Upendo"), where 33 children from impoverished backgrounds live. ROA, Vol. 12 at 695-97, 787 (TT 81-83, 173). Upendo Kids International, an Oklahoma non-profit founded and directed by Eunice Menja, operates Upendo. *Id.* at 787, 960 (TT 173, 346), Aplee. Br. at 3. Ms. Menja's

---

[1] "ROA" denotes "Record on Appeal." "TT" denotes "Trial Transcript."

2

sister, Josephine Wambugu,[2] is the manager of Upendo.  ROA, Vol. 12 at 695, 788 (TT 81, 174).

On his previous trips to Kenya, Mr. Durham had stayed with a host family, but on the fourth trip, he asked to stay at Upendo instead.  *Id.* at 1811 (TT 1197).  On June 12, 2014, Ms. Wambugu entered one of the girls' bedrooms and saw Mr. Durham lying on a bed with one of the girls.  *Id.* at 705, (TT 91).  When Ms. Wambugu came into the room, Mr. Durham left quickly.  *Id.* at 705-06 (TT 91-92).  Ms. Wambugu then spoke to some of the girls, who said they had "been doing bad manners" with Mr. Durham.  ROA, Vol. 12 at 710-11 (TT 96-97).  The children used "bad manners" to mean engaging in sexual acts.  *See id.* at 662 (TT 48); 1412 (TT 798); 1443-44 (TT 829-30).

On June 13, Ms. Menja, Ms. Wambugu, Jason Jeffries (another American volunteer at the home), and Tom Mutonga (a local supporter of Upendo) met with Mr. Durham at Upendo.  *Id.* at 817, 825 (TT 203, 211).  When he entered the meeting, Mr. Durham yelled, "You can fire me, fire me now."  *Id.* at 825 (TT 211).  Ms. Menja accused him of hurting the girls and asked for his response.  *Id.* at 826 (TT 212).  Mr. Durham said he did not remember, and asked to speak to Ms. Wambugu alone.  *Id.* at 826-27 (TT 212-13).

Once alone, he asked Ms. Wambugu to defend him, and she asked him whether he had done the acts reported by the girls.  *Id.* at 723 (TT 109).  He said, "Yes, I did it.  Yes, I did."  *Id.* at 723 (TT 109).  But when he went back to talk to the group, Mr. Durham

---

[2] The trial transcript spells Ms. Wambugu's first name as "Josphine," but court records refer to her as "Josephine."  *See* ROA, Vol. 1 at 40.  We therefore assume her name is properly spelled "Josephine."

again said he could not remember assaulting the children. He added that he had been struggling with child pornography and homosexuality. *Id.* at 724, 828 (TT 110, 214). Ms. Menja told Mr. Durham she was going to take him to a different location, explaining that, for the safety of the children, she did not want him to stay at the children's home. *Id.* at 829 (TT 215). He spent the next three days at an empty house owned by Ms. Menja's father-in-law. *Id.* at 830 (TT 216). One of the volunteers had taken Mr. Durham's passport after hearing about the allegations. *Id.* at 1052 (TT 438).

During his time away from Upendo, Mr. Durham sent his father text messages stating: "I don't want to live anymore" and "I hate myself. I deserve to burn in hell." ROA, Vol. 9 at 78 (Gov't Exh. 29). He sent a text to Ms. Menja saying: "Tell all the kids how sorry i am, and i am praying for their forgiveness every hour." *Id.* at 18 (Gov't Exh. 10) (errors in original).

Mr. Durham's great-uncle arranged for Mr. Durham to fly back to Oklahoma. ROA, Vol. 12 at 1682-83 (TT 1068-69). On June 17, before he flew out, Mr. Durham met with Ms. Menja, Ms. Wambugu, and Mr. Mutonga at the Seagull restaurant. *Id.* at 855 (TT 241). Ms. Menja video recorded some of the ensuing conversation in multiple videos on her cellphone (the "Seagull Confession Videos"). *Id.* at 856 (TT 242). Mr. Durham knew that he was being recorded and asked that the video be kept on. Gov't Exh. 4 at 12:09. On the longest video, Ms. Menja asked Mr. Durham about the allegations. He responded that he had struggled with a "temptation to touch children and to be with other men." Gov't Exh. 4 at 1:55-2:01. When Ms. Menja started asking about

specific children who had accused him of abuse, Mr. Durham admitted to assaulting those children. *See, e.g.*, *id.* at 5:39-6:15.

After Ms. Menja stopped recording the video, she said she could not listen any more, and Mr. Durham offered to write down his confession. ROA, Vol. 12 at 865 (TT 251). He wrote detailed statements about how he abused or otherwise engaged in inappropriate behavior with over ten of the children. ROA, Vol. 9 at 8-16. The following relate to three of the four charges of conviction and each concerns a different victim:

- "I would take her to the bathroom at night and hold her down and rape her. This happened on several occasions. I also made her watch me do things to [another girl]. I told her never to tell anyone, and that I loved her." ROA, Vol. 9 at 8 (Gov't Exh. 9).

- "I would take her to the bathroom and have her take off her clothes. I would touch myself and her. I don't know how many times it occurred. Also, when we had our sleepovers Friday night, [she] always made a point to sleep by me. I would spoon with her until I woke up." *Id.* at 15 (Gov't Exh. 9).

- "I took her to the bathroom and force[d] her to have sex with me. This happened on more than one occasion. I made her swear to never tell anyone . . . . Any time I try to read the bible or pray, this image comes to my [head]." *Id.* at 16 (Gov't Exh. 9).

Ms. Wambugu next spoke to the Kenyan police, who told her they could not arrest Mr. Durham. ROA, Vol. 12 at 873-74 (TT 259-60). Ms. Menja returned Mr. Durham's passport to him, and he flew out of Kenya the night of June 17. *Id.* at 874-75 (TT 260-61).

5

Ms. Menja took six victims to a doctor the next day, June 18. *Id.* at 875 (TT 261). Medical workers examined them and determined five out of six had perforated hymens. *Id.* at 1187-88 (TT 574-75). Ms. Menja later reported what had happened to the U.S. Embassy. *Id.* at 875 (TT 261).

B. ***Procedural Background***

Mr. Durham was arrested in the United States on July 18, 2014. ROA, Vol. 1 at 77. A grand jury returned an original indictment on August 5, 2014, charging three counts. *Id.* at 130-31. It later returned two superseding indictments. *Id.* at 248, 467. The second, the operative indictment, was returned in April 2015 and charged Mr. Durham with eight counts of interstate travel with intent to engage in a sexual act with a child, in violation of 18 U.S.C. § 2241(c), and eight counts of traveling in foreign commerce and engaging in illicit sexual conduct with a minor, in violation of 18 U.S.C. § 2423(c). *Id.* at 467-76. The indictment identified eight victims by their initials. *Id.* Mr. Durham also was charged with one count of traveling in foreign commerce with intent to engage in illicit sexual conduct in violation of 18 U.S.C. § 2423(b).

Trial was held between June 10, 2015, and June 18, 2015. Five of the eight alleged victims testified, including the victims associated with each of the four convictions. ROA, Vol. 12 at 658, 1406, 1426, 1440, 1458. Dr. Alawiya Abdulkadir Mohamed, who prepared some of the medical documentation in Kenya, also testified for the prosecution. *Id.* at 1186-88 (TT 572-74). Mr. Durham's written and videotaped confessions and his text messages were admitted into evidence. *Id.* at 737, 857, 1248 (TT 123, 243, 634).

6

Mr. Durham testified in his defense. ROA, Vol. 12 at 1792 (TT 1178). The defense also presented testimony from a professional counselor about forensic interviews with victims of sexual assault, *id.* 1506, 1515 (TT 892, 901), and from a sexual assault nurse examiner, Lisa Dunson, about the medical findings in the case, *id.* at 1581 (TT 967). Mr. Durham's mother, father, and great-uncle also testified in his defense. *Id.* at 1638, 1721, 1759 (TT 1024, 1107, 1145).

The jury found Mr. Durham guilty on seven counts of traveling in foreign commerce and engaging in illicit sexual conduct with a minor in violation of 18 U.S.C. § 2423(c). ROA, Vol. 3 at 193-94. It found him not guilty of the remaining counts. *Id.* Mr. Durham moved for arrest of judgment, arguing that 18 U.S.C. § 2423(c) is unconstitutional. *Id.* at 229. He also moved for acquittal and a new trial. *Id.* at 277, 305. Mr. Durham supplemented his motion for a new trial when he learned the prosecution had failed to disclose information favorable to the accused during trial. *Id.* at 489.

The district court denied the motions for arrest of judgment and a new trial. *Id.* at 752, 760, 776, 811. It granted acquittal on three of the § 2423(c) counts because the Government had not shown Mr. Durham engaged in "sexual conduct" as defined by the statute, but it denied acquittal on the other four counts. *Id.* at 762-67, 774-75.

The final Presentence Investigation Report ("PSR") calculated a recommended sentence of 1,440 months in prison under the United States Sentencing Guidelines (the "Guidelines"), based on Mr. Durham's total offense level and criminal history category. ROA, Vol. 7 at 142. This represented the statutory maximum of 30 years for each count of conviction, running consecutively. *Id.* at 142 n.3. The district court sentenced Mr.

7

Durham to 480 months in prison, a sentence it characterized as a variance below the Guidelines range. ROA, Vol. 3 at 844; ROA, Vol. 7 at 477; ROA, Vol. 13 at 158.

## II. DISCUSSION

Mr. Durham raises eight issues on appeal. As to each issue, we present the applicable standard of review and also provide additional factual, procedural, and legal background, as needed.

### A. *Issue One: Constitutionality of 18 U.S.C. § 2423(c) under the Foreign Commerce Clause*

Mr. Durham challenges the constitutionality of 18 U.S.C. § 2423(c), arguing that Congress exceeded its authority under the Foreign Commerce Clause. *See* U.S. Const. art. I, § 8, cl. 3. Section 2423(c) makes it a crime for "[a]ny United States citizen or alien admitted for permanent residence [to] travel[] in foreign commerce . . . and engage[] in any illicit sexual conduct with another person." 18 U.S.C. § 2423(c). "Illicit sexual conduct" includes any commercial or noncommercial sexual act with a person under the age of 18, *id*. § 2423(f)(1)-(2), and the production of child pornography, *id*. § 2423(f)(3). Mr. Durham was charged under § 2423(c) for traveling abroad and engaging in noncommercial sexual acts with minors. He argues that, because noncommercial illicit sexual activity abroad has no relation to foreign commerce, the statute is unconstitutional on its face and as applied to him and his conviction therefore cannot stand.[3] We review

---

[3] Mr. Durham brings both a facial and an as-applied challenge. *See* Aplt. Br. at 48. The Government contends he has waived his as-applied challenge, but even if this is so, we may resolve a facial challenge by conducting an as-applied analysis.

We previously have said that "we need not and do not address [a] facial challenge" when "we conclude the as-applied challenge fails." *United States v.*

his challenge de novo. *United States v. Pompey*, 264 F.3d 1176, 1179 (10th Cir. 2001) ("We review challenges to the constitutionality of a statute de novo." (quotations omitted)); *see also People for Ethical Treatment of Prop. Owners v. U.S. Fish & Wildlife Serv.* (*PETPO*), 852 F.3d 990, 1000 (10th Cir. 2017), *cert. denied*, 138 S. Ct. 649 (2018).

We reject Mr. Durham's constitutional challenge to § 2423(c). Congress adopted this provision and several others in 2003 as part of a broad regulatory effort that started in 1907 to combat international sex trafficking. As the following discussion shows, Congress could reasonably conclude that United States citizens and permanent residents who, in the aggregate, travel to foreign countries and commit illicit sex acts there substantially affect foreign commerce. As a result, we must defer to congressional judgment and uphold § 2423(c).

1. **Section 2423(c) and Congress's Efforts to Combat Sex Trafficking**

Section 2423(c) makes it a crime for "[a]ny United States citizen or alien admitted for permanent residence [to] travel[] in foreign commerce . . . and engage[] in any illicit

---

*Morgan*, 748 F.3d 1024, 1031 (10th Cir. 2014). For a statute to be facially unconstitutional, Mr. Durham "must establish that [the] law is unconstitutional in all of its applications." *City of Los Angeles v. Patel*, 135 S. Ct. 2443, 2451 (2015) (quotations omitted); *cf. United States v. Stevens*, 559 U.S. 460, 473 (2010) ("In the First Amendment context . . . this Court recognizes a second type of facial challenge, whereby a law may be invalidated as overbroad if a substantial number of its applications are unconstitutional . . . ." (quotations omitted)).

We therefore address Mr. Durham's facial challenge through an as-applied analysis. Under § 2423(c), Mr. Durham was convicted of engaging in illicit sexual conduct abroad after traveling in foreign commerce, the paradigmatic conduct targeted under the provision. *See, e.g.*, *United States v. Bollinger*, 798 F.3d 201, 203-04 (4th Cir. 2015), *cert. denied*, 136 S. Ct. 2448 (2016); *United States v. Pendleton*, 658 F.3d 299, 301-02 (3d Cir. 2011). Because we conclude that § 2423(c) is constitutional as applied to Mr. Durham, he cannot succeed on either a facial or as-applied challenge.

sexual conduct with another person." 18 U.S.C. § 2423(c). It is situated within a broad anti-sex trafficking statutory scheme that Congress constructed through a century of legislation. Congress attempted to address sex trafficking in the early 1900's by prohibiting the importation of women and girls for sexual exploitation. Expanding on these efforts, it enacted legislation for the prosecution of individuals who traveled abroad intending to engage in sex tourism. But proving intent was difficult. In response, Congress passed § 2423(c), which targets individuals who travel abroad and engage in illicit sexual conduct regardless of intent. When reviewed in historical context and the overall legislative scheme, Congress reasonably viewed § 2423(c) as playing an important role in its broader efforts to combat international sex tourism.

The following discussion describes how § 2423(c) facilitates Congress's efforts to combat international sex tourism. We provide a brief overview of Chapter 117 in Title 18 of the United States Code, which contains 18 U.S.C § 2423 and other anti-trafficking provisions; chart the historical development of § 2423; and review the legislative history leading to the enactment of § 2423(c).

a. *Provisions of the statutory scheme*

Chapter 117 criminalizes various activities related to sex trafficking. *See* 18 U.S.C. §§ 2421-2428 (titled "Transportation for Illegal Sexual Activity and Related Crimes"). It generally prohibits the knowing transport of "any individual in interstate or foreign commerce . . . with [the] intent that such individual engage in prostitution, or in any sexual activity for which any person can be charged with a criminal offense." *Id*. § 2421 (titled "Transportation generally"). It also targets other activities that facilitate

10

sex trafficking. *See, e.g.*, *id*. § 2422 (coercion or enticement of individuals to engage in prostitution or illicit sexual activity); *id*. § 2424 (harboring individuals for purpose of prostitution); *id*. § 2425 (transmission of information to entice individuals into illicit sexual activity).[4]

Title 18 U.S.C. § 2423, which falls within Chapter 117, deals specifically with the trafficking and sexual exploitation of minors. *See id*. § 2423 (titled "Transportation of minors"). Its seven provisions criminalize activities that involve illicit sexual contact with minors. *See id*. § 2423(a)-(g); *see, e.g.*, *id*. § 2423(a) (the transportation of minors for prostitution or illicit sexual activity). Three of its provisions—§ 2423(b), § 2423(c), and § 2423(d)—address international sex tourism. Section 2423(b) makes it a crime to travel with the intent to engage in illicit sex. *See id*. § 2423(b). Section 2423(c) targets individuals who travel abroad and engage in illicit sex—regardless of intent. *See id*. §2423(c). Section 2423(d) targets businesses that "arrange[], induce[], procure[] or facilitate[] the travel of a person" intending to engage in illicit sexual conduct abroad for

---

[4] Chapter 117 also includes sections on sentencing individuals for such offenses, definitions of illicit sexual activity, and forfeiture options once an individual is convicted. *See* 18 U.S.C § 2426 (sentencing for repeat offenders); *id*. § 2427 (definition of "sexual activity for which any person can be charged with a criminal offense" to include production of child pornography); *id*. § 2428 (forfeiture of property that was used in the commission of crimes or derived from the proceeds of crimes).

financial gain.  *Id*. § 2423(d).  "Illicit sexual conduct" includes commercial and

noncommercial sex acts[5] with a "person under 18 years of age."  *Id.* § 2423(f)(1)-(2).[6]

> b.  *Early efforts to combat sex trafficking*

Section 2423 developed through a century of legislation addressing international

sex trafficking.  In the early 1900's, Congress was concerned about the growing sex

trafficking industry from Europe in particular.  In 1907, it prohibited the "importation" of

women or girls into the United States "for the purpose of prostitution, or for any other

immoral purpose."  Act of Feb. 20, 1907, Pub. L. No. 59-96, § 3, 34 Stat. 898, 899

("1907 Act") (regulating "the immigration of aliens into the United States").[7]  Congress

recognized this practice as a "present-day existing evil of widespread dimensions" that

must be stopped.  S. Rep. No. 61-702, at 14 (1910).

Two years later, congressional investigators released a report concluding that the

1907 Act had failed to stem sex trafficking into the United States.  *See Importing Women*

---

[5] For a noncommercial sex act, the conduct would also have to "be in violation of Chapter 109A," which contains various sexual abuse offenses.  *See* 18 U.S.C. §§ 2241-2248.

[6] In the original 1994 version, § 2423(b) criminalized "any sexual act . . . with a person under 18 years of age."  *See* 18 U.S.C. § 2423(b) (1994).  The Prosecutorial Remedies and Tools Against the Exploitation of Children Today Act of 2003 ("PROTECT Act") replaced this phrase with "any illicit sexual conduct with another person" and added the definition section in § 2423(f), which includes a definition of "illicit sexual conduct" as "a sexual act with a person under 18 years of age."  Pub. L. No. 108-21, § 105, 117 Stat. 650, 654 (2003).

[7] The 1907 Act also prohibited anyone from "keep[ing], maintain[ing], control[ling], support[ing], or harbor[ing] in any house or other place" women for the purpose of prostitution.  § 3, 34 Stat. at 899.

*for Immoral Purposes*, S. Doc. No. 61-196, at 33-36 (1909) (recommending a number of policy changes addressing the unsolved problem of sex trafficking); H.R. Rep. No. 61-47, at 12 (1909). The 1907 Act had focused on stopping the flow of trafficked women at the border, but it failed to address the problem of women passing through immigration channels undetected. *See* S. Doc. No. 61-196, at 33-34; *see also* Ariela R. Dubler*, Immoral Purposes: Marriage and the Genus of Illicit Sex*, 115 Yale L.J. 756, 787 (2006). The report recommended criminalizing the interstate transportation of women and girls for the purpose of prostitution. S. Doc. No. 61-196, at 36; *see also* H.R. Rep. No. 61-47, at 10 (explaining this change was necessary to prevent the "evil" of importing women from foreign nations; otherwise prostitution "can not [sic] be met comprehensively and effectively").

In response, Congress passed the Mann Act of 1910, attempting to "put a stop to a villainous interstate and international traffic in women and girls." H.R. Rep. No. 61-47, at 9; *see* White-Slave Traffic (Mann) Act, Pub. L. No. 61-277, §§ 2-8, 36 Stat. 825, 825-27 (1910) (codified at 18 U.S.C. §§ 397-404 (1940)). Section 2 of the Mann Act prohibited the transportation of women or girls across state or international lines for the purpose of illicit sexual acts. *See* § 2, 36 Stat. at 825. It is the precursor of the current § 2423.[8]

---

[8] The Mann Act has been recodified and amended as 18 U.S.C. §§ 2421-2424. Section 2 of the Mann Act parallels 18 U.S.C. § 2423(a), which criminalizes knowingly transporting individuals for the purposes of prostitution or illicit sexual activity. *Compare* § 2, 36 Stat. at 825 (codified at 18 U.S.C. § 398 (1940)) ("[K]nowingly transport[ing] . . . in interstate or foreign commerce . . . any woman or girl for the purpose of prostitution or debauchery, or for any other immoral

In 1978 and 1986, Congress broadened the provisions of the Mann Act to fight sex

trafficking. In 1978, Congress expanded the law preventing the commercial sexual

exploitation of girls to include all children. *See* The Protection of Children Against

Sexual Exploitation Act of 1977, Pub. L. No. 95-225, § 3, 92 Stat. 7, 8 (1978) (codified at

18 U.S.C. § 2423(a)(1)-(2) (1982)); *see also* H.R. Rep. No. 99-910, at 4 (1986). But, as

Congress acknowledged less than a decade later, the 1978 Act failed to address

noncommercial exploitation—such as transporting children for the purpose of producing

child pornography for private rather than commercial use. *See* H.R. Rep. No. 99-910,

at 7. In response, Congress passed amendments in 1986 to encompass noncommercial

sexual exploitation. Child Sexual Abuse and Pornography Act of 1986, Pub. L. No.

99-628, § 5, 100 Stat. 3510, 3511 (1986) (codified at 18 U.S.C. § 2423 (1988)).

    c. *Legislative history leading to passage of § 2423(c)*

The next two major revisions to § 2423 occurred in 1994 and 2003. Congress

added § 2423(b) and § 2423(c) to target sex tourism.

    i. Enactment of § 2423(b)

In 1994, Congress enacted § 2423(b) as part of the Violent Crime Control and

Law Enforcement Act of 1994 ("Violent Crime Act"), making it a crime for "a United

States citizen . . . [to] travel[] in foreign commerce . . . for the purpose of engaging in any

---

purpose . . . ."), *with* 18 U.S.C. § 2423(a) ("[K]nowingly transport[ing] an individual
who has not attained the age of 18 years in interstate or foreign commerce . . . with
intent that the individual engage in prostitution, or in any sexual activity for which
any person can be charged with a criminal offense . . . ."). Section 2423 also
contains other provisions to address international sex tourism. *See* 18 U.S.C. §§
2423(b)-(f).

14

sexual act . . . with a person under 18 years of age . . . ." Pub. L. No. 103-322, § 160001(g), 108 Stat. 1796, 2037 (1994) (codified at 18 U.S.C. §§ 2423(a)-(b) (1994)). Its passage marked the first time Congress addressed sex tourism as part of its larger effort against international sex trafficking.

Section 2423(b) originated from Senator Charles Grassley's amendment to the Violent Crime Act. In a floor statement, Senator Grassley explained that its purpose was to combat child prostitution in the multibillion dollar child pornography and international sex tourism industries. *See* 139 Cong. Rec. 30,391 (1993). He recognized the problem of "Americans . . . travel[ing] overseas to places where children are readily available for purchase and abuse." *Id.* This practice, he noted, allowed for "profit from the rape of children." *Id.* at 30,391-92. Representative Jim Ramstad, who proposed a similar amendment in the House, *see* The Child Sexual Abuse Prevention Act of 1994, H.R. 3993, 103rd Cong. (1994), explained in his floor statement that his amendment was intended to "strike a blow at 'pedophile sex tourism,' by making it a crime to travel overseas for the purpose of sexually abusing children." 140 Cong. Rec. 6,073 (1994).

    ii.  Enactment of § 2423(c)

Section 2423(b)'s reach was limited to individuals who traveled abroad intending to engage in illicit sex acts. But proving intent was difficult. *See* H.R. Rep. No. 107-525, at 2 (2002). In 2003, Congress enacted § 2423(c) to permit the prosecution of individuals who travel abroad and engage in illicit sex acts—regardless of whether they intended to do so at the time of travel.

15

Section 2423(c) was passed as part of the Prosecutorial Remedies and Tools Against the Exploitation of Children Today Act of 2003 ("PROTECT Act"), which targeted various aspects of the sex tourism industry. *See* Pub. L. No. 108-21, § 105, 117 Stat. 650, 654 (2003) (codified at 18 U.S.C. §§ 2423(b)-(g) (2006)). Section 2423(c) adopted language from a previous bill—the Sex Tourism Prohibition Improvement Act of 2002 ("STPIA")—which had failed to pass, but its history helps in understanding § 2423(c). *See Child Abduction Prevention Act and the Child Obscenity and Pornography Prevention Act of 2003: Hearing Before the Subcomm. on Crime, Terrorism, and Homeland Sec. of the H. Comm. on the Judiciary*, 108th Cong. 25 (2003) ("*Hearings*").[9] A House Judiciary Committee Report on STPIA noted that a large number of developing countries had "fallen prey to the serious problem of international sex tourism." H.R. Rep. No. 107-525, at 2. It acknowledged that § 2423(b)'s intent requirement limited the law's effectiveness. *Id.* at 3, 13. Eliminating the intent

---

[9] STPIA's version of the provision read:

> (c) Engaging in Illicit Sexual Conduct in Foreign Places. Any United States citizen or alien admitted for permanent residence who travels in foreign commerce, and engages in any illicit sexual conduct with another person shall be fined under this title or imprisoned not more than 15 years, or both.

H.R. 4477, § 2, 107th Cong. (2002).

16

requirement, it found, would "close significant loopholes in the law [regarding] persons who travel to foreign countries seeking sex with children." *Id.* at 3.[10]

STPIA's language was incorporated into the PROTECT Act and ultimately became law in § 2423(c). The sponsor of § 2423(c), Representative Jim Sensenbrenner, who authored § 2423(c) in both the PROTECT Act and STPIA, explained that sex tourism supported one of the "fastest growing areas of international criminal activity"—human trafficking. 149 Cong. Rec. 7,625 (2003). The PROTECT Act's purpose was to curb that industry by punishing "persons who travel to foreign countries to engage in illegal sexual relations with minors." *Id.* at 7,633. But unlike § 2423(b), it would do so by criminalizing this conduct, "regardless of what [the perpetrator's] intentions may have been when he left the United States." *Hearings* at 25 (statement of Daniel P. Collins, Associate Deputy Att'y Gen., U.S. Dep't of Justice). Congress thus passed § 2423(c) to fill the enforcement gap created by § 2423(b)'s intent requirement.

\* \* \* \*

In sum, Congress has worked to combat sex trafficking—particularly of minors—for over a century, developing a statutory scheme targeting sexual exploitation for both commercial and noncommercial purposes. Part of this effort included passage of § 2423(b), which made it a crime to travel abroad intending to have illicit sex. Because the intent requirement limited the statute's effectiveness, Congress passed § 2423(c) to

---

[10] Congressional discussion of STPIA also emphasized the size of the international sex trafficking market. Representative Lamar Smith commented that "[t]his world sex market is a multi-billion dollar industry that denies children their rights, their dignity, and their childhood." 148 Cong. Rec. 11,222 (2002).

17

allow for prosecution regardless of intent. Congress viewed this provision as a critical part of its broader efforts to combat the multibillion dollar international sex trafficking market.[11]

## 2. **The Commerce Clause**

The Commerce Clause delegates power to Congress "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. art. I, § 8, cl. 3. The following discussion summarizes the Supreme Court's case law on the Interstate Commerce Clause ("ICC") and Foreign Commerce Clause ("FCC"). Although there is "rich case law interpreting the [ICC], the Supreme Court has yet to examine the [FCC] in similar depth." *United States v. Bollinger*, 798 F.3d 201, 209 (4th Cir. 2015), *cert. denied*, 136 S. Ct. 2448 (2016); *see also United States v. Clark*, 435 F.3d 1100, 1102 (9th Cir. 2006) (noting the FCC's "scope has yet to be subjected to judicial scrutiny").

---

[11] Section 2423(c)'s more recent legislative history bolsters this understanding. In 2013, Congress passed the, Violence Against Women Reauthorization Act ("VAWRA"), Pub. L. No. 113-4, 127 Stat. 54 (2013). The Act added the "residing clause" to § 2423(c): individuals who "reside[], either temporarily or permanently in a foreign country" and engage in illicit sexual conduct may also be prosecuted. *Id.* § 1211, 127 Stat. at 142 (codified at 18 U.S.C. § 2423(c)). Senator Patrick Leahy introduced the "residing clause" to VAWRA through his amendment. *See* S. Amend. 21, 113th Cong. (2013) (amending S. 47, 113th Cong. (2013) (enacted)); 159 Cong. Rec. 1137 (2013) (statement of Sen. Leahy). He emphasized the amendment targeted the global sex trafficking market: "We know that young women and girls often just 11, 12, or 13 years old are being bought and sold," and that "millions around the world are counting on us." *Id.* at 1138.

a. *ICC case law*

The Supreme Court has recognized that the ICC empowers Congress to regulate (1) the channels of interstate commerce, (2) the instrumentalities of interstate commerce, and (3) activities that substantially affect interstate commerce. *United States v. Lopez*, 514 U.S. 549, 558-59 (1995); *Perez v. United States*, 402 U.S. 146, 150 (1971).

In *Lopez*, the Court considered whether Congress exceeded its authority under the ICC when it prohibited guns near schools in the Gun-Free School Zones Act. *See Lopez*, 514 U.S. at 551. The Court explained that Congress's power to regulate commerce among the states is broad, but federalism concerns limit it. Congressional power "may not be extended so as to . . . obliterate the distinction between what is national and what is local." *Id.* at 557 (quotations omitted). "[The ICC's scope] must be considered in the light of our dual system of government." *Id.* (quotations omitted). The Court laid out the three categories of regulation, demarcating the ICC's outer limits. *See id.* at 557-59.

i. Channels

Congress may regulate the channels of interstate commerce. *United States v. Patton*, 451 F.3d 615, 620 (10th Cir. 2006). It may prohibit the transportation of goods and people in interstate channels, effectively halting their interstate movements. *See, e.g.*, *Caminetti v. United States*, 242 U.S. 470 (1917) (upholding statute prohibiting the interstate transportation of women for "immoral" purposes); *Champion v. Ames*, 188 U.S. 321 (1903) (upholding statute prohibiting the transportation of lottery tickets across interstate lines). Congress need not be motivated by commercial concerns; it may also stop the movement of goods and people to prevent immoral or injurious activities. *See,*

19

*e.g.*, *United States v. Darby*, 312 U.S. 100 (1941) (upholding a ban on the "injurious" transportation of goods produced in substandard labor conditions).

## ii. Instrumentalities

Congress may regulate the instrumentalities of interstate commerce, or the "means of interstate commerce, such as ships and railroads." *Patton*, 451 F.3d at 621 (citing *Lopez*, 514 U.S. at 558; *Perez*, 402 U.S. at 150). Regulation "may extend to intrastate activities that threaten these instrumentalities," such as criminalizing the destruction of a grounded aircraft. *Id.* at 622.

Congress also may regulate "the persons or things that the instrumentalities are moving," such as criminalizing the theft of goods from an interstate carrier, like a train. *Id.* But "not all people and things that have ever moved across state lines" qualify as permissible targets of regulation. *Id.* The regulation of goods and people extends only to the duration of their transport. *See id.* Thus, under this category, Congress may regulate goods or people while they are on a ship or plane, but not necessarily once they are unloaded or disembark.

## iii. Substantial effect

Finally, Congress may regulate activity—including intrastate activity—that "substantially affects" interstate commerce. *Lopez*, 514 U.S. at 559. The Court has upheld, for example, federal regulation of intrastate coal mining, *see Hodel v. Va. Surface Min. & Reclamation Ass'n*, 452 U.S. 264 (1981); intrastate public accommodation practices, *see Katzenbach v. McClung*, 379 U.S. 294 (1964); and homegrown wheat production, *see Wickard v. Filburn*, 317 U.S. 111 (1942). In each instance, the Court

20

determined the laws under review regulated activity that had a substantial effect on interstate commerce. In making such a determination, courts need decide only whether Congress had a "rational basis" that such activities substantially affect interstate commerce. *Gonzales v. Raich*, 545 U.S. 1, 22 (2005) (quotations omitted).

In deciding whether federal legislation is constitutional under the ICC, courts consider congressional findings or the legislative record regarding the effect of a regulated activity. *See id.* at 21. Legislative findings, however, are neither necessary nor determinative in a court's rational-basis decision. *See United States v. Morrison*, 529 U.S. 598, 612 (2000) (congressional findings are helpful, but not required nor sufficient for upholding a statute); *Raich*, 545 U.S. at 21 (particularized findings not necessary).

In assessing a regulated activity's effect on interstate commerce, courts need not examine the activity in isolation, but may aggregate it. For example, courts may consider the effect of not just one farmer's wheat production on the national grain market, but may consider the cumulative effect of all farmers' production. *See Wickard*, 317 U.S. at 127-28. But courts should do so when the activity is economic as opposed to noneconomic. *See Morrison*, 529 U.S. at 613 (holding that the effect of domestic violence, a noneconomic activity, could not be considered in the aggregate).[12] The economic-noneconomic distinction arises from federalism concerns and serves to preserve "what is truly national and what is truly local." *Lopez*, 514 U.S. at 567-68.

---

[12] Although the Court has discouraged the aggregation of noneconomic activity, it has not prohibited it. In *Morrison*, the Court did not "adopt a categorical rule against aggregating the effects of any noneconomic activity." 529 U.S. at 613.

21

Courts would otherwise "pile inference upon inference" to determine a regulated activity substantially affects commerce. *Id*. at 567.

Finally, courts also consider whether the statute contains an express jurisdictional element relating to interstate commerce. *Id*. at 561. Congress may explicitly "require an additional nexus to interstate commerce" in its statute. *Id.* at 562. For example, a statute that criminalizes the possession of a firearm that has traveled in interstate commerce contains an express jurisdictional element because violation of the statute hinges on the firearm's connection to interstate commerce. *Id.* (using what was formerly 18 U.S.C. § 1202(a) as an example).

b. *FCC case law*

Under the FCC, Congress may regulate commerce "with foreign Nations." U.S. Const. art. I, § 8, cl. 3. There is "precious little case law" on the FCC. *United States v. Pendleton*, 658 F.3d 299, 307 (3d Cir. 2011); *see Clark*, 435 F.3d at 1102 (noting "[c]ases involving the reach of the [FCC] . . . are few and far between"). Two Supreme Court cases, however, provide some guidance.

First, in *Board of Trustees of University of Illinois v. United States*, 289 U.S. 48 (1933), the Court upheld a federal tariff under the FCC. The University of Illinois argued that the tariff interfered with its importation of goods and was thus unconstitutional. *Id.* at 56. The Court disagreed, holding that Congress had acted within its "constitutional authority to regulate Commerce with foreign nations," *id.* (quotations omitted), which includes imposing duties on imports, "pass[ing] embargo and non-intercourse laws," and making "all other regulations necessary to navigation, to the safety of passengers, and the

22

protection of property," *id.* at 58 (quotations omitted).  This power "comprehend[s] every species of commercial intercourse between the United States and foreign nations," *id.* at 56 (quoting *Gibbons v. Ogden*, 22 U.S. 1, 193 (1824)), and is "exclusive and plenary," *id.*

The Court further explained that the federalism constraints limiting Congress's ICC power do not apply in the FCC context.  "The principle of duality in our system of government does not touch the authority of Congress in the regulation of foreign commerce."  *Id.* at 57.  The university had argued that the Constitution prohibited the taxation of state entities, in particular that federal taxation "is subject to the constitutional limitation that the Congress may not tax so as to impose a direct burden upon an instrumentality of a state used in the performance of a governmental function."  *Id.* at 57-58.  The tariff, however, was not a tax passed under the Congress's taxing power, but was instead a regulation passed under its FCC power.  Because "the immunity of state instrumentalities . . . [was] implied from the necessity of maintaining our dual system," this constitutional limitation did not extend to statutes regulating foreign commerce.  *Id.* at 59.  Rather, as in international relations, the "United States act[s] through a single government with unified and adequate power" in the foreign commerce arena.  *Id.*

Second, in *Japan Line, Ltd. v. County of Los Angeles*, 441 U.S. 434 (1979), the Court struck down California's property tax on shipping containers as a violation of the dormant FCC.[13]  Japan Line, a Japanese shipping company, owed more than $550,000 in

---

[13] As with the ICC, the Court has recognized that, in addition to delegating express power to regulate foreign commerce, the FCC implicitly restricts the states from regulating foreign commerce.  *See Japan Line*, 441 U.S. at 449 (discussing the "negative implications" of Congress's power under the FCC).

23

taxes on its shipping containers under California law.  *Id.* at 437.  The company challenged the state tax's constitutionality.  *Id.* at 440-41.  It argued that because the containers traveled only in foreign commerce, they were foreign instrumentalities—as opposed to interstate instrumentalities—and the dormant FCC protected foreign commerce from state interference such as the California tax.  *See id.* at 437-38.  The Court agreed with Japan Line and concluded the state tax "may impair federal uniformity in an area where federal uniformity is essential."  *Id.* at 448.  Normally, if a state tax is "applied to an activity with a substantial nexus with the taxing State, is fairly apportioned, [and] does not discriminate against interstate commerce, . . . no impermissible burden on interstate commerce will be found."  *Id.* at 444-45 (quotations omitted).  State taxes on foreign entities are different, however, because there is a "need for uniformity in treating with other nations."  *Id.* at 448.  States imposing their own taxes might create "asymmetry in the international tax structure," and foreign governments may retaliate in their trade policies with the United States.  *Id.* at 450.  Compared with the ICC, "the Founders intended the scope of the foreign commerce power to be the greater," *id.* at 448, and thus states are more likely to offend the FCC—rather than the ICC—with their taxation policy, *see id.* at 448-49.  California's tax was therefore unconstitutional under the dormant FCC.  *Id.* at 453-54.

3.  **Congressional Authority Broader Under the FCC than the ICC**

"[The] scope [of the FCC] has yet to be subjected to judicial scrutiny."  *Clark*, 435 F.3d at 1102.  This section compares the boundaries of congressional authority under the

24

FCC and the ICC. It describes how the FCC, unconstrained by federalism considerations, provides Congress broader authority to regulate commerce than the ICC.

Congressional authority under the FCC is broad because Congress must speak with "one voice" in the foreign commerce context. *Japan Line*, 441 U.S. at 449 (quotations omitted). Moreover, as the dissent appears to agree, federalism limits congressional authority under the ICC, but not the FCC. *See* Dissent Op. at 27. And, as the Supreme Court has stated, "[a]lthough the Constitution, Art. I, § 8, cl. 3, grants Congress power to regulate commerce 'with foreign Nations' and 'among the several States' in parallel phrases, there is evidence that the Founders intended the scope of the foreign commerce power to be the greater." *Japan Line*, 441 U.S. at 448; *see also Atl. Cleaners & Dyers v. United States*, 286 U.S. 427, 434 (1932) ("[Congressional] power when exercised in respect of foreign commerce may be broader than when exercised as to interstate commerce.").

Because the FCC concerns commerce "with foreign Nations"—as opposed to commerce "among the several States"— the federalism considerations that constrain Congress's authority under the ICC do not apply to the FCC, which therefore confers broader authority on Congress. *Bd. of Trustees*, 289 U.S. at 57 ("The principle of duality in our system of government does not touch the authority of Congress in the regulation of foreign commerce."). History, text, and purpose support this conclusion.

a. *History*

For the Founders, expansive congressional control over foreign commerce was imperative. They wanted the federal government to have enough authority to promote

25

foreign commerce, which comprised most of the early American economy. *See* Scott Sullivan, *The Future of the Foreign Commerce Clause*, 83 Fordham L. Rev. 1955, 1962-65 (2015). An 1877 report from the Treasury Department noted that at the time of the founding, "our foreign commerce . . . attracted public attention much more than did the comparatively small internal commerce." Joseph Nimmo, Jr., Department of Treasury, *Report on the Internal Commerce of the United States* 8 (1877). Under the Articles of Confederation, state interference had disrupted foreign commerce, and federal power to tax and to regulate commerce was completely absent. *See* Sullivan at 1962-64. States circumvented federal trade agreements with foreign nations by negotiating their own. *Id.*

Because foreign commerce was so vital to the American economy, the Founders sought to bolster federal power over international trade and ensure that the federal government could "speak with one voice when regulating commercial relations with foreign governments." *Japan Line*, 441 U.S. at 449 (quotations omitted). The FCC was designed as the "great and essential power" that the ICC merely "supplement[s]." The Federalist No. 42, at 283 (James Madison) (J. Cooke ed. 1961); *see also United States v. Baston*, 818 F.3d 651, 668 (11th Cir. 2016), *cert. denied*, 137 S. Ct. 850 (2017).

b. *Text*

The FCC's text reflects the Founders' objective to provide broader authority than under the ICC. Again, the Commerce Clause delegates power to Congress "[t]o regulate Commerce *with* foreign Nations, and *among* the several States, and *with* the Indian Tribes." U.S. Const. art. I, § 8, cl. 3 (emphases added). The difference between "with"

26

and "among" affects the scope of the FCC and the ICC. *See* Sullivan at 1966-67 (describing how the difference allows states to retain some lawmaking authority under the ICC, but Congress retains full authority under the FCC and Indian Commerce Clause).

In *Gibbons v. Ogden*, the Supreme Court discussed the word "among" when it acknowledged that Congress may regulate intrastate activity under the ICC. 22 U.S. 1, 194 (1824). It said "[t]he word 'among' means intermingled with," and "[c]ommerce among the States[] cannot stop at the external boundary line of each State, but may be introduced into the interior." *Id*. But the Court also recognized limits to ICC authority. "Comprehensive as the word 'among' is, it may very properly be restricted to that commerce which concerns more States than one." *Id*. The word "among" restricts Congress from regulating "those [internal concerns] which are completely within a particular State." *Id*. at 195; *see also Lopez*, 514 U.S. at 553 ("The *Gibbons* Court . . . acknowledged that limitations on the commerce power are inherent in the very language of the Commerce Clause.").

After its discussion of commerce "among the several States," the *Gibbons* Court contrasted commerce "with foreign nations." *Gibbons*, 22 U.S. at 195. "[I]n regulating commerce with foreign nations, the power of Congress does not stop at the jurisdictional lines of several States." *Id*. Though the Court did not elaborate on the word "with," it pointed to the textual difference in the two clauses. "Among" in the ICC restrains Congress in regulating intrastate matters—a restraint not present in the FCC.

27

Both the FCC and the Indian Commerce Clause contain the preposition "with," and the Court has drawn comparisons between the two. The Indian Commerce Clause provides broad "plenary power" to Congress in regulating commerce with Indian tribes. *United States v. Lara*, 541 U.S. 193, 200 (2004) (quotations omitted). The Court has recognized a similar breadth of authority under the FCC. "The power to regulate foreign commerce is certainly as efficacious as that to regulate commerce with the Indian tribes." *Buttfield v. Stranahan*, 192 U.S. 470, 493 (1904); *see also United States v. Forty-Three Gallons of Whiskey*, 93 U.S. 188, 194 (1876) ("Congress now has the exclusive and absolute power to regulate commerce with the Indian tribes[]—a power as broad and as free from restrictions as that to regulate commerce with foreign nations.").[14]

c. *Purpose*

Both the FCC and the ICC empower Congress to address national interests, but federalism concerns do not constrain the FCC as they do the ICC. The ICC's purpose is

---

[14] The dissent counters that the "difference in prepositions indicates the opposite." Dissent Op. at 20. It posits that "[i]f the [FCC] permitted regulation of commerce '*among* foreign nations' . . . then Congress would be empowered to regulate commerce among France, England, and Italy," suggesting that "among" is broader than "with." *Id*. But the relevant comparison is not between the FCC's use of "with" and a hypothetical FCC's use of "among." Rather, it is between the FCC's use of "with" and the ICC's use of "among." Looking at these words in context supports our interpretation. In *Gibbons*, after discussing how "among" prevented Congress from regulating "those [internal concerns] which are completely within a particular State," the Court stated that the phrase "with foreign nations" means "the power of Congress does not stop at the jurisdictional lines of the several States." *Gibbons*, 22 U.S. at 195. Because "with foreign nations" allows for federal regulation of activity within states without limitation, the Court in *Gibbons* suggests the phrase confers broader authority. Moreover, the use of "with" in the Indian Commerce Clause suggests broader authority, granting "plenary power" in regulating commerce with Indian tribes. *See Lara*, 541 U.S. at 200 (quotations omitted).

to enable Congress to regulate interstate commerce in a federal system.  It empowers

Congress to regulate on behalf of national economic concerns as long as the regulation

does not interfere with "truly local" affairs.  *Lopez*, 514 U.S. at 568.  The ICC permits

Congress to ensure that "[i]nterstate trade [i]s not left to be destroyed or impeded by the

rivalries of local government," *The Shreveport Rate Case*, 234 U.S. 342, 350 (1914), but

federalism concerns cabin Congress's power to regulate.  "[T]he scope of the interstate

commerce power must be considered in the light of our dual system of government and

may not be extended so as to embrace effects upon interstate commerce so indirect and

remote that to embrace them . . . would effectually obliterate the distinction between what

is national and what is local . . . ."  *Lopez*, 514 U.S. at 557 (quotations omitted).

The FCC's purpose is to enable Congress—and thus the nation—to speak with one

voice on international matters.  "In international relations and with respect to foreign

intercourse and trade the people of the United States act through a single government

with unified and adequate national power."  *Bd. of Trustees*, 289 U.S. at 59.  Unlike with

the ICC, federalism concerns do not limit FCC authority.  *See Japan Line*, 441 U.S. at

448 n.13 (stating that "Congress'[s] power to regulate foreign commerce" is not limited

by "considerations of federalism and state sovereignty").

d. *The dissent's view*

The dissent questions whether congressional authority is broader under the FCC

than the ICC.  *See* Dissent Op. at 27.  It concedes that the FCC is broader than the ICC in

certain situations.  *See id.* at 21.  But it disagrees we have such a situation here.  First, it

argues that the FCC's scope is broader only when applied to restricting state regulation in

29

the dormant FCC context.  Second, it argues that the sovereignty of other nations

constrains FCC authority.[15]

### i. *Japan Line* and the scope of FCC power

The dissent attempts to limit *Japan Line*'s statement that the "scope of the foreign

commerce power [is] greater" than the interstate power.  *Japan Line*, 441 U.S. at 448.  It

appears to argue that any suggestion in *Japan Line* that the FCC delegates broader

authority to Congress than the ICC is limited to the context of that case—a dormant

commerce doctrine challenge to state regulation.  *See* Dissent Op. 16-18.  Distinguishing

between the FCC's grant of "congressional power to regulate" and the dormant FCC's

"restriction on the States" to legislate, *id*. at 17, the dissent argues that the Court in *Japan*

*Line* examined the latter, not the former.  But the scope of FCC authority is the same

regardless of whether a case involves a challenge to a state's power to regulate commerce

---

[15] The dissent starts with a line in *Gibbons*:  "[Commerce] carr[ies] the same meaning throughout the [Commerce Clause] . . . unless there be some plain intelligible cause which alters it."  Dissent Op. at 5 (quoting *Gibbons*, 22 U.S. at 194).  The dissent also "infer[s] that the same proposition applies to the word *regulate* in the Clause."  *Id*.

It assumes the Indian Commerce, Foreign Commerce, and Interstate Commerce Clauses convey the same power absent a "plain, intelligible cause."  But even though "commerce" and "regulate" may "carry the same meaning" throughout the Commerce Clause, each modifier—Indian, Foreign, and Interstate—and its accompanying preposition—"among" and "with"—describe a different context.  *See* *Atlantic Cleaners & Dyers*, 286 U.S. at 434 (Although "the power to regulate commerce is conferred by the same words of the commerce clause with respect both to foreign commerce and interstate commerce . . . the power when exercised in respect of foreign commerce may be broader than when exercised as to interstate commerce.").  As the dissent acknowledges, for example, the Indian Commerce Clause grants Congress a broader power than the ICC, despite the meaning of commerce and regulate remaining the same in both provisions.  *See* Dissent Op. at 5-6 (quoting *Lara*, 541 U.S. at 200).

or to the federal government's power to legislate. Supreme Court precedent makes this clear.

By way of background, the Constitution does not contain a dormant Commerce Clause. The doctrine derives from the Commerce Clause itself, which provides that "Congress shall have [the] power . . . [t]o regulate commerce . . . among the several States." U.S. Const. art. I, § 8, cl. 3. As to matters within the scope of the Commerce Clause power, Congress may choose to regulate, thereby preempting the states from doing so, *see Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 96-98 (1992); *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947), or to authorize the states to regulate, *see In re Rahrer*, 140 U.S. 545, 555-56 (1891); *Prudential Ins. Co. v. Benjamin*, 328 U.S. 408, 429-31 (1946).

If Congress is silent—neither preempting nor consenting to state regulation—and a state attempts to regulate in the face of that silence, the Supreme Court, going back to *Gibbons*, 22 U.S. at 236-37 (1824) (Johnson, J., concurring), and *Cooley v. Bd. of Port Wardens*, 53 U.S. 299, 318-19 (1851), has interpreted the Commerce Clause to limit state regulation of interstate commerce by applying the negative implications of the Commerce Clause—"these great silences of the Constitution," *H.P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525, 535 (1949); *see White v. Mass. Council of Constr. Emp'rs, Inc.*, 460 U.S. 204, 213 (1983). Accordingly, the Commerce Clause is both an express grant of power to Congress and an implicit limit on the power of state and local government. *See Comptroller of the Treasury of Md. v. Wynne*, 135 S. Ct. 1787, 1794 (2015); *Kleinsmith v. Shurtleff*, 571 F.3d 1033, 1039 (10th Cir. 2009). The dormant Commerce Clause

31

doctrine extends to state regulation that may conflict with Congress's foreign commerce regulatory authority. *See, e.g.*, *Japan Line*, 441 U.S. 434.

When the Supreme Court has considered dormant commerce doctrine challenges to state regulation, it has recognized that the scope of Congress's affirmative powers under the Commerce Clause and the scope of commerce subject to the dormant Commerce Clause are coextensive. *See, e.g.*, *Lewis v. BT Inv. Managers, Inc.*, 447 U.S. 27, 39 (1980); *Philadelphia v. New Jersey*, 437 U.S. 617, 622-23 (1978). It follows, contrary to the dissent, that if the Supreme Court, in a dormant Commerce Clause case, recognizes, as it did in *Japan Line*, that the FCC confers broader authority on Congress than the ICC, then Congress's authority is broader under the FCC in general.

The dissent is correct that the Court in *Japan Line* "did not say that the term *commerce* has a broader meaning in the foreign-commerce context," Dissent Op. at 16, but it did say "the Founders intended the scope of the foreign commerce power to be greater," *Japan Line*, 441 U.S. at 448. The Court's statement thus sheds light on the FCC's outer limits for both its grant of congressional authority and its restriction on states.

### ii. Sovereignty of other nations

Although the dissent concedes that state sovereignty does not limit the FCC, it "reject[s] the notion that . . . the power under the [FCC] to regulate conduct in foreign nations is unconstrained," Dissent Op. at 27, and suggests that the sovereignty of other nations limits the FCC. The dissent presents no relevant authority—text, history, or

32

precedent—that the sovereignty of foreign nations limits Congress's authority under the FCC.

An enumerated power both confers and constrains legislative authority. *See* Richard Primus, *The Limits of Enumeration*, 124 Yale L.J. 576, 578 (2014). Internal limits "are the boundaries of Congress's powers taken on their own terms," *id.*, that is, based on the language of the text itself. For example, an internal limit on Congress's power under the Commerce Clause is the meaning of the word "commerce." By contrast, external limits "are affirmative prohibitions that prevent Congress from doing things that would otherwise be permissible exercises of its powers." *Id*. Federalism and the Bill of Rights, for example, externally limit legislative authority under the Constitution's enumerated powers. *See, e.g.*, *Lopez,* 514 U.S. at 557 ("[T]he scope of the interstate commerce power must be considered in the light of our dual system of government." (quotations omitted)); *New York v. United States*, 505 U.S. 144, 156 (1992) ("[U]nder the Commerce Clause Congress may regulate publishers engaged in interstate commerce, but Congress is constrained in the exercise of that power by the First Amendment.").

First, the FCC is an enumerated power and therefore defines and limits that power by its own terms. The FCC's internal limits derive from the words "commerce," "regulate," and "with foreign nations."[16] The Framers did not think, nor do we, that the FCC conferred "plenary power to police the behavior of Americans in foreign countries." Dissent Op. at 23. The power to regulate foreign commerce, like all of

---

[16] These limits are reflected in the doctrinal framework we draw from the third *Lopez* category and adapt for the foreign commerce context. *See infra* Part II.A.4.

Congress's enumerated powers, "[is] defined, and limited." *Marbury v. Madison*, 5 U.S. 137, 176 (1803). But because federalism concerns do not apply in the foreign commerce context, congressional authority is broader under the FCC than the ICC.

Second, the dissent's suggestion that the sovereignty of foreign nations is an "external limit" on the FCC finds no traction. No provision in the Constitution restricts the FCC in this manner. Unlike federalism, an integral part of our constitutional structure, and unlike the Bill of Rights, an express set of limits on government power, foreign nation sovereignty appears nowhere in the constitutional scheme—either in the Constitution itself or the cases interpreting it.[17]

---

[17] To support its foreign state sovereignty theory, the dissent quotes *The Schooner Exchange v. McFaddon*, 11 U.S. 116 (1812), and Alexander Hamilton's *The Defence*, Dissent Op. at 23-24 (quoting *Schooner Exch.,* 11 U.S. at 136 and Alexander Hamilton, *The Defence* No. XXXVI (Jan. 2, 1796), in 20 The Papers of Alexander Hamilton (Harold C. Syrett ed. 1974)), but their relevance to congressional authority under the FCC is unclear.

First, *The Schooner Exchange* established that foreign sovereigns and their instruments may not be hailed into American courts, which hardly speaks to congressional authority to regulate foreign commerce under the FCC. *See Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 486 (1983) (describing foreign sovereign immunity as a matter of comity and grace and not a constitutional restriction). Second, the dissent's Hamilton quote comes from his thirty-sixth essay in 1796 advocating for adoption of the proposed Jay Treaty with Great Britain and explaining why the treaty was constitutional. The essay mentions the FCC in its discussion distinguishing treaties and laws. But it sheds little light on our issue here, other than perhaps Hamilton's comment that the power to make laws for the nation under the FCC reaches its citizens abroad. *See The Defence* No. XXXVI (Jan. 2, 1796), in 20 The Papers of Alexander Hamilton (Harold C. Syrett ed. 1974) (the power to make laws "*acts . . . upon its own citizens . . . without its territory* in certain cases and under certain limitations. But it can have no obligatory action whatsoever upon a foreign nation or any person or thing within the jurisdiction of such foreign Nation." (emphasis added)). Mr. Durham was charged when he returned to the jurisdiction of the United States.

International rules of sovereignty and jurisdiction do not affect the scope of Congress's authority under the Constitution. They concern issues of international law, custom, and politics, not constitutional ones. *See, e.g.*, *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 486 (1983) ("*The Schooner Exchange* made clear . . . foreign sovereign immunity is a matter of grace and comity on the part of the United States, and not a restriction imposed by the Constitution."). Whether a statute conflicts with a foreign law or policy may implicate international law and politics, not whether Congress may pass such a statute under the FCC.

Moreover, the Court has long recognized Congress's authority to pass extraterritorial laws that apply to conduct in foreign countries. The dissent suggests any law with application in a foreign country "would imply a diminution of [the foreign country's] sovereignty . . . ." Dissent Op. at 23 (quoting *The Schooner Exch.*, 11 U.S. at 136). But the Supreme Court has recognized "Congress has the authority to enforce its laws beyond the territorial boundaries of the United States." *E.E.O.C. v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991). Indeed, the application of a federal statute "so far as citizens of the United States in foreign countries are concerned, is one of construction, not of legislative power." *Blackmer v. United States*, 284 U.S. 421, 437 (1932).

Finally, the statute at issue in this case, § 2423(c), does not impinge on the sovereignty of other nations. It does not prevent another country from enforcing its child sex abuse laws against an American traveling there. For example, in *Pendleton*, 658 F.3d at 301, Thomas Pendleton was first arrested, convicted, and sentenced in Germany— where he had molested a 15-year-old boy—under German law. After he had served his

19 months in a German prison, the United States then charged him under § 2423(c) for his illicit conduct. *Id.*

### iii. Summary

The dissent attempts to argue that congressional authority under the FCC is not broader than under the ICC by (1) restricting *Japan Line*'s statement about the breadth of FCC authority to the dormant FCC context and (2) suggesting foreign state sovereignty as an external limit on FCC authority. We disagree. As we have shown, the *Japan Line* statement is relevant, binding, and speaks to the reach of the FCC generally. *See Gaylor v. United States*, 74 F.3d 214, 217 (10th Cir. 1996) ("While these statements are dicta, this court considers itself bound by Supreme Court dicta almost as firmly as by the Court's outright holdings."). And the dissent's foreign state sovereignty theory lacks merit or support.

* * * *

Congressional authority under the FCC is broader than under the ICC. The Founders wanted to boost foreign trade—the early nation's economic engine—through a broad delegation of authority to Congress under the FCC. They did so in the Commerce Clause, distinguishing the ICC and FCC by using the terms "among" and "with," respectively. Though Congress may advance national interests under both clauses, federalism interests limit congressional authority under the ICC and not the FCC.

## 4. **The *Lopez* Categories in the Foreign Commerce Context**

The three *Lopez* categories provide a useful starting point in analyzing challenges under the FCC. The following explains why the third category applies to this case, traces

its evolution in the interstate commerce context, and explains how it should be analyzed in the foreign commerce context. Because the federalism concerns limiting the third *Lopez* category do not apply to the foreign commerce context, the substantial-effect analysis is different under the FCC than the ICC. *See Bollinger*, 798 F.3d at 215 (Without alteration, "the third *Lopez* category . . . [would be] unduly demanding in the foreign context.").

a. *The ICC's three categories as a starting point*

The dissent agrees that we "can adopt the Interstate Commerce Clause doctrine['s] . . . three types of regulation" to consider constitutional challenges under the FCC. Dissent Op. at 27; *see also Pendleton,* 658 F.3d at 308 (finding "*Lopez*'s 'time-tested' framework" suitable for the foreign commerce context). The few Supreme Court decisions about the FCC also describe similar categories—channels, instrumentalities, and activities affecting commerce with foreign nations. *See Bd. of Trustees*, 289 U.S. at 57 (upholding a tariff under the FCC based on Congress's authority to regulate the movement of goods in foreign commerce); *Japan Line*, 441 U.S. at 454-55 (invalidating a state's tax on the "instrumentalities of foreign commerce" under the dormant FCC); *Bd. of Trustees*, 289 U.S. at 58 (recognizing Congress's authority to legislate under the FCC and "consider the conditions of foreign trade in all its aspects and *effects*") (emphasis added)).

Although the three *Lopez* categories "provide a useful starting point in defining Congress's powers under the [FCC]," *Bollinger*, 798 F.3d at 215, they are not an end point. In light of the FCC's broader grant of authority, we consider the third *Lopez*

37

category, how it has evolved, and whether its analysis needs to be adapted for application in the foreign commerce context. *See id.*; *see also United States v. Bredimus*, 352 F.3d 200, 204-08 (5th Cir. 2003) (recognizing the FCC's broader grant of authority while also applying the ICC framework); *United States v. Cummings*, 281 F.3d 1046, 1049 n.1 (9th Cir. 2002) (same).

b. *The substantial-effect category is applicable here*

To determine which *Lopez* categories apply to this case, we must consider the nature of the regulation under § 2423(c). In passing this statute, Congress criminalized the combination of "travel in foreign commerce" and "engag[ing] in any illicit sexual conduct." *See* 18 U.S.C. § 2423(c). The third *Lopez* category concerns a wide range of statutes that purport to regulate "activities" substantially affecting interstate commerce. *See Morrison*, 529 U.S. at 609; *Lopez*, 514 U.S. at 558-59. Because § 2423(c) regulates the activity of illicit sexual conduct, we analyze its constitutionality under the third category. *See Morrison*, 529 U.S. at 609.[18]

c. *Evolution of the third* Lopez *category*

This section traces the evolution of the third *Lopez* category as the foundation to explain how it applies in the foreign commerce context. The Court has developed the third category's jurisprudence in three important cases—*Wickard*, 317 U.S 111, *Lopez*,

---

[18] Because we determine that § 2423(c) is constitutional under the third category, we need not analyze it under the first and second. We note that § 2423(c) does not regulate the instrumentalities of foreign commerce and that the Third Circuit has upheld the constitutionality of § 2423(c) as a valid regulation of the channels of foreign commerce. *See Pendleton,* 658 F.3d at 311.

514 U.S. 549, and *Morrison*, 529 U.S. 598—and has applied it in *Raich*, 545 U.S. 1, in a manner particularly relevant to this case. Federalism considerations have played a pivotal role.

In *Wickard*, the Court upheld the Agricultural Adjustment Act's quota for wheat production, which had been enacted to maintain wheat prices, by applying an aggregate-effects analysis to "those activities intrastate which so affect interstate commerce." 317 U.S at 114, 128 (quoting *United States v. Wrightwood Dairy Co.*, 315 U.S. 110, 119 (1942)). Under the Act, Roscoe Filburn had exceeded his allotment, which he had harvested for personal consumption, and was fined. *Id.* at 114-15. Even though his wheat production had only a de minimis effect on interstate commerce, the Court found the cumulative effect of all farmers' home-grown wheat production substantially affected the interstate wheat market and upheld the Act. *Id.* at 127-28. Through its use of this aggregation analysis, *Wickard* "ushered in an era of Commerce Clause jurisprudence that greatly expanded the previously defined authority of Congress under the Clause." *Lopez*, 514 U.S. at 556.

Between 1937 and 1995, the Court did not invalidate one federal law under the ICC. *See* Erwin Chemerinsky, *Constitutional Law* § 3.4.4 (5th ed. 2015). But in *Lopez*, 514 U.S. 549, it struck down the Gun-Free School Zones Act of 1990, which made it a crime to have a gun within 1,000 feet of a school, as exceeding congressional authority under the ICC. *Id.* at 551, 567-68. The Court determined the gun legislation attempted to regulate in the third category and concluded that gun possession near schools did not substantially affect interstate commerce. *Id.* at 559, 561. It noted that the statute had

39

"nothing to do with commerce" and was "not an essential part of a larger regulation of economic activity," which distinguished this case from *Wickard*. *Id.* at 561 (quotations omitted). Further, the Court pointed out that neither the statute nor its legislative history contained express legislative findings that the regulated activity substantially affected interstate commerce. *Id.* at 562-63. Accordingly, "[t]he possession of a gun in a local school zone is in no sense an economic activity that might, through repetition elsewhere, substantially affect any sort of interstate commerce." *Id.* at 567.

In *Lopez,* federalism shaped the outer limit of the substantial-effect ICC analysis. The Court declined to aggregate the noneconomic activity of gun possession near schools. *Id.* at 561. It rejected the government's arguments that gun possession near schools would adversely affect students' learning environments, which, in turn, would have a negative effect on the national economy. *Id.* at 564. The connection was too tenuous for the Court. To have upheld the statute by "pil[ing] inference upon inference" would mean "there [would] never [] be a distinction between what is truly national and what is truly local." *Id.* at 567-68. If the Court were to follow such logic, the ICC would grant Congress a general police power over such areas as education, a traditional concern of the states. *Id.* at 565-66.

Five years later, the Court in *Morrison* struck down the Violence Against Women Act of 1994, which authorized victims of gender-motivated crimes to sue for damages. 529 U.S. at 601-02. Although Congress had made detailed findings that gender-based violence substantially affected interstate commerce, including deterrence of interstate travel, the Court declined to draw the connection. *Id.* at 614-15. It declined to do so

40

because it regarded gender-based violence as noneconomic activity. *Id* at 617. The Court discouraged "aggregating the effects of any noneconomic activity." *Id.* at 613 (noting that "our cases have upheld Commerce Clause regulation of intrastate activity only where that activity is economic in nature"). As in *Lopez,* the Court refused to accept the "but-for causal chain from the initial occurrence of violent crime . . . to every attenuated effect upon interstate commerce." *Id.* at 615.

The Court said the federalism "concern that [it] expressed in *Lopez* that Congress might use the Commerce Clause to completely obliterate the Constitution's distinction between national and local authority seems well founded." *Id.* at 615. Were the Court to accept aggregated noneconomic activity, Congress could potentially regulate purely intrastate matters, such as violent crime and family affairs. *Id.* at 615-17.

Finally, in *Raich*, the Court upheld the application of the Controlled Substances Act ("CSA") to the home cultivation and possession of marijuana. 545 U.S. at 21-22. Even though the CSA contained no particularized congressional findings, the Court determined from the legislative history and the statutory scheme that Congress could reasonably conclude noncommercial marijuana production and possession substantially affects the interstate market for illicit drugs and that the prohibition is an essential part of a broader economic regulation. *Id.* at 22, 27. As discussed further below, this case supports upholding § 2423(c).

* * * *

In sum, the Court has limited congressional authority under the third *Lopez* category due to federalism concerns. In *Lopez* and *Morrison*, it refused to aggregate

noneconomic activities to determine whether the regulated activity had a substantial effect on interstate commerce. It feared that such reasoning would obliterate the distinction between local and national interests in our system of dual federalism and allow congressional regulation of purely intrastate matters.

    d. *Adapting the third* Lopez *category to the FCC*

For legislation under the FCC that regulates activity, the federalism constraints developed for ICC challenges do not apply. The *Lopez* category-three analysis must therefore be modified for the foreign commerce context.

Congressional authority under the third *Lopez* category extends further in the FCC context. Because the federalism considerations underlying the ICC do not arise in the regulation of foreign commerce, the economic and noneconomic distinction, which otherwise discourages the aggregation of noneconomic activity, is unnecessary.

In *Lopez, Morrison*, and *Raich*, the Supreme Court recognized limits on Congress's power under the ICC based on federalism concerns. To preserve "the distinction between what is national and what is local," *Lopez*, 514 U.S. at 557, the Court distinguished between commercial and noncommercial activity and between economic and noneconomic activity. It discouraged aggregating noneconomic activities to determine whether an activity has a substantial effect on interstate commerce. These distinctions are therefore tied to the external federalism limit on Congress's ICC power.

Federalism limits do not apply to Congress's FCC power and therefore do not constrain application of the substantial-effect analysis in the FCC context. "It has

42

never been suggested that Congress'[s] power to regulate foreign commerce could be so limited" by "considerations of federalism and state sovereignty." *Japan Line,* 441 U.S. at 448 n.13. The FCC provides Congress broader authority to regulate activity that substantially affects foreign commerce. *See id.* (collecting cases). Relatedly, the Supreme Court has recognized the need for broader authority because Congress must speak with one unified voice abroad. *See Bd. of Trustees*, 289 U.S. at 59.

FCC analysis thus does not require the distinction between economic and noneconomic activity. Courts consequently may aggregate both economic and noneconomic activity—and consider congressional findings of substantial effect based on aggregation—in determining whether Congress had a rational basis to determine that an activity substantially affects foreign commerce and is therefore subject to federal regulation.

5. **Constitutionality of § 2423(c)**

Section 2423(c) is constitutional under the third *Lopez* category as applied to Mr. Durham. Under the substantial-effect category, we must determine whether Congress had a rational basis for concluding that travel abroad followed by noncommercial, illicit sexual conduct with a minor, "taken in the aggregate, substantially affect[s]" foreign commerce. *Raich*, 545 U.S. at 22. We conclude that Congress had such a rational basis.

Congress passed § 2423(c) as an essential part of its broader effort to combat international sex trafficking—specifically sex tourism. Under § 2423(b), prosecuting individuals who traveled abroad to have illicit sex—whether commercial or noncommercial—required intent. Because proving intent was too onerous, Congress

43

omitted intent in § 2423(c) to achieve the broader regulatory goals of § 2423 aimed at international sex tourism. Congress therefore had a rational basis to determine that travel to a foreign country followed by illicit sexual conduct with minors substantially affects the international sex tourism industry.

Section 2423(c)'s (1) legislative history, (2) role in the broader statutory scheme, and (3) jurisdictional hook together support the statute's constitutionality. The Supreme Court's analysis in *Gonzales v. Raich* lends further support.

a. *Section 2423(c)'s legislative history supports rational basis*

By 2002, Congress had recognized the problem of sex tourism was growing despite previous efforts to address it. *See* H.R. Rep. No. 107-525, at 2 ("[C]hild-sex tourism . . . is increasing," especially in many "developing countries"). For many developing countries, sex tourism had become a source of income, and "[b]ecause poor countries are often under economic pressure to develop tourism, those governments often turn a blind eye towards [the problem of sex tourism] because of the income it produces." *Id.* The legislative record contains statements expressing concern that the sex tourism industry "support[s] one of the fastest growing areas of international criminal activity." 149 Cong. Rec. 7,625 (2003) (statement of Rep. Sensenbrenner).

The 2003 PROTECT Act sought to stop this problem. § 105, 117 Stat. at 654. It added a statutory scheme to dismantle sex tourism. *See id.* In addition to § 2423(c), three of the Act's other provisions also targeted the industry. Section 2423(d) punished sex tourism operators and their businesses; § 2423(e) criminalized conspiracies or

44

attempts to engage in sex tourism; and § 2423(f) defined commercial acts,

noncommercial acts, and the production of child pornography as activities of sex tourism.

One of the PROTECT Act's critical additions was § 2423(c). This provision

addressed a problem with one of Congress's previous attempts to curb sex tourism—

§ 2423(b)'s stringent mens rea requirement. Section 2423(b) required the prosecution to

show an individual traveled with the "inten[t]" to engage in illicit sexual contact with

minors, which was "difficult to prove." *Hearings* at 25 (statement of Daniel P. Collins,

Associate Deputy Att'y Gen., U.S. Dep't of Justice). Section 2423(c) closed this gap; it

targeted "persons who travel to foreign countries to engage in illegal sexual relations with

minors" regardless of intent. 149 Cong. Rec. 7,633 (2003) (statement of Rep.

Sensenbrenner).

The dissent correctly observes that congressional findings "can inform the

analysis" but also are "not dispositive." Dissent Op. at 41. The dissent also accurately

notes that the PROTECT Act did not contain congressional findings on the impact of

noncommercial sex on foreign commerce. *See id.* at 42. But "the absence of

particularized findings does not call into question Congress'[s] authority to legislate."

*Raich*, 545 U.S. at 21. Courts may look to the legislative history more broadly in

determining whether Congress had a rational basis to conclude that an activity

substantially affects foreign commerce. *See id.* at 22.

b. *Section 2423(c) is an essential part of a broader statutory scheme*

Section 2423(c) not only bolstered § 2423(b), it joined a long lineage of legislation

aimed at sex trafficking. Beginning with the Act of 1907, the United States banned the

"importation" of foreign prostitutes into the United States. § 3, 34 Stat. at 899. Congress expanded its efforts to end international sex trafficking by passing the Mann Act in 1910 to prevent interstate trafficking, 36 Stat. 825; the Protection of Children Against Sexual Exploitation Act in 1978 to prevent the trafficking of boys as well as girls, § 3, 92 Stat. at 8; and the Child Sex Abuse and Pornography Act in 1986 to prevent the noncommercial sexual exploitation of children, § 5, 100 Stat. at 3511. The 1994 Violent Crime Control and Law Enforcement Act, § 160001(g), 108 Stat. at 2037, and the 2003 PROTECT Act, § 105, 117 Stat. at 654—adding § 2423(b) and § 2423(c) to 18 U.S.C. § 2423, respectively—were Congress's most recent attempts to combat sex trafficking through criminalization of sex tourism.

The pathway to the enactment of § 2423(c) manifests a purpose to address the foreign commerce problem of the international sex trade. Unlike the gun possession provision in *Lopez*, which was "not an essential part of a larger regulation of economic activity," 514 U.S. at 561, Congress viewed § 2423(c) as a necessary part of the broader effort to combat the sex tourism market. It determined that 2423(b)'s gap limited 18 U.S.C. § 2423's efficacy. Thus, in criminalizing illicit sexual conduct abroad, whether commercial or noncommercial and regardless of intent, Congress determined that such activity, in the aggregate, substantially affects foreign commerce. Congress had a rational basis to conclude that the conduct § 2423(c) addresses substantially affects foreign commerce—in this instance, the international sex trade.

The dissent argues that "the great bulk of [the long history of federal legislation governing interstate and international travel for sex offenses] is irrelevant because it does

46

not speak to the specific regulation at issue here." Dissent Op. at 42. But this history is the predicate for showing that § 2423(c) is an essential part of the broader regulatory scheme. Although we do not rely on formal legislative findings for this point, we properly rely, as have other courts, on the legislative history leading up to and including the enactment of § 2423(c). *See Raich*, 545 U.S. at 10-15 (discussing drug legislation from 1906 to 1970, which "culminated in the passage of" the act containing the CSA); *Fullilove v. Klutznick*, 448 U.S. 448, 475 (1980) (plurality opinion) (stating "[t]he legislative history of the [statute] shows that there was a rational basis for Congress to conclude that the [regulated activity] . . . has an effect on interstate commerce" and that "Congress could take necessary and proper action to remedy the situation"). The legislative history demonstrates that Congress regarded § 2423(c) as an essential part of the broader regulation resulting from a long history of combatting international sex tourism.[19]

---

[19] The dissent also suggests that there must be congressional findings demonstrating that a larger "*regulatory scheme could be undercut unless the intrastate activity were regulated.*" Dissent Op. at 40 (quoting *Lopez*, 514 U.S. at 561). Because, the dissent contends, Congress made no findings that the "failure to control noncommercial illicit sexual conduct would 'undercut' [the regulation of commercial sex]," *id*. at 40-41, § 2423(c) was not an essential part of the broader regulation. We disagree.

First, as already stated, "the absence of particularized findings does not call into question Congress'[s] authority to legislate." *Raich*, 545 U.S. at 21. The Court has never required legislative findings, let alone findings showing that a regulatory scheme would be undercut without regulation of a particular activity.

Second, the legislative history demonstrates that § 2423(c) was an essential part of the broader regulatory scheme. The intent requirement in § 2423(b) was undercutting sex tourism prosecutions. By shedding the mens rea requirement, Congress enabled the prosecution of individuals who travel abroad and have illicit sex—whether commercial or noncommercial—with minors. Congress could

47

c. *Section 2423(c)'s jurisdictional element supports rational basis*

The dissent recognizes that § 2423(c) contains an "express jurisdictional element" tying § 2423(c) to foreign commerce. Dissent Op. at 45. In addition to "engag[ing] in illicit sexual conduct," § 2423(c) requires "travel[] in foreign commerce" as an element of the offense. 18 U.S.C. § 2423(c). An express element limits the statute's reach by linking the prohibited illicit activity to foreign commerce. *See Morrison*, 529 U.S. at 611-12; *Patton*, 451 F.3d at 632-34. The dissent properly points out that "[a] jurisdictional hook is not, however, a talisman that wards off constitutional challenges." *See* Dissent Op. at 45 (quoting *Patton*, 451 F.3d at 632). But § 2423(c)'s jurisdictional hook nonetheless points to Congress's explicitly limiting the statute to "foreign commerce" and to having a rational basis for its enactment. Although the presence of a jurisdictional element is "neither necessary nor sufficient," it is "certainly helpful" in determining whether "the prohibited activity has a substantial effect on" foreign commerce. *Patton*, 451 F.3d at 632.

d. Raich *supports rational basis for* § 2423(c)

The Supreme Court's 2005 decision in *Gonzales v. Raich* supports the foregoing analysis. After *Lopez* and *Morrison*, *Raich* was the first Supreme Court case to uphold a federal statute on interstate commerce grounds.

The CSA classified marijuana as a Schedule I drug, making its manufacture, distribution, or possession a criminal offense. *Raich*, 545 U.S. at 14; *see* 21 U.S.C.

_____

rationally believe that without § 2423(c), these same individuals would continue to fuel the international sex tourism market.

§§ 812(c), 841(a)(1). State law allowed California residents Angel Raich and Diane Monson to cultivate or possess marijuana for personal medical purposes. *Raich*, 545 U.S. at 5. They challenged § 841(a)(1) of the CSA, arguing it exceeded congressional authority under the ICC as applied to them. *Id.* at 22; *see* 21 U.S.C. §§ 812(c), 841(a)(1) (2000). The Court upheld § 841(a)(1) as applied to Ms. Raich and Ms. Monson, finding it was part of a larger regulation of economic activity and that Congress had a rational basis to conclude that home-grown marijuana for medical use substantially affected interstate commerce. *Raich*, 545 U.S. at 22; *see* 21 U.S.C. § 812 (2000) (CSA section categorizing controlled substances); *id.* §§ 821-830 (CSA sections specifying requirements for registering, producing, labeling, packaging, and recordkeeping for controlled substances).

The Court upheld the CSA despite the lack of a congressional finding concerning the impact of noncommercial marijuana cultivation on interstate commerce. *Raich*, 545 U.S. at 21. The Court stressed that it need only determine whether Congress had a "rational basis" for determining that these activities taken in the aggregate substantially affect interstate commerce. *Id.* at 22. It had "no difficulty concluding that Congress had a rational basis for believing that failure to regulate the intrastate manufacture and possession of marijuana would leave a gaping hole in the CSA." *Id.* The Court determined that the provision is part of the CSA's larger regulatory scheme that regulated the market for controlled substances. *Id.* at 15, 20-21. Section 841(a)(1) was one part of the CSA, which classifies drugs into five schedules, each with a distinct set of controls. *Id.* at 13-14. The CSA's purpose is to control the supply of and demand for both legal

and illegal drugs. *See id.* at 19. Thus, the Court determined that personally cultivated marijuana for medical purposes, taken in the aggregate, substantially affected the illicit market for drugs, and was subject to regulation under the ICC. *Id.* at 22, 28-29.[20]

Two aspects of the *Raich* analysis are noteworthy.

First, the Court observed that the CSA was the product of decades of legislation. Congress "set out to enact legislation that would . . . provide meaningful regulation over legitimate sources of drugs to prevent diversion into illegal channels." *Id.* at 10. Like Congress's early attempts to regulate sex trafficking, Congress attempted to regulate the national drug market early on, passing the Pure Food and Drug Act of 1906 and the Harrison Narcotics Act of 1914. *Id.* It also attempted to regulate the market for

---

[20] We have recently interpreted *Raich* as supporting congressional "regulation of noncommercial, purely intrastate activity that is an essential part of a broader regulatory scheme that, as a whole, substantially affects interstate commerce (i.e., has a substantial relation to interstate commerce)." *PETPO*, 852 F.3d at 1002. In *PETPO*, we upheld the provisions of the Endangered Species Act ("ESA") that allow the U.S. Fish and Wildlife Service ("FWS") to promulgate regulations protecting threatened or endangered species. *Id.* at 994. Under these provisions, the FWS prohibited the "take"—or the harassment, harm, pursuit, hunting, shooting, wounding, killing, trapping, capturing, or collecting—of Utah prairie dogs, a purely intrastate species, on nonfederal lands. *Id*. PETPO, an organization of property owners affected by the regulation, argued that Congress exceeded its authority under the ICC in authorizing the FWS to promulgate regulations prohibiting the "take" of prairie dogs—a noncommercial activity. *Id*. at 996.

We upheld the provisions because, under *Raich*, they were "an essential part of the ESA's broader regulatory scheme which, in the aggregate, substantially affects interstate commerce." *Id*. at 1002. Even though the regulation protecting prairie dogs concerned noncommercial activity, we recognized that Congress had a rational basis to conclude that the regulated activity had a substantial relationship to interstate commerce. "Congress had a rational basis to believe that providing for the regulation of take of purely intrastate species like the Utah prairie dog is essential to the ESA's comprehensive regulatory scheme." *Id*. at 1006-07.

marijuana with the Marihuana Tax Act in 1937. *Id.* at 11. From these piecemeal attempts, Congress finally passed the Comprehensive Drug Abuse Prevention and Control Act of 1970—which contained the CSA—to regulate the illegal and legal drug markets. *Id.* at 10.

Congress followed a similar course in passing the PROTECT Act, building on previous attempts to regulate the international market for sex trafficking. Beyond criminalizing the transport of prostitutes under the Mann Act, for example, the PROTECT Act attempted to address sex tourism comprehensively. It also closed gaps by targeting sex tourism operators and not requiring intent for travelers who engage in illicit sex. Just as legislative lineage supported a rational basis for congressional action in *Raich,* it also does so for § 2423(c).

Second, the Court in *Raich* examined the home-grown marijuana provision within the broader statute and recognized that it was part of the CSA's larger scheme to regulate commerce. *Id.* at 23 (noting the CSA was a "valid statutory scheme" regulating the illicit drug market). It was "of no moment" that this larger scheme both envisioned and captured some purely intrastate activity. *Id.* at 22. Because § 841(a)(1) was one component of a regulatory framework, the Court "refuse[d] to excise individual components of that larger scheme." *Id.* Thus, the Court upheld the CSA's regulation of noncommercial cultivation of medical marijuana as a valid part of a larger scheme to regulate the controlled substances market.

Similarly, § 2423(c) is part of the PROTECT Act's larger scheme to combat sex tourism. Congress passed § 2423(c) as a vital component to regulate the illicit

51

international market for sex. The § 2423 provisions work together to curb the trafficking and sexual exploitation of minors abroad. Section 2423(a) targets the trafficking of minors across state and international borders; section 2423(b) targets those who travel abroad with the *intent* to engage in illicit sexual acts with minors; section 2423(c) targets those who travel *without intent* to engage in such acts; and § 2423(d) targets those who operate businesses that facilitate such illicit sexual conduct abroad. Together, the provisions curb the supply and demand in the sex tourism industry. That § 2423(c) captures intranational, noncommercial activity is "of no moment," *see id.* at 22, because it is a part of a statutory structure aimed at regulating foreign commerce—the international sex tourism industry.[21]

e. *Rational basis standard*

Rational basis is a deferential standard. The dissent mistakenly suggests that because the regulated activity must have a substantial effect on commerce and because noncommercial sex is noneconomic, such an effect is impossible. *See* Dissent Op. at 37-

---

[21] The *Raich* Court recognized that Congress exercised its authority under the ICC and the Necessary and Proper Clause to pass "comprehensive legislation to regulate" the illicit substances market. *Raich*, 545 U.S. at 22. "Congress was acting well within its authority to 'make all Laws which shall be necessary and proper' to 'regulate Commerce . . . among the several States.'" *Id*. (quoting U.S. Const. art. I, § 8, cl. 3 and cl. 18). Because Congress had "a rational basis for believing that failure to regulate the intrastate manufacture and possession of marijuana would leave a gaping hole in the CSA," the regulation of noncommercial, intrastate activity—home cultivation and possession of medical marijuana—was "of no moment." *Id*. The Court refused to "excise individual components of that larger scheme." *Id*. It was therefore "necessary and proper" under Congress's ICC power to regulate the noncommercial, intrastate activity. *Id*. Because the Government does not rely on the Necessary and Proper Clause to defend § 2423(c), we do not address that provision.

38. The dissent criticizes the government for its failure to show that "noneconomic sex abuse will affect the market in commercial sex trafficking," *id*. at 38, or that the "regulation is 'an essential part' of the regulation of commercial sex tourism," *id*. at 40. It demands "data [] that [show] prosecutions of noncommercial child sexual abuse reduce the incidence of commercial abuse" because noncommercial sex is not a "fungible commodit[y]." *Id*.[22]

But under the proper standard of review, "[w]e ask not whether, as judges, we believe the challenged statute has a substantial effect on interstate commerce, but whether Congress could reasonably have thought so." *Patton*, 451 F.3d at 625. As the Court emphasized in *Raich*: "[W]e stress that the task before us is a modest one. We need not determine whether respondents' activities, taken in the aggregate, substantially affect interstate commerce in fact, but only whether a 'rational basis' exists for so concluding." *Raich*, 545 U.S. at 22. Here, the legislative history, the overall statutory scheme, and jurisdictional hook all evince that Congress had a rational basis for concluding that, in the aggregate, Americans who travel abroad and

---

[22] The dissent emphasizes the economic and noneconomic distinction. *See* Dissent Op. at 34 ("The fact that noncommercial nonconsensual sexual activity is not economic activity is extremely important, probably dispositive, in determining whether it is subject to the third category of regulation of commerce."). But this distinction arose from federalism concerns in the ICC context, and those concerns do not apply here.

Even in the ICC context, the Court has never "adopt[ed] a categorical rule against aggregating the effects of any noneconomic activity." *Morrison*, 529 U.S. at 613. The Court has upheld congressional regulation of noncommercial activity, *see Raich*, 541 U.S. at 21-22, and this court has upheld laws regulating what appeared to be noneconomic activity. *See PETPO*, 852 F.3d at 1002 (upholding the protection of prairie dogs under the ESA).

53

have noncommercial sex with minors substantially affect the international sex tourism market.[23]  Congress determined, after years of experience with the evolving legislative framework, that it needed § 2423(c) to complete the package.  We cannot say this choice was unreasonable.

6.  **Legal Landscape**

Both of the circuits that have examined the constitutionality of § 2423(c)'s criminalization of noncommercial illicit sexual conduct abroad under the FCC have upheld it.  *See Bollinger*, 798 F.3d at 218 (the Fourth Circuit upholding § 2423(c) because of its "demonstrable" effect on foreign commerce); *Pendleton*, 658 F.3d at 311 (the Third Circuit upholding § 2423(c) because of its express connection to the channels of foreign commerce); *see also United States v. Flath*, 845 F. Supp. 2d 951, 956 (E.D. Wis. 2012) (upholding under the FCC); *United States v. Martinez*, 599 F. Supp. 2d 784, 808 (W.D. Tex. 2009) (upholding under the FCC and the necessary and proper clause). *But see United States v. Al-Maliki*, 787 F.3d 784, 791-92 (6th Cir. 2015) (not deciding the issue, but expressing doubt about § 2423(c)'s constitutionality under the FCC).[24]

---

[23] The dissent relies on the three-factor framework laid out in *Patton*, but eschews a holistic analysis.  It recognizes that three factors—(1) the activity's relation to commerce, (2) congressional findings, and (3) jurisdictional hook—are relevant to our substantial-effect analysis, *see* Dissent Op. at 35-36, but analyzes them separately from each other, *see id.* at 36-48.  Here, we consider the legislative history, the regulatory scheme, and the jurisdictional hook *together* in "answer[ing] [the] question" of "whether Congress had a rational basis to find that the regulated activity, taken in the aggregate, would substantially affect interstate commerce." *Patton*, 451 F.3d at 623; *see also Raich*, 545 U.S. at 10-11, 22-23.

[24] The Ninth Circuit also has upheld § 2423(c) under the FCC in a challenge to the provision's prohibition of commercial illicit sexual conduct.  *See Clark*, 435 F.3d

54

Two district court opinions in the District of Columbia have held otherwise. *See United States v. Reed*, No. CR 15-188 (APM), 2017 WL 3208458, at *14 (D.D.C. July 27, 2017) (unpublished) (finding § 2423(c)'s application to noncommercial conduct unconstitutional under the FCC); *United States v. Park*, 297 F. Supp. 3d 170, 179 (D.D.C. 2018) (using *Reed*, 2017 WL 3208458, to come to the same conclusion). But, unlike here, these cases concerned individuals charged under § 2423(c)'s "residing clause." *See* 18 U.S.C. § 2423(c) ("Any United States citizen . . . who travels in foreign commerce or *resides, either temporarily or permanently, in a foreign country*, and engages in any illicit sexual conduct . . . ." (emphasis added)). The district courts lacked a jurisdictional hook to "foreign commerce," which is present in our case. *See, e.g.*, *Reed*, 2017 WL 3208458, at *12. Moreover, the district courts emphasized the sexual abuse at issue was noneconomic and its connection to international sex tourism was too attenuated to have a "substantial effect" on foreign commerce. *See, e.g.*, *id.* In coming to this conclusion, they focused on a lack of particularized legislative findings and history. As explained above, the Supreme Court has never required "particularized findings," and such a limited focus overlooks the legislative history laid out in this opinion and § 2423(c)'s place in a broader regulatory scheme. *Raich*, 545 U.S. at 21; *see also Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 252 (1964) (upholding the Civil Rights Act even without congressional findings).

---

1100. It also recently interpreted the language of § 2423(c) without addressing its constitutionality. *See United States v. Pepe*, 895 F.3d 679 (9th Cir. 2018).

7. **Conclusion**

In passing § 2423(c), Congress had a rational basis to conclude it was regulating activity that substantially affects foreign commerce. In particular, it could reasonably decide that foreign travel followed by noncommercial sex with minors—in the aggregate—substantially affects the international market for sex tourism. We therefore uphold § 2423(c) as applied to Mr. Durham as a permissible exercise of congressional authority under the FCC.

Section 2423(c)'s legislative history, place in the broader regulatory scheme, and jurisdictional hook indicate Congress's rational basis for determining the activity's substantial connection to foreign commerce. In 2002, the congressional sponsors of § 2423(c) recognized that the sex tourism industry was expanding and that the "growing . . . industry" fueled human sex trafficking, a massive illicit international market. 149 Cong. Rec. 7,625 (2003) (statement of Rep. Sensenbrenner). Congress attempted to curtail such markets with the PROTECT Act in 2003. Section 2423(c)—and its accompanying provisions—target sex tourists and operators, commercial and noncommercial acts, and travel with and without intent to engage in illicit sexual acts. Specifically, § 2423(c) closed the enforcement gap created by § 2423(b)'s intent requirement. Congress had a rational basis to conclude that, without § 2423(c), the failure to capture such behavior would substantially affect foreign commerce—here sex tourism.

Thus, under the FCC, Congress permissibly exercised its authority in passing § 2423(c).

56

B. *Issue Two:* **Brady** *Claim*

In his supplemental motion for new trial under Federal Rule of Criminal Procedure 33, Mr. Durham alleged that the Government suppressed evidence favorable to the accused in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). The district court denied the motion, and Mr. Durham appeals the *Brady* ruling. We affirm because Mr. Durham has not shown by a preponderance of the evidence that nondisclosure of the evidence prejudiced his case.

1. **Additional Procedural Background**

   a. *Trial testimony*

At trial, Dr. Alawiya Abdulkadir Mohamed testified about the victims' medical records. ROA, Vol. 12 at 1178 (TT 564). In June 2014, Dr. Abdulkadir supervised the outpatient clinic in Kenya where the victims were examined. *Id.* at 1179-80 (TT 565-66). Although she did not examine the children, she reviewed the Post Rape Care ("PRC") forms prepared by the clinician who did on June 18, 2014. *Id.* at 1182-83, 1188-89 (TT 568-69, 574-75). Dr. Abdulkadir prepared Medical Examination Reports based on the PRCs. *Id.* at 1183 (TT 569). Her testimony included the following:

> Q. [C]an you explain to the jury what the hymen is on a female?
> A. Okay. So the hymen is a membrane which covers the vagina and it's -- it doesn't fully cover the vagina, so there's a portion which is slightly open to allow the menstrual flow. So it's a membrane which is usually most people get born with it and it's usually present in kids and -- yes.
> Q. If a hymen is perforated, what does that mean?

57

A. Okay. We -- the hymen could be perforated due to several reasons. One of them would be due to sexual assault. The others would be due to extraneous exercises involving the groin region or falling astride, like falling on a wall, having bicycle accidents and horseback riding. Those are the common things which break the hymen.

*Id.* at 1185-86 (TT 571-72). She further testified that five of the six girls had a perforated hymen and that would not be normal for girls their ages. *Id.* at 1187-88 (TT 573-74). On cross-examination Dr. Abdulkadir testified:

Q. Now, you talked a lot about a perforated hymen?
A. Yes.
Q. Now, a hymen -- a hymen can be in very different shapes; is that right?
A. True.
Q. It can be flat; is that right?
A. Yes.
Q. It can be round, some are bigger and some are smaller?
A. Bigger in terms of?
Q. Of their size. Some women will have a bigger hymen than others?
A. It's a membrane, so it's more thickness than bigger, it's not --
Q. More thickness?
A. The dimensions are not three-dimensional.
Q. If a woman has not started menstruating yet, would her hymen -- it's called non-estrogenized; is that right?
A. Yes.
Q. And that means that the hymen is more rigid and hard?
A. Yes.
Q. And so that would be the situation for children who have not yet hit their menstrual cycle; is that right?
A. Yes.

*Id.* at 1198-99 (TT 584-85); *see also id.* at 1220-21 (TT 606-07) (answering in the negative when asked if a 7, 6, 13 or 11-year-old should have a perforated hymen).

Dr. Abdulkadir testified that even if the assaults occurred a month before the examinations, the exams were conducted because "[t]he hymen doesn't come back. So we're looking out for the hymen. It doesn't regenerate, so --." *Id.* at 1214 (TT 600), *see also id.* at 1221 (TT 607). She agreed that "there's no way you can be certain that Mr. Durham committed the assaults." *Id.* at 1215 (TT 601); *see also id.* at 1222 (TT 608).

Later in the trial, the defense called Lisa Dunson, a sexual assault nurse examiner, who was present in the courtroom when Dr. Abdulkadir testified. *Id.* at 1581, 1585 (TT 967, 971). Nurse Dunson testified that all hymens have a hole in them, that preadolescent children do not usually have physical injuries following a sexual assault, and that hymens have different shapes and sizes. *Id.* at 1594-96 (TT 980-82). As for the term "perforated hymens," she testified:

> Q. Now, what about -- what was the term used on the medical records as far as the hymen; do you recall?
> A. Yes. They used the word "perforated."
> Q. And the examiner who conducted -- who viewed the children didn't testify. What in your mind is -- does that mean, "perforated hymen"?
> A. Truthfully, I don't know. We don't use that term anymore. It hasn't been used since I've been doing exams, which is since 2003. I think when the general population hears the word "perforated," we think of a tear or a hole that's not supposed to be there, so I don't know what that means because I don't use that.
>
> ***
>
> Q. So "perforated" could mean a tear, it could mean just the natural opening of the hymen. We don't know at this point; is that right?
> A. I wouldn't speculate what that means.

59

*Id.* at 1596-97 (TT 982-83). She conceded that the term "perforated hymen" might be commonly used elsewhere, and that it appears in the Kenyan protocol for sexual assault examinations. *Id.* at 1621, 1626 (TT 1007, 1012). Although the term had not been used since she started doing examinations in 2003, she said it was once used in the United States. *Id.* at 1626 (TT 1012).

Nurse Dunson testified, contrary to Dr. Abdulkadir, that hymen tissue can repair itself. *Id.* at 1598 (TT 984). She had reviewed an article that said "minor abrasions and lacerations usually heal within about three to four days." *Id.* She said that "statistics say that 90 to 95 percent of all children exams, regardless of what the disclosure, are normal." *Id.* at 1599 (TT 985). She also testified that in examinations of children who have been sexually assaulted, "there usually isn't an injury. Children are usually not injured." *Id.* at 1616 (TT 1002). She also agreed that a "positive finding" for five of the six children would be unlikely. *Id.* at 1617-18 (TT 1003-04). She said that an acute injury of the hymen is from blunt force trauma. *Id.* at 1625 (TT 1011).

b. *Supplemental motion for new trial*

On October 2, 2015, Mr. Durham moved for leave to file a supplemental motion for a new trial, which was granted, and he filed his memorandum in support on October 27. Mr. Durham alleged the Government violated his right to due process under *Brady* because the prosecutor in the case, Assistant United States Attorney

("AUSA") Robert Don Gifford, failed to disclose evidence favorable to the accused. ROA, Vol. 3 at 505-06.[25]

The supplemental motion stemmed from two memoranda that the Oklahoma County District Attorney, David Prater, sent to the district court after the trial. On September 28, 2015, the court sent them to the parties' counsel. ROA, Vol. 3 at 812. The memoranda recounted telephone conversations on the evening of June 15, 2015, the day the prosecution rested its case-in-chief.

On August 16, 2015, Oklahoma County Assistant District Attorney ("ADA") Gayland Geiger wrote the first memorandum. It described his June 15 telephone conversation with AUSA Gifford:

> I asked Gifford about the facts of his case. He said there were 5 or 6 or 7 (don't remember the exact number) of female victims ages 6 to 14. All but one of them had a perforated hymen. He indicated this evidence was presented by the government's medical witness. . . . A reviewing doctor actually testified to the perforated hymens. He said as best as they could tell, the sexual assault exams were done about 6 weeks after the abuse occurred. He said the defense was calling a sexual assault expert, and he did not know what the expert would say. . . . I told him that I have not heard the term perforated hymen. I told him it is very unusual to have physical findings in children; that it is extremely unusual to have physical findings 6 weeks after the event; that even if there were an injury, it would have healed in that amount of time; and, that it is extremely unusual and almost unheard of to have physical findings in 5 of 6 or 6 of 7 victims. I called [Physician Assistant] Donaldson and joined her for a three-

---

[25] Mr. Durham also alleged in his initial motion for new trial that the Government violated *Brady* because it suppressed video data of his conversation with Ms. Menja, in which he confessed to certain allegations against him. The district court rejected this claim, and Mr. Durham has not pursued it on appeal.

way conversation with Gifford. She told him the same things. We together told him that there are legitimate medical studies showing even pregnant girls have normal exams. Donaldson explained the anatomy and that a perforated hymen is a normal finding. . . . I expressed my opinion to him that [] he cannot cross examine the defense expert in good faith on those issues, because medical research and the legitimate medical community share those opinions. I encouraged him to instead contact Dr. Brown to be a rebuttal witness to use to say even if the African exams are incorrect, it still does not mean sexual abuse did not occur.

*Id.* at 813.

At ADA Geiger's request, Dr. Ryan Brown, Chair of the Child Protection Committee at the University of Oklahoma Children's Hospital, wrote the second memorandum about his discussions with AUSA Gifford on the night of June 15:

We had discussed what a performed hymen meant to me. I had told him that to me, it meant that the hymen had a hole in it, which is normal. I didn't know if that was what the African physician had meant by it, but we don't normally use that language to describe hymens here in the US. . . . I had also stated that an imperforate hymen, is still normal, but is actually not a common finding. He had stated to me that the African physician had stated that he had found 5 of the 6 young ladies in the case to have perforated hymens and that the physician was calling that an abnormal finding. I spoke with him that actually it is rare to have findings in sexual abuse exams, especially in your preadolescent children. I told him that about 95% of the time we will have a normal finding, and of the 5%, 2/3 of the evidence is found on the clothing or bed. I also reiterated that a normal exam does not rule in or rule out a sexual encounter. Also, that it would be quite rare for 5 individuals to have the same findings on exam in regards to a sexual assault, unless the perpetrator was using some type of instrumentation, I also spoke about how quickly findings on exams can heal, IF there were findings to begin with. . . . Again I stated that it would be a small chance to

> have abnormal findings on a preadolescent sexual abuse exam, and to have multiple children with the same finding, other than normal, would be rare. I also stated again that time is of the essence and rape exams done after a week could be normal even if there was a finding to begin with since the tissue heals so quickly.

*Id.* at 816.

In his supplemental motion, Mr. Durham argued that AUSA Gifford had failed to disclose the information he learned in his June 15, 2015 conversations in violation of *Brady*. In opposition, the Government argued there was no *Brady* violation because the information at issue was available to the defense and because it was not material in light of Nurse Dunson's testimony.

The district court denied the *Brady* claim based on the Government's second argument. It first said that, although the information provided by Dr. Brown was available from other sources, the fact it came from Dr. Brown was not. But the court concluded that the Government's failure to apprise Mr. Durham of Dr. Brown's statements did not deprive him of a fair trial because of Nurse Dunson's "vigorous opposition" to Dr. Abdulkadir's testimony. ROA, Vol. 3 at 810.[26]

---

[26] The motion also alleged that AUSA Gifford had failed to correct Dr. Abdulkadir's false testimony in violation of *Napue v. Illinois*, 360 U.S. 264 (1959). ROA, Vol. 3 at 500-04. The district court denied the *Napue* claim, concluding there was no evidence that Dr. Abdulkadir committed perjury rather than testified inconsistently with Mr. Durham's expert, Nurse Dunson. *Id.* at 808-09. On appeal, Mr. Durham does not present a *Napue* argument. He concedes that he "cannot prove that Dr. Abdulkadir herself knew [her testimony] was false" and thus that his *Napue* claim is foreclosed by *United States v. Garcia*, 793 F.3d 1194 (10th Cir. 2015). Aplt. Reply Br. at 6 n.1; *see Garcia*, 793 F.3d at 1207 ("A *Napue* violation occurs when (1) a government witness *committed perjury*, (2) the prosecution knew the testimony to be false, and (3) the testimony was material." (emphasis added)); *see also United*

2. **Analysis**

a. *Standard of Review*

"Our review of a *Brady* claim asserted in the context of a Rule 33 motion for a new trial is de novo, with any factual findings reviewed for clear error." *United States v. Torres*, 569 F.3d 1277, 1281 (10th Cir. 2009); *see United States v. Garcia*, 793 F.3d 1194, 1205 (10th Cir. 2015). "[W]hether suppressed evidence is material is a mixed question of law and fact which we also review de novo." *Douglas v. Workman*, 560 F.3d 1156, 1172 (10th Cir. 2009).

b. *Legal Background*

Under Federal Rule of Criminal Procedure 33, "the court may vacate any judgment and grant a new trial if the interest of justice so requires." Mr. Durham's Rule 33 motion was based, in part, on an alleged *Brady* violation.

In *Brady*, the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. The Court later held that the duty to disclose such evidence applies even when the accused has made no request. *United States v. Agurs*, 427 U.S. 97, 107 (1976). *Brady* applies to impeachment evidence, or evidence affecting witness credibility, "[w]hen the reliability of a given witness may well be determinative of guilt or innocence." *Giglio v. United States*, 405 U.S. 150,

_____

*States v. Caballero*, 277 F.3d 1235, 1244 (10th Cir. 2002) ("Even postulating tension between [a witness]'s responses on direct and cross, such inconsistency alone does not establish the knowing use of *perjured* testimony." (emphasis added)).

64

154-55 (1972) (quotations omitted); *see also United States v. Bagley*, 473 U.S. 667, 676-77 (1985).

To establish a *Brady* violation, "[1] [t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999); *see United States v. DeLuna*, 10 F.3d 1529, 1534 (10th Cir. 1993). The defense needs to establish these elements by a preponderance of the evidence. *McCormick v. Parker*, 821 F.3d 1240, 1246 (10th Cir. 2016). In *Strickler*, the Court said the third element concerns "whether petitioner has established the prejudice necessary to satisfy the 'materiality' inquiry." 527 U.S. at 282. The evidence is material and its nondisclosure is prejudicial "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682; *see also Kyles v. Whitley*, 514 U.S. 419, 433-434 (1995); *Garcia*, 793 F.3d at 1205.

c. *No prejudice for a* Brady *violation*

The information that AUSA Gifford learned from the June 15 conversations was favorable to the defense, and he did not disclose the conversations to defense counsel. [27] But even assuming Mr. Durham could show the first two elements of

---

[27] In this regard, the concerns of DA Prater and ADA Geiger were well taken. *See* ROA, Vol. 3, at 813-15.

*Brady* were met,[28] he has not established prejudice because the information was not material in light of Nurse Dunson's testimony. We therefore affirm the district court's denial of Mr. Durham's *Brady* motion.

AUSA Gifford's June 15, 2015 conversations with ADA Geiger, Ms. Donaldson, and Dr. Brown were was not material in light of the trial record. On June 16, Mr. Durham called Nurse Dunson to testify. She said there are "usually not injuries with children" following a sexual assault, ROA, Vol. 12 at 1598 (TT 984), that a physical finding was less likely if the exam occurred five days after an assault, *id.* at 1597 (TT 983), that "minor abrasions and lacerations usually heal within about three to four days," *id.* at 1598 (TT 984), that "perforated hymen" was an antiquated term no longer in use, *id.* at 1626 (TT 1012), and that "statistics say that 90 to 95 percent of all children exams, regardless of what the disclosure, are normal," *id.* at 1599 (TT 985). Nurse Dunson therefore testified to the information AUSA Gifford learned during his June 15 conversations, including the rarity of physical findings in cases of child sexual assault and that lacerations to the hymen heal quickly. ROA, Vol. 3 at 813-15.

As the district court said, Mr. Durham has not shown prejudice due to "Ms. Dunson's vigorous opposition to Dr. Abdulkadir's testimony." ROA, Vol. 3 at 810. The jury received the information from Mr. Durham's own expert, Nurse Dunson.

---

[28] The Government argues it did not suppress because the defendant knew or could have acquired the information from another source. Aplee. Br. at 22. Due to our disposition of the *Brady* issue on lack of prejudice, we do not address this argument.

She provided testimony that was the same as or comparable to the information from Dr. Brown about perforated hymens, the likelihood of findings during sexual abuse examinations, that normal findings do not rule out sexual assault, the rarity of the same findings in multiple children, and the speed of healing. *Compare* ROA, Vol. 3 at 816 *with* ROA, Vol. 12 at 1595-96, 1598-99, 1616-18, 1626, 1631 (TT 981-82, 984-85, 1002-04, 1012, 1017).

Mr. Durham cannot show prejudice because Nurse Dunson rebutted each of Dr. Abdulkadir's points that may otherwise have been impeached by the information that AUSA Gifford learned in the June 15 conversations. Indeed, Mr. Durham admits on appeal that Nurse Dunson's testimony "largely rebutted Dr. Abdulkadir's claims." Aplt. Br. at 23-24. Taking the differences between the experts' opinions into account, we still conclude that there was no *Brady* violation because Mr. Durham has not shown "a reasonable probability that, had [Dr. Brown's information] been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682.

We therefore affirm the district court's denial of the part of the supplemental motion for a new trial alleging a *Brady* violation.

### C. *Issue Three: Mr. Durham's Statements about Child Pornography and Homosexuality*

Mr. Durham argues that the district court's admission of his out-of-court statements that he had struggled with child pornography and homosexuality violated (1) Federal Rule of Evidence 404(b) because the statements were used to show

67

propensity to commit the charged offenses, (2) Federal Rule of Evidence 401 because the statements were irrelevant, and (3) Federal Rule of Evidence 403 because the statements were unfairly prejudicial. Because the district court did not abuse its discretion, we affirm.

1. **Standard of Review**

We review the admission of evidence for abuse of discretion "and will not reverse if the district court's ruling falls within the bounds of permissible choice in the circumstances and is not arbitrary, capricious or whimsical." *United States v. Willis*, 826 F.3d 1265, 1270 (10th Cir. 2016) (quotations omitted).

2. **Additional Factual Background**

a. *Evidence about child pornography and homosexuality*

The prosecution presented evidence at trial about two separate times when Mr. Durham said he had struggled with child pornography or homosexuality.

First, Ms. Wambugu, Ms. Menja, Mr. Mutonga, and Mr. Jeffries testified about statements made at the June 13, 2014 meeting at Upendo. They each said that during the meeting, Mr. Durham went outside to talk to Ms. Wambugu, ROA, Vol. 12 at 721, 827, 998, 1132, and that, upon returning with Ms. Wambugu to the sitting room, Mr. Durham said he had struggled with child pornography and homosexuality. *Id.* at 724, 828, 999. According to Ms. Wambugu, Mr. Durham said he could not remember molesting the children, but could "only remember . . . he ha[d] been struggling with child pornography and homosexuality." ROA, Vol. 12 at 724 (TT 110). Ms. Menja testified that Mr. Durham "said that he needed help because he has been struggling with child pornography

68

and homosexuality." *Id.* at 828 (TT 214). Mr. Mutonga testified that Mr. Durham said he "needed to apologize, he needed to be forgiven," and that he "struggled with homosexuality and child pornography." *Id.* at 1133 (TT 519). In his testimony, Mr. Durham admitted saying at this meeting that he struggled with homosexuality, but denied mentioning child pornography. *Id.* at 1848-49 (TT 1234-35).

Second, the jury was shown the Seagull Confession Videos that were recorded on June 17. At the beginning of one of the videos, Mr. Durham stated he could not remember what happened. Ms. Menja responded that if Mr. Durham did not have a memory of the events and could not describe them, they would "want the police [t]here to deal with it first." Gov't Exh. 4 at 1:03-1:10. Mr. Durham said, "I've told you the truth, I've told you that I've struggled with this my whole life . . . ." *id.* at 1:32-1:37, and described a "temptation to touch children and to be with other men," *id.* at 1:57-2:01.

b. *District court rulings*

Before trial, Mr. Durham moved to exclude evidence about his alleged struggles with "wanting to touch children"[29] or "erotic pornography," ROA, Vol. 2 at 282, and also moved to exclude evidence "regarding [his] sexual history and sexual orientation," *id.* at 345. The district court denied these motions at a pre-trial hearing. On the pornography, the Government argued the statement was "inherent as a part of [Mr. Durham's] confession," and the court seemed to agree. ROA, Vol. 12 at 523. The court admitted the statements about homosexuality because "when a defendant is ostensibly explaining

---

[29] Although Mr. Durham sought to exclude the statement about a temptation to touch children before trial, he does not challenge its admission on appeal.

69

what he's done, that . . . would be very relevant and probative and admissible." *Id.* at 531.

When Ms. Wambugu testified at trial about the June 13 statements, the court asked if Mr. Durham would like a limiting instruction to the jury that Mr. Durham was "not on trial for child pornography or homosexuality." *Id.* at 725 (TT 111). Defense counsel declined, saying he "d[idn't] see how there c[ould] be any limiting instruction that cure[d] [the testimony's] prejudice," so none was given. *Id.* at 725-26 (TT 111-12).

Mr. Durham based his motion for a new trial in part on the admission of the evidence about his statements concerning child pornography and homosexuality. *See* ROA, Vol. 3 at 316-324. The district court ruled he was not entitled to a new trial based on the admission of the statements. *Id.* at 785. It said the statement about child pornography was relevant "because it was offered by Defendant as a justification for the behavior of which he was accused," and found any prejudicial effect of the evidence did not substantially outweigh its probative value. ROA, Vol. 3 at 786. As to the statements about homosexuality, the court found "that the potential prejudice of admitting Defendant's statements did not outweigh their probative value." *Id.* at 785. "[D]espite the potential for prejudice to Defendant . . . the evidence herein was relevant, largely because it was offered by Defendant as some type of explanation or justification when he was accused of engaging in inappropriate sexual activity with children at Upendo." *Id.* at 785-86.

## 3. Legal Background

### a. *Rule 404(b)*

Federal Rule of Evidence 404(b) prohibits evidence of a "crime, wrong, or other act . . . to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."

"When we apply Rule 404(b), we distinguish between evidence that is extrinsic or intrinsic to the charged crime." *United States v. Kupfer*, 797 F.3d 1233, 1238 (10th Cir. 2015). Rule 404(b) prohibits evidence of "other acts," "but this rule does not cover evidence that is considered intrinsic" to the charged crime. *Id.* (quotations omitted). Evidence is intrinsic when it is "directly connected to the factual circumstances of the crime and provides contextual or background information to the jury." *Id.* (quotations omitted).

### b. *Rules 401 and 402*

Evidence is admissible only if it is relevant. Fed. R. Evid. 402. Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence; and . . . the fact is of consequence in determining the action." Fed. R. Evid. 401.

### c. *Rule 403*

Otherwise admissible evidence may be excluded under Rule 403 if its "probative value is substantially outweighed by . . . unfair prejudice." Fed. R. Evid. 403. "'Unfair prejudice' within its context means an undue tendency to suggest [a] decision on an improper basis, commonly, though not necessarily, an emotional

one." *United States v. Silva*, 889 F.3d 704, 712 (10th Cir. 2018) (quoting Fed. R. Evid. 403 advisory committee note to 1972 proposed rules). "[A]s to a criminal defendant, [it] speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." *Old Chief v. United States*, 519 U.S. 172, 180 (1997).

"The district court has considerable discretion in performing the Rule 403 balancing test, but exclusion of evidence under Rule 403 that is otherwise admissible under the other rules is an extraordinary remedy and should be used sparingly." *Silva*, 889 F.3d at 712 (quotations omitted).

4. **Analysis**

The district court did not abuse its discretion when it determined the challenged statements were (1) intrinsic to the charged crimes, (2) relevant, and (3) not unfairly prejudicial.

a. *Rule 404(b)*

The district court did not abuse its discretion by holding the statements were intrinsic rather than Rule 404(b) evidence.[30] Although the district court did not use the word "intrinsic," it viewed the statements as intrinsic to the charged crimes because they were part of Mr. Durham's denials and eventual confession to the crimes. *See* ROA, Vol. 12 at 523, 531; ROA, Vol. 3 at 785-86.

---

[30] Although the statements at issue "are party admissions under [Federal Rule of Evidence] 801(d) and thus not hearsay, they must nevertheless also be analyzed for admissibility under Rule 404(b)" because they reference other acts that could have been used as propensity evidence. *United States v. Oberle*, 136 F.3d 1414, 1418 (10th Cir. 1998).

Mr. Durham made both statements at issue when the Upendo volunteers confronted him about the children's allegations. The statements were intrinsic evidence because they provided "contextual or background information" regarding his actions when confronted with the allegations against him and his confession at the Seagull on June 17. *Kupfer*, 797 F.3d at 1238.

The fact that the statements were made after the charged conduct had occurred does not make them extrinsic. For example, in *United States v. Bajoghli*, 785 F.3d 957 (4th Cir. 2015), the Fourth Circuit held it was an abuse of discretion for the district court to exclude evidence of a defendant's post-scheme conduct, *id.* at 966. In that case, the government sought to introduce evidence that the defendant had halted his fraudulent scheme after he was interviewed by law enforcement. *Id.* at 964. The court held this evidence was admissible intrinsic evidence, not 404(b) evidence, because it showed the defendant's knowledge and intent to defraud. *Id.* at 965. Although Mr. Durham made his statements after the charged conduct, they were nonetheless intrinsic evidence because they "bear[] directly" on his response to the allegations against him. *Id.* at 964 (alteration and quotations omitted).

The district court did not abuse its discretion by holding the statements were intrinsic evidence and not subject to the Rule 404(b) bar.

b. *Rules 401 and 402*

As intrinsic evidence, the statements satisfied Rule 401's "any tendency" relevance standard. *See Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 587 (1993) (calling Rule 401's standard as "liberal"). In the face of allegations that he had

73

molested children and that two of his alleged victims were male, Mr. Durham's

statements that he had struggled with both child pornography and homosexuality

provided context and explanation, making them relevant and admissible under Rules

401 and 402. Mr. Durham has not presented any persuasive argument on appeal that

the district court abused its discretion in determining the statements not only

constituted intrinsic evidence but also met "the minimal relevance requirements of

Rule 401." *United States v. Spence*, 721 F.3d 1224, 1229 (10th Cir. 2013); *see*

*United States v. Breton*, 740 F.3d 1, 14 (1st Cir. 2014) (recognizing "the low bar of

relevancy set out in Rule 401").

c. *Rule 403*

The district court did not abuse its discretion in admitting the statements over Mr.

Durham's Rule 403 challenge.

As described, the statements were probative as intrinsic to Mr. Durham's

explanation for his conduct. The district court acted within its discretion to determine

that the potential for unfair prejudice did not substantially outweigh the statements'

probative value.[31]

We affirm the district court's admission of the statements about struggles with

child pornography and homosexuality.

---

[31] We note the district court offered a limiting instruction on this evidence, which defense counsel rejected. ROA, Vol. 12 at 725-26 (TT 111-12). The instruction likely would have lowered the prejudicial effect of the evidence, and Mr. Durham should not now benefit from declining it.

## D. *Issue Four: Prosecutorial Misconduct*

Mr. Durham contends that the district court erred when it denied the part of his Rule 33 motion for a new trial which alleged that the Government made improper propensity statements about his struggle with homosexuality. Aplt. Br. at 34-39. The statements occurred during the Government's cross-examination of Mr. Durham and its closing argument. Because Mr. Durham failed to contemporaneously object to the alleged improper statements on prosecutorial misconduct grounds, we review for plain error. We find none and affirm the district court's denial of Mr. Durham's motion for a new trial on this issue.

### 1. **Standard of Review**

"Ordinarily, we review the trial court's decision to grant or deny a new trial for abuse of discretion, and will reverse the denial of a motion for a new trial only if the trial court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." *United States v. Toro-Pelaez*, 107 F.3d 819, 828 (10th Cir. 1997). But where the defendant "failed to contemporaneously object regarding the . . . reasons he asserts as justification for a new trial[,] . . . we . . . may only reach the issue if we find plain error." *Id.*

"Plain error occurs when there is (1) error, (2) that is plain, which (3) affects the defendant's substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Fleming*, 667 F.3d 1098, 1103 (10th Cir. 2011) (quotations omitted). "To show that an error affected his substantial rights, [the defendant] must establish a reasonable probability that, but for the

75

error claimed, the result of the proceeding would have been different." *United States v. Uscanga-Mora*, 562 F.3d 1289, 1295 (10th Cir. 2009) (quotations omitted). "When evaluating allegedly inappropriate remarks of counsel for plain error, we must view the remarks in the context of the entire trial." *Fleming*, 667 F.3d at 1103 (quotations omitted).

2. **Additional Factual Background**

As described in Issue Three above, the jury heard evidence that Mr. Durham had twice stated that he struggled with homosexuality. We now provide additional factual background on the two alleged instances in which the prosecution made improper propensity arguments relating to these statements.

a. *The Government's cross-examination of Mr. Durham*

During the cross-examination of Mr. Durham, the prosecutor questioned him about his struggle with homosexuality. After replaying part of one of the Seagull Confession Videos, the prosecutor asked Mr. Durham: "[W]hat do you struggle with?" ROA, Vol. 12 at 1999 (TT 1385). Mr. Durham's counsel objected to the question on the ground that "this is repetitious," and the trial court sustained the objection. *Id.* The prosecutor continued: "Mr. Durham, you struggle with homosexuality?" *Id.* Mr. Durham answered, "I did, yes," after which his counsel objected, again because "[i]t's repetitious." *Id.* The Court again sustained the objection. *Id.* The prosecution resumed playing the Seagull Confession Video, and defense counsel "object[ed] to continually replaying it after Your Honor has ruled." *Id.* The court sustained the objection, remarking that "[i]t has been played before." *Id.* at 2000 (TT 1386).

76

b. *The Government's closing argument*

During rebuttal closing argument, the prosecutor twice referred to Mr. Durham's "life-long struggle with touching children and homosexuality." *Id.* at 2087 (TT 1473), 2096 (TT 1482).

First, the prosecutor argued:

> There is always a first victim to a crime, a first time when you go to Upendo, long before your mother does, 24 days, a first time when you ask to stay at Upendo among the little children that you're going to be with . . . while you have a life-long struggle with touching children and homosexuality.

*Id.* at 2087 (TT 1473).

Second, the prosecutor argued:

> [Mr. Durham] insisted on going to Kenya weeks before anyone else. He insisted on living at Upendo when he knew he had a life-long struggle with touching children and homosexuality. He put himself there knowing he couldn't resist, knowing it was all likelihood that he would get what he always wanted, and that was to be with children.

*Id.* at 2096-97 (TT 1482-83).

Mr. Durham's counsel did not object to either of these statements. *See* ROA, Vol. 12 at 2087-2103 (TT 1473-89).

3. **Additional Procedural Background**

After the jury rendered its verdict, Mr. Durham filed a motion for new trial on various grounds. One ground was that the prosecution had "implied . . . that [his] struggles with homosexuality make it more likely that [he] sexually assaulted and molested children." ROA, Vol. 3 at 321.

The district court denied the motion. In doing so, it did not separately address Mr. Durham's claim that the prosecution had improperly suggested he had a propensity to commit the charged conduct. Instead, within its discussion of the admissibility of Mr. Durham's statements about struggling with homosexuality, the court stated that "[t]he United States never argued that Defendant engaged in sexual activity with the children because he is homosexual, rather the prosecution noted in closing argument that when confronted, he proffered an excuse." *Id.* at 785.[32]

4. **Legal Background**

"We analyze whether a statement constitutes prosecutorial misconduct using a two-step process." *Fleming*, 667 F.3d at 1103. "First, we determine whether the prosecutor's statements were improper." *Id.* (quotations omitted). "Second, we determine whether the prosecutor's improper statements were harmless beyond a reasonable doubt." *Id.* (quotations omitted).

"The Government generally bears the burden of proving that an improper statement is harmless beyond a reasonable doubt." *Id.* But "when, as here, a defendant fails to object to a prosecutor's statement, reversal is warranted only when: (1) the prosecutor's statement is plainly improper and (2) the defendant demonstrates that the improper statement affected his or her substantial rights." *Id.*

---

[32] Mr. Durham does not contend that the district court did not rule on the prosecutorial misconduct ground raised in his motion for a new trial. *See* Aplt. Br. at 34-39. Regardless of whether the district court ruled on this issue, the record is sufficiently developed to show that any error did not affect Mr. Durham's substantial rights under our plain error standard of review, as we explain below.

5. **Analysis**

Mr. Durham contends that "[t]he Government committed prosecutorial misconduct by arguing Mr. Durham was more likely to commit the alleged crimes because he struggled with homosexuality and Mr. Durham was irreparably prejudiced." Aplt. Br. at 39. Because, as we explain below, Mr. Durham failed to preserve either of the alleged instances of prosecutorial misconduct for appellate review, we review for plain error only. *See Toro-Pelaez*, 107 F.3d at 828. We begin and end our analysis at the third step of the plain error test—whether the error affected Mr. Durham's substantial rights. We conclude that Mr. Durham has failed to satisfy the substantial rights step, and we therefore affirm the district court's denial of his motion for a new trial.

a. *Preservation*

Mr. Durham failed to preserve either of the alleged instances of prosecutorial misconduct for appellate review by contemporaneously objecting on prosecutorial misconduct grounds.[33] We address each alleged instance of prosecutorial misconduct separately.

i. Alleged misconduct during cross-examination of Mr. Durham

Although defense counsel contemporaneously objected to the prosecution's cross-examination of Mr. Durham about struggling with homosexuality, defense counsel

---

[33] Mr. Durham "submits he properly preserved the [issue of prosecutorial misconduct] and that the standard of review is abuse of discretion" because he "raised the issue . . . in his motion for new trial." Aplt. Br. at 34. Our precedent forecloses this argument. *See Toro-Pelaez*, 107 F.3d at 828 (when the defendant "failed to contemporaneously object regarding the . . . reasons he asserts as justification for a new trial[,] . . . we . . . may only reach the issue if we find plain error").

objected on the ground that the questioning was repetitious—not on the ground of prosecutorial misconduct for making a propensity argument. *See* ROA, Vol. 12 at 1999 (TT 1385). The district court therefore "did not have notice that defense counsel believed the prosecutor's questioning of [Mr. Durham] to be an inappropriate attempt at [making a propensity argument] or to rise to the level of prosecutorial misconduct." *United States v. Baldridge*, 559 F.3d 1126, 1135 (10th Cir. 2009).[34]

ii. Alleged misconduct during closing argument

The record shows—and Mr. Durham concedes—that defense counsel did not contemporaneously object to the prosecution's references to his struggle with homosexuality in its closing argument. *See* ROA, Vol. 12 at 2087-2103 (TT 1473-89); Aplt. Br. at 34 ("Defendant . . . did not contemporaneously object during closing argument.").

b. *Plain error—substantial rights*

Because Mr. Durham failed to preserve either of the alleged instances of prosecutorial misconduct for appellate review, we review for plain error only. We find no plain error because Mr. Durham has failed to show that the alleged misconduct affected his substantial rights. We address each alleged instance of prosecutorial misconduct separately.

---

[34] Even if we were to conclude that the objections on the ground of repetitiousness sufficed to put the district court on notice that defense counsel believed the Government was making a propensity argument, Mr. Durham would still not be entitled to relief. Our reasons, discussed below, for determining that any error in the prosecution's questioning did not affect Mr. Durham's substantial rights would also persuade us that any error was harmless beyond a reasonable doubt.

### i. Alleged misconduct during cross-examination of Mr. Durham

Even assuming error in the prosecutor's references to homosexuality during cross-examination of Mr. Durham, any error did not affect Mr. Durham's substantial rights. "To show that an error affected his substantial rights, Mr. [Durham] must establish a reasonable probability that, but for the error claimed, the result of the proceeding would have been different." *Uscanga-Mora*, 562 F.3d at 1295 (quotations omitted).

As discussed above, defense counsel objected to the prosecutor's questioning on Mr. Durham's struggle with homosexuality on the ground of repetitiousness. The district court sustained defense counsel's objections. Moreover, the court's preliminary instructions to the jury at the trial's outset had included the following: "If an objection is sustained, ignore the question." ROA, Vol. 12 at 623 (TT 9). Additionally, the jury's acquittal of Mr. Durham on several counts, despite the prosecutor's questions, suggests that the jury's verdict was "based on reason, rather than emotion." *United States v. Archuleta*, 737 F.3d 1287, 1296 (10th Circuit 2013). Under these circumstances, Mr. Durham has not shown a reasonable probability that, but for the prosecutor's questions, the jury would have rendered a different verdict. *See United States v. Lane*, 883 F.2d 1484, 1498 (10th Cir. 1989) ("As a general rule, we presume that juries follow [limiting] instructions.").

### ii. Alleged misconduct during closing argument

Even assuming error in the prosecutor's references to homosexuality during closing argument, the error did not affect Mr. Durham's substantial rights. Mr. Durham contends otherwise, citing *United States v. Schene*, 543 F.3d 627 (10th Cir. 2008). Aplt.

81

Reply Br. at 14.[35]  In *Schene*, this court said that a prosecutor's question about whether the defendant had visited "websites with homosexual themes" was "arguably improper." 543 F.3d at 641-42.

Mr. Durham's argument fails because it does not consider the prosecution's remarks "in the context of the entire trial." *Fleming*, 667 F.3d at 1103 (quotations omitted).  Despite acknowledging the potentially prejudicial impact of the prosecutor's conduct, we held in *Schene* that, "even assuming, *arguendo*, that [the defendant] preserved this argument for appeal . . . the district court did not abuse its discretion in failing to grant a mistrial based on the prosecutorial misconduct."  543 F.3d at 642.  We reasoned that, "[g]iven the evidence against [the defendant], . . . the alleged prosecutorial misconduct was not flagrant enough to influence the jury to convict on grounds other than the evidence presented."  *Id.* (quotations omitted).

Even more so here under plain error review, when "it is the defendant rather than the Government who bears the burden of persuasion with respect to prejudice," *Fleming*, 667 F.3d at 1103 (quotations omitted), relief is not warranted based on the prosecution's closing argument.  As summarized above, the Government presented ample independent evidence to show that Mr. Durham committed the offenses on which the jury convicted.  For example, the trial evidence supporting the jury's verdict included victim testimony and detailed written confessions by Mr. Durham.  ROA, Vol. 9 at 8, 15, 16; ROA, Vol.

---

[35] Mr. Durham's argument assumes that the jury harbored biases about sexual orientation.  He has not provided any evidence that it did, but to the extent his assumption holds, we nevertheless conclude Mr. Durham has not shown that any error affected his substantial rights, as we explain below.

12 at 658, 1406, 1440, 1458.  And again, the jury's acquittal of Mr. Durham on the remaining counts further supports the harmlessness of any improper prosecutorial argument.  *See Archuleta*, 737 F.3d at 1296.  So even if we could read the prosecutor's closing argument as improperly suggesting that Mr. Durham's struggle with homosexuality made him more likely to act on his temptation to touch children, Mr. Durham is not entitled to relief on plain error review.

* * * *

Mr. Durham has not shown that the alleged improper prosecutorial statements, individually or taken together, affected his substantial rights under the plain error test. We therefore affirm the district court's denial of Mr. Durham's motion for a new trial on grounds of prosecutorial misconduct.

## E.  *Issue Five:  Cellphone Videos Authentication*

Mr. Durham challenges the admission of Ms. Menja's cellphone-recorded videos of his confession as improperly authenticated.  Aplt. Br. at 42.  He argues the "Government did not sufficiently address [his] contention that the recordings had been altered."  Aplt. Br. at 45.  He contends the videos were admitted in error due to Mr. Durham's "specific showing of irregularities" and inability to inspect the cellphone itself. [*Id.* at 46.]  Because Ms. Menja's testimony laid a sufficient foundation for authentication, we find that the district court did not abuse its discretion when it admitted her cellphone videos and affirm.

1. **Standard of Review**

Whether the Government laid a sufficient foundation for the videos to be admitted at trial is reviewed for abuse of discretion. *United States v. Green*, 175 F.3d 822, 829 (10th Cir. 1999). Abuse of discretion is defined as "an arbitrary, capricious, whimsical, or manifestly unreasonable judgment." *United States v. Cardenas*, 864 F.2d 1528, 1530 (10th Cir. 1989).

2. **Additional Background**

On June 17, 2014, Ms. Menja recorded part of her conversation with Mr. Durham at the Seagull restaurant on her cellphone. The Government's trial exhibits included the five Seagull Confession Videos recorded by Ms. Menja that day. *See* Gov't Exs. 3-7. Each was admitted and played for the jury.[36] Videos played in ROA, Vol. 12, 858-870 (TT 244-56). Ms. Menja initially turned over her cellphone to the Government so that investigators could copy the data. ROA, Vol. 12 at 433. The Government made copies and returned the phone to her. *Id.*

   a. *Pre-Trial*

Before trial, Mr. Durham moved in limine to inspect the cellphone used to record his statements and to have an expedited chain of custody hearing. ROA, Vol. 1 at 631. The court held a hearing on the motion. ROA, Vol. 12 at 427. At the hearing, the

---

[36] Gov't Exh. 3, 1 minute, 49 seconds (preliminary conversation); Gov't Exh. 4, 12 minutes 10 seconds (Mr. Durham describing his interactions with various children); Gov't Exh. 5, 29 seconds (Mr. Durham calling his mother to discuss his actions); Gov't Exh. 6, 20 seconds (Mr. Durham writing out his interactions with various children); Gov't Exh. 7, 10 seconds (another video of Mr. Durham writing out his interactions with various children.)

Government explained that it would be providing Mr. Durham a "mirror image" of Ms.

Menja's phone, but not the cellphone itself. ROA, Vol. 12 at 433; ROA, Vol. 2 at 543.

The Government described the mirror image as follows:

> When you make a video with a phone, unbeknownst to the person who is filming, images are embedded into the phone called LBLs. If you go back to that video and you cut off a portion of the recording, a forensic examiner would show that those LBLs still exist. More or less, it's like a fingerprint. In this case, the only way to get to that is to look at the actual phone. So based upon the defendant's concerns, we asked to receive the phone and we made a mirror image. That way, we can return the phone and do a forensic review on the computer, it would be just like we had her phone.

ROA, Vol. 12 at 427-28.

The Government explained that the mirror image would allow defense counsel to

analyze whether the videos had been altered: "[a forensic examiner] would be able to

look at the LBLs to make sure there's no outstanding LBL missing video." *Id.* at 429.

Defense counsel responded that the mirror image would not be sufficient to inspect for

alterations. *Id.* at 430.

The court ordered the Government to turn over the mirror image to defense

counsel. It denied without prejudice Mr. Durham's "Motion to Compel Production,

Inspection and Imaging of Cell Phone and Expedite Chain of Custody Hearing," allowing

Mr. Durham to renew the motion if necessary following his counsel's inspection of the

mirror image. ROA, Vol. 12 at 435; ROA,Vol. 2 at 40.

After his forensic expert, Donovan Farrow, analyzed the mirror image, Mr.

Durham filed a "Renewed Motion to Compel Production, Inspection, and Imaging of Cell

Phone." ROA, Vol. 2 at 533.[37]  In support of the motion, Mr. Farrow submitted an affidavit arguing that the mirror image "cannot be considered a true representation of the evidence at the time the videos were recorded" and that "[i]t appears the Government is attempting to piecemeal the cell phone evidence and only provide Defense Counsel with limited information regarding the videos." *Id.* at 543.  More specifically, he opined:

> [A] type of data scrubbing had occurred on some of the video files.  Data scrubbing is a technique used to erase metadata that is related to a file.  This technique has to be done by a person with knowledge and is not something that can occur unintentionally.  Thus, this evidence has been compromised as it was intentionally tampered with to the point the video's metadata was deleted.

*Id.* at 544.

Before the hearing on the renewed motion to compel, the court arranged for a meeting between the parties' forensic experts.  ROA, Vol. 12 at 592-596.  At that meeting, Mr. Farrow requested a "logical image" from the Government, which he later received and analyzed.  ROA, Vol. 12 at 595.[38]

At the pretrial hearing on the renewed motion to compel, Mr. Durham's counsel argued, "[W]e stated last time we were here in court that the metadata had been scrubbed. . . . After looking at the logical image, which is just a portion of the cell phone, [Mr. Farrow] found that the videos had, in fact, been split up.  They had been cut.  He can tell that from the file names." ROA, Vol. 12 at 595.  The court concluded Mr. Durham could

---

[37] Mr. Durham also renewed his motion for an "expedited chain of custody hearing."  ROA, Vol. 2 at 533 (capitalization altered).

[38] Defense counsel described a "logical image" as "a smaller portion of a forensic image."  ROA, Vol. 12 at 595.

call Mr. Farrow as a witness to testify that the videos had been altered, but it declined to exclude the videos entirely. ROA, Vol. 12 at 596. The court also noted that the Government "will have to lay the proper foundation for the introduction of these videos, and, obviously, cross-examination could be fruitful." ROA, Vol. 12 at 596.

b. *Trial*

At trial, the court overruled Mr. Durham's contemporaneous objection to admission of the Seagull Confession Videos. ROA, Vol. 12 at 857 (TT 243). The Government first showed one of the videos during its direct examination of Ms. Menja, who had recorded the video on her cellphone. Before showing the video, the Government asked Ms. Menja if she had reviewed the cellphone videos on both her phone and on a computer. She responded that she had and that the videos were "identical." ROA, Vol. 12 at 856-57 (TT 242-43). The Government then moved to admit the cellphone videos. *Id.* at 857 (TT 243). Before the court ruled, it asked Ms. Menja whether the videos "accurately reflect[ed] [her] memory of what occurred on that date." *Id.* at 857 (TT 243). She said that they did, and the court admitted the videos. *Id.*

During the direct examination of Ms. Menja, the Government asked her several times whether she manipulated, changed, or edited the footage in any way. ROA, Vol. 12 at 859, 861, 865 (TT 245, 247, 251). Each time, she responded that she had not. *Id.* The defense neither cross-examined Ms. Menja about alteration of the videos nor called

Mr. Farrow or any other forensic expert to testify about the Seagull videos.[39]  ROA, Vol. 12, at 893-961 (TT 279-347).

3. **Legal Background**

To authenticate evidence for admission at trial, "the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a).

"When evidence is unique, readily identifiable and relatively resistant to change, the foundation need only consist of testimony that the evidence is what its proponent claims." *United States v. Johnson*, 977 F.2d 1360, 1367 (10th Cir. 1992) (quotations omitted); *see also United States v. McIntyre*, 836 F.2d 467, 470 (10th Cir. 1987) (audiotape of statement admissible in trial where witness who heard statement also testifies and gives independent support for testimony).

On the other hand, when evidence "is not readily identifiable and is susceptible to alteration by tampering or contamination, the trial court requires a more stringent foundation entailing a chain of custody of the item with *sufficient completeness* to render it *improbable* that the original item has either been exchanged with another or been contaminated or tampered with." *Johnson*, 977 F.2d at 1367 (quotations omitted).  A videotape that has been altered in some form may still be "readily identifiable" and "not susceptible to alteration by tampering" for purposes of authentication. *See, e.g., United States v. Mills*, 194 F.3d 1108, 1112 (10th Cir. 1999) (allowing videotape into evidence,

---

[39] On cross-examination, Mr. Durham's counsel asked Ms. Menja about the context of the videos and why some were started or stopped when they were, but not about alterations.  ROA, Vol. 12, at 893-961.

finding it "readily identifiable" and "sufficient[ly] complete[] to render it improbable [that it had] . . . been contaminated or tampered with," despite a deletion that did "not affect the accuracy of the remaining images"). The trial court "need not rule out *every* possibility that the evidence underwent alteration; it need only find that the reasonable probability is that the evidence has not been altered in any material aspect." *Cardenas*, 864 F.2d at 1532.

### 4. **Analysis**

The district court did not abuse its discretion in determining there was a sufficient foundation supporting the cellphone videos' authenticity. Ms. Menja testified that she had reviewed the videos and that they were a fair and accurate depiction of what she saw. ROA, Vol. 12 at 857 (TT 243). That testimony gave the court sufficient basis to determine the videos were authentic. *See Mills*, 194 F.3d at 1112 (finding no abuse of discretion for a video's admission when the person responsible for creating the video confirmed that it accurately depicted what it claimed to depict); *see also United States v. Cejas*, 761 F.3d 717, 723 (7th Cir. 2014) (finding no error in admitting video that the witness testified was a "fair and accurate depiction" of what he saw). Further supporting the video's authenticity was Ms. Menja's testimony that she had not edited or altered the videos in any way. ROA, Vol. 12 at 859, 861, 865 (TT 245, 247, 251).[40]

---

[40] No chain of custody analysis was necessary given that Ms. Menja's testimony provided a foundation for the video, which was "unique, readily identifiable and relatively resistant to change." *Cardenas*, 864 F.2d at 1531. Mr. Durham contends that the videos were "easily subject to manipulation" but did not choose to present evidence on this point at trial. Aplt. Reply Br. at 16. He otherwise does not argue in his briefing why the video was not "readily identifiable."

To the extent Mr. Durham believed the videos did not depict what they claimed to depict, the court gave him an opportunity to cross-examine Ms. Menja on alterations to the videos and to call his forensic expert to testify on them. He chose to do neither. *See Johnson*, 977 F.2d at 1368 (defense counsel's failure to cross on an authentication issue cuts against an argument to exclude evidence). The district court did not abuse its discretion when it admitted the cellphone videos as sufficiently authenticated.

## F. *Issue Six:  Victims' Medical Records*

Mr. Durham challenges the district court's admission of the full set of the victims' medical records, rather than just a portion of those records, on four grounds:  (1) the court admitted all of the records when he had requested admission of only part of them (the "P-3" records), Aplt. Br. at 47; (2) the additional admitted material lacked authentication, Aplt. Br. at 47; (3) the full records included inadmissible "double hearsay," Aplt. Br. at 47-48;[41] and (4) admitting the full records was unduly prejudicial. As to the last point, Mr. Durham alleges the records contained graphic representations that "inflamed the Jury's sympathies for the alleged victims" and contained an entry that one child "was

---

[41] Mr. Durham's hearsay argument in his opening brief consists of two sentences:  "The PRC Forms and clinician notes contain information relayed by the patient or third parties.  This constitutes inadmissible double hearsay. *See United States v. Gwathney*, 465 F.3d 1133, 1141 (10th Cir. 2006)." Aplt. Br. at 47-48. In his reply brief, he maintains that a particular victim's identification of Mr. Durham during her examination was "impermissible double hearsay" but contests no other specific information in the victims' medical records. Aplt. Reply Br. at 19. We therefore consider only the abuser identification hearsay argument because Mr. Durham fails to identify any other information in the medical records he wishes to challenge on hearsay grounds.

defiled by a man named Matthew." Aplt. Br. at 47-48. Because Mr. Durham invited any error, and because he cannot show error, his argument fails under plain error review. We affirm the district court's admission of the full medical records.

1. **Standard of Review**

Mr. Durham failed to object to admission of the records at trial, so the plain-error standard applies. He must accordingly show: "(1) error, (2) that is plain, which (3) affects the defendant's substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Baldridge*, 559 F.3d 1126, 1135 (10th Cir. 2009). Mr. Durham's challenge fails at the first element— whether the district court erred. We review evidentiary rulings for error under an abuse of discretion standard. *Willis*, 826 F.3d at 1270.

2. **Additional Background**

The medical records that the Government provided to Mr. Durham consisted of: (1) a Post Rape Care ("PRC") form; (2) lab requests; (3) clinician notes; and (4) a Medical Examination Report, also known as a P-3 form. ROA, Vol. 10a at 28-80. The clinician on call filled out the PRC form for the six children examined. ROA, Vol. 12 at 1182 (TT 568). A supervising physician, Dr. Abdukladir, then reviewed the PRC forms and prepared P-3 forms based on that review. ROA, Vol. 12 at 1182-85 (TT 568-71).

During cross-examination of Dr. Abdulkadir, defense counsel moved for admission of a P-3 Form only. *See* ROA, Vol. 12 at 1202 (moving to admit pages "1 through 4" of Government's Exhibit 44); ROA, Vol. 10a at 28 (P-3 form). The Government responded by moving to enter the entire exhibit, which included all four

components described above. ROA, Vol. 12 at 1202 (TT 588). Defense counsel then stated: "I would ask that they move to[sic] Exhibits – enter Exhibit 45, 46, 47, 48, and 49 as well." ROA, Vol. 12 at 1202 (TT 588). The Court admitted all of the records. *Id.* Defense counsel did not object. *Id.*

3. **Legal Background**

a. *Invited error*

It is "fundamental that a defendant cannot complain of error which he invited upon himself." *United States v. Chavez*, 229 F.3d 946, 952 (10th Cir. 2000) (quotations omitted).

b. *Authentication*

To authenticate evidence for admission at trial, "the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a).

c. *The hearsay rule and pertinent exceptions*

"Hearsay" is a statement that "the declarant does not make while testifying at the current trial or hearing" and "a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). It is inadmissible unless an exception applies. Fed. R. Evid. 802. One such exception is for business records—"records of a regularly conducted activity." Fed. R. Evid. 803(6). "[H]ospital records . . . fit conceptually within the long-established exception for business records." *Manocchio v. Moran*, 919 F.2d 770, 776 (1st Cir. 1990).

Another exception to the hearsay rule is for a "statement that: (A) is made for—and is reasonably pertinent to—medical diagnosis or treatment; and (B) describes medical history; past or present symptoms or sensations; their inception; or their general cause." Fed. R. Evid. 803(4). This court has recognized that "the Fourth, Eighth and Ninth Circuits have held that statements made by a child to a physician which identify the sexual abuser as a member of the family or household are 'reasonably pertinent to diagnosis or treatment' and may therefore be admissible [under Rule 803(4)]." *United States v. Joe*, 8 F.3d 1488, 1494 (10th Cir. 1993). Accepting these holdings as valid, we extended their application to cover abuser identifications during medical examinations made by adult domestic sexual assault victims. *Id.* at 1495.

d. *Unfair prejudice*

Under Federal Rule of Evidence 403, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403. The graphic nature of evidence does not alone make it inadmissible. *See United States v. Naranjo*, 710 F.2d 1465, 1468-69 (10th Cir. 1983) (allowing photograph of victim shot in the face because it showed the "particulars of the crime scene" and "was not unduly nor designedly inflammatory").

4. **Analysis**

Mr. Durham's challenge to the court's admission of the victims' full medical records fails. Any error was invited, and he cannot show error on any ground he raises on appeal. It follows that he cannot show plain error. *Baldridge*, 559 F.3d at 1135.

At trial, following Mr. Durham's request to admit a P-3 Form, which was part of the medical records in Government Exhibit 44, the Government requested the admission of the entire medical record—including the PRC form, lab requests, clinician notes, and the Medical Examination Report. ROA, Vol. 12 at 1202 (TT 588). Rather than object, Mr. Durham's counsel requested to move "Exhibit[s] 45, 46, 47, 48, and 49" into evidence "as well." ROA, Vol. 12 at 1202 (TT 588). Those exhibits included entire medical records, not just P-3 forms. Mr. Durham thus invited any potential error from admitting the records and cannot establish a plain error warranting reversal. *See Chavez*, 229 F.3d at 952 (finding no plain error when the appellant invited the complained-of error). Although invited error alone is sufficient to reject Mr. Durham's challenge on appeal to admission of this evidence, we also determine there was no error based on any of the four grounds Mr. Durham argues.

First, Mr. Durham argues his initial request to admit only the P-3 form showed "counsel's intent was to admit only a limited portion of the medical records." Aplt. Reply Br. at 17. Even if that were so, counsel switched gears and requested admission of the entire records.

Second, Mr. Durham's authenticity argument fails in light of Dr. Abdukladir's testimony. *See* ROA, Vol. 12 at 1179-83 (TT 565-69). She testified that she supervised the department where the records were created, reviewed the PRCs when they were filled out to make sure they had been properly completed, and reviewed the records before testifying. *Id.*

94

Third, there was no hearsay error. Mr. Durham makes no argument about admission of the medical records themselves under the business record or some other exception to the hearsay rule. The only specific reference in the medical records Mr. Durham challenges based on hearsay is one victim's identification of "Matthew" during her examination. That statement, identifying a member of the child's household as the abuser, was admissible under *Joe*. 8 F.3d at 1494-95.[42]

Fourth, the court did not abuse its discretion under Fed. R. Evid. 403. Mr. Durham does not question the probativeness of the medical records. Mr. Durham characterizes the records as including "graphic representations about where the child was touched and the purported genital injury," Aplt. Br. at 47. We have reviewed the evidence and conclude the district court's balancing of the probative value and prejudicial effect was reasonable. *See Naranjo*, 710 F.2d at 1468-69 (graphic image admissible if highly probative and not designedly inflammatory). The records were highly probative of the victims' injuries. The evidence was collected as part of a standardized medical examination process and was not "designedly inflammatory." *Id.* at 1469.

---

[42] Mr. Durham cites *United States v. Gwathney*, 465 F.3d 1133, 1141 (10th Cir. 2006), to support his "double hearsay" argument. Aplt. Br. at 47-48. In *Gwathney*, we said that "[a]ny information provided by another person, if an outsider to the business preparing the record, must itself fall within a hearsay exception to be admissible." 465 F.3d at 1141. Here, the statement made by the "outsider"—the victim identifying the abuser—is admissible under the hearsay exception recognized in Federal Rule of Evidence 803(4).

95

Because Mr. Durham invited error and has not otherwise shown the court erred, we affirm the records' admission and reject Mr. Durham's appeal.[43]

G. *Issue Seven: Substantive Reasonableness of Sentence*

Mr. Durham challenges his 480-month sentence as substantively unreasonable. Aplt. Br. at 58-59. He "does not challenge the district court's procedure in calculating" the recommended sentence under the Guidelines. Aplt. Reply Br. at 26. We affirm his sentence because he has not shown that the district court abused its discretion in weighing the sentencing factors set forth in 18 U.S.C. § 3553(a).

1. **Standard of Review**

We "review the substantive reasonableness of a sentence for abuse of discretion." *United States v. Chavez*, 723 F.3d 1226, 1233 (10th Cir. 2013); *see also Gall v. United States*, 552 U.S. 38, 51 (2007) ("[T]he appellate court should . . . consider the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard.").

We find no abuse unless the sentence "is arbitrary, capricious, whimsical, or manifestly unreasonable." *United States v. Munoz–Nava*, 524 F.3d 1137, 1146 (10th Cir. 2008) (quotations omitted). "That is to say, we recognize that in many cases there will be a range of possible outcomes the facts and law at issue can fairly support; rather than pick

---

[43] Mr. Durham raises a new argument in reply that, to the extent his counsel invited error, his counsel was ineffective. Aplt. Reply Br. at 21. Because that argument was not raised in his opening brief, it is waived. *See Silverton Snowmobile Club v. U.S. Forest Serv.*, 433 F.3d 772, 783 (10th Cir. 2006) (declining to consider arguments not raised in opening brief). It would be more appropriate to raise this argument through a motion under 28 U.S.C. § 2255. *See United States v. Galloway*, 56 F.3d 1239, 1242 (10th Cir. 1995) (en banc) ("The rule in this circuit . . . is that claims of constitutionally ineffective counsel should be brought on collateral review, in the first petition filed under 28 U.S.C. § 2255.").

and choose among them ourselves, we will defer to the district court's judgment so long as it falls within the realm of . . . rationally available choices." *United States v. McComb*, 519 F.3d 1049, 1053 (10th Cir. 2007).

## 2. **Additional Factual Background**

The final PSR calculated a Guidelines sentence of 1,440 months in prison based on Mr. Durham's total offense level and criminal history category. ROA, Vol. 7 at 142.[44] The PSR identified only one factor potentially warranting a downward departure—that Mr. Durham was 19 years old when he committed the offenses of conviction. *Id.* at 145-46. The district court adopted the PSR's calculated Guidelines sentence of 1,440 months. *Id.* at 475.[45]

The court sentenced Mr. Durham to 480 months in prison, a sentence it characterized as a downward variance. ROA, Vol. 3 at 844; ROA, Vol. 7 at 477; ROA,

---

[44] The PSR calculated Mr. Durham's total offense level to be 49 and his criminal history category to be I. ROA, Vol. 7 at 135, 136. Under the Guidelines, an offense level exceeding 43, the highest offense level reflected in the sentencing table, "is to be treated as an offense level of 43." U.S.S.G. Ch. 5, Pt. A (Sentencing Table), Application Note 3. The Guidelines recommend a sentence of "life" for a defendant with an offense level of 43, regardless of the criminal history category. *See* U.S.S.G. Ch. 5, Pt. A (Sentencing Table). The probation officer who prepared Mr. Durham's PSR, after consulting with the United States Sentencing Commission, arrived at a Guidelines sentence of 1,440 months to be consistent with the cumulative statutory maximum sentence for the four counts of conviction. ROA, Vol. 7 at 142 n.3. Under these circumstances, the PSR calculated a recommended Guidelines sentence rather than a sentence range.

[45] Based on its finding that Mr. Durham had committed perjury at trial, the district court applied a two-level enhancement for obstruction of justice, bringing Mr. Durham's offense level to 51. ROA, Vol. 7 at 475. Because the offense level calculated in the PSR already exceeded the maximum offense level of 43, the two-level enhancement had no effect on the recommended Guidelines sentence.

Vol. 13 at 158.[46]  The court offered the following explanation of its decision at Mr.

Durham's sentencing hearing:

> The sentence the Court has selected, I'm satisfied, is
> sufficient but not greater than necessary, when considering
> the sentencing factors set forth in 18 U.S. Code 3553.
>
> 18 U.S. Code 3553 requires the Court to consider these
> factors:
>
> The nature and circumstance of the offense; and the history
> and characteristics of the defendant.
>
> In this regard, pursuant to reading the sentencing
> memorandum and what I've heard here today, I have
> considered the age of the defendant, the fact he is a first-time
> offender, his potential for the future, his charitable efforts
> prior to this occasion, that this at least appears to be aberrant
> behavior, the defendant has asked for mercy from the
> Court[,] . . . his success in school, and all the other matters
> raised in the defendant's brief.
>
> The next factor the Court must consider are [sic] the need for
> the sentence imposed.  This includes to reflect the seriousness
> of the offense, to promote respect for the law, and to provide
> just punishment for the offense, to afford adequate deterrence
> to criminal conduct, to protect the public from further crimes
> of the defendant, to provide the defendant with needed
> education or vocational training, medical care, or other
> correctional treatment in the most effective manner.
>
> The kind of sentence available is number three.
>
> Finally, the kind of sentences and the sentencing range, which
> has been established.  And the sentencing guidelines call for a
> sentence of life in prison.

---

[46] The 480-month sentence consists of 360 months on each of the four counts
of conviction, running partially consecutively and partially concurrently to achieve
the total sentence of 480 months.  ROA, Vol. 3 at 844; ROA, Vol. 13 at 158-59.

Next, the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. . . . I read all the cases cited by both the defendant and the government. And, actually, I didn't find these particularly helpful. They went all over the lot, and circumstances differed from one case to another. There obviously wasn't one that fit exactly with this case, and you wouldn't expect there to be.

The only time I have had a case of rape . . . I had one sentence five or six years ago . . . in which the defendant was convicted of raping his 11-year-old niece. He had a prior conviction for sexual molestation, and I imposed a sentence of 50 years' incarceration.

Finally is the need to provide restitution to any victims of the offense.

These were heinous crimes committed on the most vulnerable victims. These darling children, who had been abandoned and orphaned, looked to the defendant for love and support. Instead, one by one they were raped. One was but five years old.

At times he chose to humiliate the children by having one watch while he abused or raped another. He was their worst nightmare come true.

Of course, there are other victims, including the children the defendant molested, but the counts were dismissed because the acts didn't technically fit the charge.

And the Upendo home and the people that worked and volunteered there, they were trying to help the forsaken. This is now how they are known or what they must deal with.

These violent acts demand a harsh sentence. The victims must feel secure that he will not touch them again. However, I also believe, when considering everything, there should be some light at the end of the tunnel.

> Hopefully, with appropriate treatment and strict supervision after release, the defendant can live productively and safely in society.

ROA, Vol. 13 at 156-58.

3. **Legal Background**

A substantive reasonableness sentencing challenge asks us to address "whether the length of the sentence is reasonable given all the circumstances of the case in light of the factors set forth in 18 U.S.C. § 3553(a)." *United States v. Verdin-Garcia*, 516 F.3d 884, 895 (10th Cir. 2008) (quotations omitted); *see Gall*, 552 U.S. at 51.[47]

---

[47] Courts must consider the following factors in imposing a sentence:
   (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
   (2) the need for the sentence imposed—
      (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
      (B) to afford adequate deterrence to criminal conduct;
      (C) to protect the public from further crimes of the defendant; and
      (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
   (3) the kinds of sentences available;
   (4) [the applicable Guidelines recommended kind and range of sentence];
   (5) [any pertinent Guidelines policy statements];
   (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
   (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

When a defendant is sentenced within a properly calculated Guidelines range, the sentence "is entitled to a rebuttable presumption of reasonableness." *United States v. Kristl*, 437 F.3d 1050, 1054 (10th Cir. 2006) (per curiam). In addition, we have endorsed "the logical and unremarkable proposition that 'a below-guideline sentence is also presumptively reasonable against an attack by a defendant claiming that the sentence is too high.'" *United States v. Balbin-Mesa*, 643 F.3d 783, 788 (10th Cir. 2011) (quoting *United States v. Liddell*, 543 F.3d 877, 885 (7th Cir. 2008)).

4. **Analysis**

Mr. Durham challenges his 480-month sentence as substantively unreasonable. Aplt. Br. at 58-59. Because Mr. Durham "does not challenge the district court's procedure in calculating" the Guidelines sentence, Aplt. Reply Br. at 26, which was determined to be 1,440 months, we presume that his sentence is substantively reasonable.[48] We affirm because Mr. Durham's arguments fail to overcome the presumption that his sentence is substantively reasonable in light of the § 3553(a) factors.

First, Mr. Durham appears to argue that he should have been sentenced to no more than 470 months in prison, citing an online publication by the United States Sentencing Commission (the "Commission") for the proposition that "a life sentence is the equivalent of 470 months." Aplt. Br. at 58. This argument implicates procedural reasonableness rather than substantive reasonableness because it relates to the district

---

[48] Mr. Durham's sentence of 480 months is less than the recommended Guidelines sentence of 1,440 months, as determined by the district court. Whether we characterize Mr. Durham's sentence as within or below the Guidelines range, it is entitled to a presumption of reasonableness. *See Kristl*, 437 F.3d at 1054; *Balbin-Mesa*, 643 F.3d at 788.

court's calculation of the Guidelines range rather than its weighing of the § 3553(a) factors. *See Gall*, 552 U.S. at 51 ("failing to calculate (or improperly calculating) the Guidelines range" is a procedural error). "To the extent [Mr. Durham] seeks to challenge the procedural reasonableness of the district court's sentencing calculation, . . . any such arguments have been waived by [his] failure either to raise th[is] specific objection[] below or to make an argument for plain error review on appeal." *United States v. DeRusse*, 859 F.3d 1232, 1236 n.1 (10th Cir. 2017).[49]

Second, Mr. Durham contends that his sentence is unreasonably high in light of the need to avoid unwarranted disparities. *See* Aplt. Br. at 58-59. This argument also lacks merit. At Mr. Durham's sentencing hearing, the district court stated that it had "read all the cases cited by both the defendant and the government [pertaining to the disparities factor]" but "didn't find [them] particularly helpful" because "circumstances differed from one case to another." ROA, Vol. 13 at 157. On appeal, Mr. Durham has not challenged the court's determination that the other cases he presented involved dissimilarly situated offenders. *See United States v. Franklin*, 785 F.3d 1365, 1372 (10th Cir. 2015) ("No two cases are identical, and comparison of an individual sentence with a few counsel-selected cases involving other defendants sentenced by other judges is

_____

[49] In any event, we are not persuaded that the Commission has "state[d] that a life sentence is the equivalent of 470 months." Aplt. Br. at 58. Mr. Durham cites an online publication entitled the "Variable Codebook for Individual Offenders." *Id.* This publication defines the standard codes the Commission applies to the sentencing data it gathers, including the code "470," which denotes life sentences. *See generally* U.S. Sentencing Comm'n, *Variable Codebook for Individual Offenders: Standardized Research Data Documentation for FY1999-2014* (Rev. Apr. 8, 2015), *available at* https://perma.cc/A8X6-8TTF. Contrary to Mr. Durham's assertion, the publication nowhere equates a life sentence with 470 months in prison.

almost always useless." (citation and quotations omitted)).  Nor has he advanced any

reason to question the court's weighing of the disparities factor.  *See United States v.*

*Barnes*, 890 F.3d 910, 921 (10th Cir. 2018) ("Even if the disparities factor weighs in

favor of a higher sentence, the district court considered it alongside other factors and the

facts of this case and did not abuse its discretion in imposing the sentence[] it did.").

\* \* \* \*

Mr. Durham has failed to rebut the presumption that the district court reasonably

weighed the § 3553(a) factors or to show that its sentencing decision exceeds the bounds

of permissible choice.  We therefore affirm Mr. Durham's 480-month sentence.

## H. *Issue Eight:  Cumulative Error*

Finally, Mr. Durham argues that the errors he alleges, taken together, deprived him

of a fair trial.  Aplt. Br. at 59-60.  "To analyze cumulative error, we aggregate all the

errors that we have found to be harmless and determine whether their cumulative effect

on the outcome of the trial mandates reversal."  *United States v. Anaya*, 727 F.3d 1043,

1060–61 (10th Cir. 2013) (quotations omitted).  In conducting our cumulative error

analysis, we consider two of Mr. Durham's claims:  (1) the *Brady* claim,[50] and (2) the

---

[50] We "include[] [*Brady* claims] in the cumulative-error calculus if they have been individually denied for insufficient prejudice."  *Cargle v. Mullin*, 317 F.3d 1196, 1207 (10th Cir. 2003).  Here, as discussed above, we held that no *Brady* violation occurred because the withheld evidence lacked materiality, which speaks to prejudice.  We therefore include the alleged *Brady* error in our cumulative error analysis.

prosecutorial misconduct claim.[51]

"When there are both preserved and unpreserved errors, cumulative-error analysis should proceed as follows: First, the preserved errors should be considered as a group under harmless-error review. If, cumulatively, they are not harmless, reversal is required." *Id.* at 1061 (alterations and quotations omitted). "The only potential preserved error is the [alleged *Brady* error]. Without other errors to aggregate, there can be no cumulative harm." *Id.* We therefore proceed to the next step of our cumulative error analysis.

"If the preserved errors are cumulatively harmless, then the court should consider whether those preserved errors, when considered in conjunction with the unpreserved errors, are sufficient to overcome the hurdles necessary to establish plain error." *Id.* (quotations omitted). "That is, we look to whether the combination of the [alleged *Brady* error] and the prosecutor's statements regarding [Mr. Durham's struggle with homosexuality] affected Mr. [Durham]'s substantial rights or seriously affected the fairness, integrity, or public reputation of judicial proceedings." *Id.* (alterations and quotations omitted).

Mr. Durham cannot show that the combination of the alleged *Brady* and prosecutorial misconduct errors affected his substantial rights. As discussed above, he

---

[51] In our above discussion of the prosecutorial misconduct claim, we "did not determine whether [the] alleged errors constituted actual errors but instead concluded that any potential errors did not merit reversal because they did not affect the outcome of Mr. [Durham's] case." *Anaya*, 727 F.3d at 1061. "For the purposes of cumulative error analysis, we assume without deciding that these alleged errors were errors and proceed accordingly." *Id.*

suffered minimal (if any) prejudice from the alleged *Brady* error because defense counsel—through Nurse Dunson—presented an effective rebuttal to Dr. Abdulkadir's testimony based on information that was substantially the same as the withheld evidence. Moreover, the evidence of Mr. Durham's guilt was strong. For example, the trial evidence supporting the jury's verdict included victim testimony and detailed written confessions by Mr. Durham. ROA, Vol. 9 at 8, 15, 16; ROA, Vol. 12 at 658, 1406, 1440, 1458. "Consequently, even if we aggregate the[] alleged [*Brady* and prosecutorial misconduct] errors, there is no cumulative error." *Anaya*, 727 F.3d at 1061.

## III. CONCLUSION

We affirm Mr. Durham's convictions and sentence.

16-6075, *United States v. Durham*

**HARTZ**, Circuit Judge, dissenting.

In 2014, Defendant, 19 years old at the time, made his fourth missionary trip from the United States to Kenya to volunteer at a home for impoverished children. A jury acquitted him of traveling with the intent to engage in illicit sexual conduct. But he did engage in illicit sexual conduct after his travel to Kenya. While living at the home, he sexually assaulted a number of the boys and girls he was supposed to be helping. Kenyan police said they could not arrest him, and he was permitted to return to the United States. A federal jury convicted him of the offenses he committed after he arrived in Kenya.

Defendant's offenses were horrific. The only question is whether the United States could properly prosecute him. The government asserts that Congress had the authority to criminalize Defendant's behavior under the Constitution's Foreign Commerce Clause because such conduct has a substantial effect on foreign commerce. The panel majority agrees. I respectfully dissent.

The only foreign "commerce" identified by the government is commercial sex trafficking of children. I do not dispute that such trafficking is within the purview of the Foreign Commerce Clause.[1] But (1) there is no evidence in this case of any commercial sexual activity, (2) I fail to see how conduct like that of Defendant has any impact on commercial sexual activity, and (3) no one has presented to this court any evidence of

---

[1] Congress may also have authority over such trafficking under the Treaty Clause, because this country has ratified the Optional Protocol to the Convention on the Rights of the Child regarding the Sale of Children, Child Prostitution and Child Pornography. But the government has not relied on the Treaty Clause in this case and the Optional Protocol addresses only commercial activity.

such a connection.  If Congress has authority under the Foreign Commerce Clause to criminalize Defendant's actions, it has power to criminalize any conduct by Americans abroad.

In my view, the Foreign Commerce Clause does not authorize Congress to prohibit noncommercial sexual assaults, no matter how heinous, committed by Americans abroad who formed the intent to commit the acts after arriving abroad.  The Interstate Commerce Clause would not permit Congress to prohibit noncommercial sexual assaults within a State, even if the perpetrator had traveled from another State, so long as the perpetrator did not form the intent to commit the act before arriving in the State where the crime was perpetrated.  The majority suggests that even if the Interstate Commerce Clause would not authorize the domestic statute, a statute governing conduct abroad would be valid under the Foreign Commerce Clause because it conveys more expansive power than does the Interstate Commerce Clause and the Foreign Commerce Clause is not limited by concerns about state sovereignty.  But these suggestions are not persuasive.  The limits on congressional authority under the Interstate Commerce Clause are based on the Supreme Court's understanding of what it means to regulate commerce and the understanding that provisions of a constitution creating a government of limited power should not be interpreted in a way that would confer general police power.  Although federal power under the Foreign Commerce Clause exceeds that under the Interstate Commerce Clause in some respects—in particular, the Foreign Commerce Clause restricts state regulation of foreign commerce because of the need for this country

2

to speak with one voice in foreign affairs—this additional power is irrelevant in the present context.

This dissent will travel much of the same ground as the panel opinion. But, as might be expected, my description of the terrain will be somewhat different.

## I.    The Charge

Defendant was convicted under 18 U.S.C. § 2423(c), which is part of the Prosecutorial Remedies and Other Tools to End the Exploitation of Children Today Act (PROTECT Act) enacted in 2003. Section 105 of the Act, entitled "Penalties Against Sex Tourism," amended § 2423 to add a subsection (b) entitled "Travel with intent to engage in illicit sexual conduct"[2] and a subsection (c) entitled "Engaging in illicit sexual conduct in foreign places."[3] In subsection (f) it defines *illicit sexual conduct* to include commercial sex acts with persons under 18, production of child pornography, and sexual

---

[2] Subsection (b) states:

> Travel with intent to engage in illicit sexual conduct.--A person who travels in interstate commerce or travels into the United States, or a United States citizen or an alien admitted for permanent residence in the United States who travels in foreign commerce, for the purpose of engaging in any illicit sexual conduct with another person shall be fined under this title or imprisoned not more than 30 years, or both.

This subsection replaced a somewhat narrower version in the Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, 108 Stat. 1796.

[3] Subsection (c) states:

> Engaging in illicit sexual conduct in foreign places.--Any United States citizen or alien admitted for permanent residence who travels in foreign commerce or resides, either temporarily or permanently, in a foreign country, and engages in any illicit sexual conduct with another person shall be fined under this title or imprisoned not more *than* 30 years, or both.

3

acts with persons under 18 that would violate chapter 109A of the federal criminal code if committed in federal territorial jurisdiction.[4]  The jury found that Defendant engaged in conduct described in Chapter 109A.  He was not charged with committing any commercial sex act, which is defined in 18 U.S.C. § 1591 as "any sex act, on account of which anything of value is given to or received by any person."  And he was acquitted of a charge under § 2423(b), which requires that the defendant "travel[] in foreign commerce, for the purpose of engaging in any illicit sexual conduct."

The question before the court is whether the power to regulate commerce with foreign nations includes the power to punish Americans who traveled to a foreign nation and then, in what was not a commercial sex act, decided to and did molest a child there. To answer the question requires a deep dive into the Foreign Commerce Clause.

## II.       The Commerce Clause

The Constitution grants Congress the power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes."  U.S. Const. art.1, § 8, cl. 3.  Almost two centuries ago Chief Justice Marshall noted the commonality of the

---

[4]  Subsection (f) states:

> Definition.--As used in this section, the term "illicit sexual conduct" means-

> (1) a sexual act (as defined in section 2246) with a person under 18 years of age that would be in violation of chapter 109A if the sexual act occurred in the special maritime and territorial jurisdiction of the United States;

> (2) any commercial sex act (as defined in section 1591) with a person under 18 years of age; or

> (3) production of child pornography (as defined in section 256(8)).

4

three clauses within the Commerce Clause—the Foreign Commerce Clause, the Interstate Commerce Clause, and the Indian Commerce Clause—in an opinion construing the meaning of the Interstate Commerce Clause. He wrote, "It has been truly said, that commerce, as the word is used in the constitution, is a unit, every part of which is indicated by the term." *Gibbons v. Ogden*, 22 U.S. 1, 194 (1824). Having previously stated the accepted meaning of *commerce* in the context of international trade, he concluded that "the word . . . must carry the same meaning throughout the sentence, and remain a unit, unless there be some plain intelligible cause which alters it." *Id*. I would infer that the same proposition applies to the word *regulate* in the Clause. Thus, when interpreting the Foreign Commerce Clause to resolve this case, one can look to Supreme Court doctrine under the other commerce clauses, while recognizing that there may well be "plain intelligible cause[s]" that require differentiation among the clauses. I begin with a brief explanation of why I think that doctrine under the Indian Commerce Clause teaches little about how to interpret the Foreign Commerce Clause in the context of this case, and then I compare the Foreign Commerce Clause and the Interstate Commerce Clause.

### A. The Indian Commerce Clause

The constitutional provision containing the Interstate Commerce Clause and the Foreign Commerce Clause also grants congressional power "[t]o regulate Commerce . . . with the Indian Tribes." U.S. Const. art. 1, § 8, cl. 3. The Supreme Court has described the federal power "to legislate in respect to Indian tribes . . . as plenary and exclusive." *United States v. Lara*, 541 U.S. 193, 200 (2004) (internal quotation marks omitted). That

5

plenary power has been exercised so far as to impose federal criminal law within Indian territory. *See, e.g.*, 18 U.S.C. § 1153 (major crimes by Indians committed in Indian country). Is similar authority conveyed under the Foreign Commerce Clause? After all, at first glance the Indian Commerce Clause would appear to be a close relative of the Foreign Commerce Clause. The relationship between this nation and Indian tribes has much in common with the relationship between this nation and foreign nations. At the time of the Founding (and long after), the tribes were treated as sovereignties with which this country entered into treaties.

On closer inspection, however, the comparison cannot be sustained. Although the Indian Commerce Clause was juxtaposed with the other two commerce clauses, it was a late add-on at the constitutional convention, *see* Albert S. Abel, *The Commerce Clause in the Constitutional Convention and in Contemporary Comment*, 25 Minn. L. Rev. 432, 467 (1941) (Abel) (the clauses granting the other two commerce powers "had been published by the committee of detail two weeks . . . before the subject of the Indian trade was introduced on the floor of the convention"); and, more importantly, the Indian-commerce power was a special subject never discussed in relation to the other two powers, *see id.* at 468 ("Whatever regulation of commerce might mean in connection with transactions with the Indians, it was so distinct and specialized a subject [at the Convention] as to afford no basis for argument as to the meaning of the rest of the clause.").

Moreover, congressional power over Indian tribes does not derive just from the Commerce Clause. As additional sources of "plenary and exclusive" power with respect

6

to Indian tribes, which have been described by the Court as "*dependent* sovereign[s]" that are not States, *Lara*, 541 U.S. at 203 (emphasis added), the Supreme Court has identified the Treaty Clause, the Property Clause, and "preconstitutional powers necessarily inherent in any Federal Government, namely, powers that this Court has described as 'necessary concomitants of nationality,'" *id.* at 200–01. And it has pointed to the federal government's assumption of "guardian-ward" status with respect to Indian Tribes as a source for Congress's "plenary power . . . to deal with the special problems of Indians." *Morton v. Mancari*, 417 U.S. 535, 551 (1974). Given this unique status of Indians in our constitutional system, I think that one can learn very little about Foreign Commerce Clause power over Americans in foreign nations (the situation presented in this appeal) by examining congressional authority in Indian country.

### B. The Interstate Commerce Clause

The component of the Commerce Clause that has bred the most Supreme Court doctrine is the Interstate Commerce Clause. Although, as Chief Justice Marshall suggested, special considerations pertinent to each clause preclude mechanical application to one clause of doctrine regarding another, I first consider interstate-commerce doctrine and then address what, if any, adjustments are needed.

I begin with propositions regarding interstate commerce that are derived from notions of international commerce. Chief Justice Marshall's description of commerce was adopted by Chief Justice Rehnquist in *United States v. Lopez*, 514 U.S. 549 (1995): "'Commerce, undoubtedly, is traffic, but it is something more: it is intercourse. It describes the commercial intercourse between nations, and parts of nations, in all its

7

branches, and is regulated by prescribing rules for carrying on that intercourse,'" *id*. at 553 (quoting *Gibbons*, 22 U.S. at 189–90). But "limitations on the commerce power are inherent in the very language of the Commerce Clause." *Id.* Again quoting Chief Justice Marshall:

> It is not intended to say that these words comprehend that commerce, which is completely internal, which is carried on between man and man in a State, or between different parts of the same State, and which does not extend to or affect other States. Such a power would be inconvenient, and is certainly unnecessary.
> . . . The enumeration presupposes something not enumerated; and that something, if I regard the language, or the subject of the sentence, must be the exclusively internal commerce of a State.

*Id*. (quoting *Gibbons*, 22 U.S. at 194–95). In recognition of these limitations, the Supreme Court has identified "three categories of regulations permitted by the Interstate Commerce Clause: (1) regulation of "'use of the channels of interstate commerce'"; (2) regulation of "'instrumentalities of interstate commerce, or persons or things in interstate commerce'"; and (3) regulation of "'activities that substantially affect interstate commerce.'" *People for Ethical Treatment of Prop. Owners v. United States Fish & Wildlife Serv.*, 852 F.3d 990, 1000 (10th Cir. 2017) (quoting *Lopez*, 514 U.S. at 558–59).

Under the first category Congress can bar a class of goods or people from the channels of commerce because they are deemed to be tainted by "immoral [or] injurious uses." *United States v. Patton*, 451 F.3d 615, 621 (10th Cir. 2006). Thus, Congress can ban the interstate transportation of kidnapped persons or stolen goods, *see Perez v. United States*, 402 U.S. 146, 150 (1971); of women for the purpose of prostitution, *see Caminetti v. United States*, 242 U.S. 470, 491–92 (1917); of plural wives for the purpose

8

of polygamy, *see Cleveland v. United States*, 329 U.S. 14, 18 (1946); of lottery tickets, *see Champion v. Aims*, 188 U.S. 321, 354–55 (1903); or of goods produced by underpaid workers, *see United States v. Darby*, 312 U.S. 100, 112–14 (1941). These cases illustrate that this regulatory authority is not limited to legislation targeting commercial activities. *See Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 256 (1964).

Under the second category Congress can regulate "the means of interstate commerce"—such as ships, railroads, airplanes, and the telegraph; can regulate "intrastate activities that threaten these instrumentalities"; and can protect "the persons or things that the instrumentalities are moving." *Patton*, 451 F.3d at 622. For example, Congress can ban the destruction of aircraft or theft from interstate shipments. *See Perez*, 402 U.S. at 150.

Under the third category Congress can regulate activities, even intrastate and noncommercial activities, if "Congress ha[s] a rational basis to find that the regulated activity, taken in the aggregate, would substantially affect interstate commerce." *Patton*, 451 F.3d at 623. This authority permits Congress to restrict a farmer's production of wheat for his own use when the restriction's purpose is to boost the price of wheat in commerce. *See Wickard v. Filburn*, 317 U.S. 111, 127–29 (1942); *id*. at 115 (the statute was designed "to control the volume [of wheat] moving in interstate and foreign commerce in order to avoid surpluses and shortages," thereby controlling the price). This authority also permits Congress to control marijuana in national commerce by barring the noncommercial cultivation, possession, and use of marijuana for personal medical purposes. *See Gonzales v. Raich*, 545 U.S. 1, 25–33 (2005). To determine whether a

9

statute is authorized under this category, courts consider (1) whether the regulated activity is commercial or economic; (2) the relation of the regulated activity to interstate commerce; (3) congressional findings about the effects of the regulated activity on commerce; and (4) whether the statute is limited to activities having an explicit connection to interstate commerce—a so-called jurisdictional hook. *See Patton*, 451 F.3d at 624, 626, 630, 632.

When the regulated activity is commercial, the regulation is generally permissible, given how integrated our national economy is. *See id.* at 623. Otherwise, "the last three factors are significant." *Id.* at 624. Because almost any human activity could be said to have some effect on commerce, the Supreme Court has carefully examined the relationship of the regulated activity to commerce to be sure that the Commerce Clause power is not rendered so expansive as to supersede all the other grants of power under the Constitution. In particular, an effect cannot be considered "substantial" if inclusion of such effects would as a practical matter confer a plenary police power, contrary to the notion that the Constitution established a government of limited powers. In *United States v. Lopez,* 514 U.S. at 549, the Court invalidated a federal statute prohibiting possession of a firearm in a school zone, despite arguments that such possession may result in violent crime, which can affect the national economy (1) because the costs imposed are spread throughout the population, (2) because fear of violence deters individuals from traveling to unsafe areas, and (3) because the threat to the educational system will reduce the productivity of the citizenry. *See id.* at 567–68 (to expand interstate-commerce power to encompass the statute "would require us to conclude that the Constitution's enumeration

10

of powers does not presuppose something not enumerated, and that there never will be a distinction between what is truly national and what is truly local" (citation omitted)). And in *United States v. Morrison*, 529 U.S. 598 (2000), the Court invalidated a federal civil remedy for the victims of gender-motivated crimes of violence, rejecting arguments that gender-motivated violence affects interstate commerce because it can deter interstate travel, engaging in interstate business, etc. *See id.* at 617–18 ("The Constitution requires a distinction between what is truly national and what is truly local . . . . The regulation and punishment of intrastate violence that is not directed at the instrumentalities, channels, or goods involved in interstate commerce has always been the province of the States."). The problem with the statutes in *Lopez* and *Morrison* was not that it was irrational to think that the regulated activities would affect commerce, but that the effect was so indirect—and therefore not "substantial"—that to uphold the statute would be to uphold unlimited Commerce Clause power. *See Patton*, 451 F.3d at 629 (*Lopez* and *Morrison* rejected the government's arguments "largely on the ground that, if accepted, similar effects could be invoked in every case, and the Commerce Clause would become, in effect, a grant of general governing authority").

It is important to keep in mind this limitation on the third category of regulation under the Commerce Clause—the regulation of activities that substantially affect interstate commerce – when considering the scope of the first two categories—(1) the regulation of the use of the channels of commerce and (2) the regulation of the instrumentalities of commerce and persons or things in interstate commerce. The first two categories are qualitatively different from the third. "The first two categories are

11

self-evident, since they are the ingredients of interstate commerce itself." *Raich*, 545 U.S. at 34 (Scalia, J., concurring). "[A]ctivities that substantially affect interstate commerce [, however,] are not themselves part of interstate commerce." *Id.* Regulation in the first two categories can be upheld just by identifying what is being regulated – the use of the channels of interstate commerce, or instrumentalities of interstate commerce, or persons or things in interstate commerce. But determining the propriety of regulation under the third category requires more. The courts must determine whether the activity being regulated has a causal connection to interstate commerce that can properly be deemed "substantial." An improper expansion of either of the first two categories to encompass regulation that properly belongs within the third category therefore would evade the constitutional constraints imposed on the third category of regulation. For example, this court has said that under the channels category, "Congress regulates not conduct *related to* interstate commerce but rather interstate commerce itself, barring from the channels of interstate commerce a class of goods or people"; and the court described that category of regulation as being "confined to statutes that regulate interstate transportation itself, not manufacture before shipment or use after shipment." *Patton*, 451 F.3d at 621. The court concluded that "[a] prohibition on the mere intrastate possession of body armor cannot be upheld under Congress's power to regulate the channels of interstate commerce." *Id.*

Finally, one aspect of the Supreme Court's three-part test is often overlooked. The division of interstate-commerce regulation into three categories is less a policy matter than it is definitional. To my knowledge, no one has suggested that there is some other

type of possible regulation outside of those categories. Controversy concerns only whether one of those types of regulation is permitted at all by the Constitution, *see Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 132, 2677 (Thomas, J., dissenting) (stating that there is no constitutional power to regulate activity simply because it has a "substantial effect" on commerce), or what is the proper scope of one of the categories (such as the question of how substantial the effect on commerce must be).

### C.  The Foreign Commerce Clause

I next consider how much of this Interstate Commerce Clause doctrine translates to the Foreign Commerce Clause. How much of the doctrine should be carried over and how much is not applicable because of some special consideration—that is, in the words of *Ogden,* 22 U.S. at 194, because of some "plain intelligible cause"? In particular, how should one analyze congressional authority under the Foreign Commerce Clause over conduct of Americans abroad, as in the case before us?

The critical question is when, if ever, the terms *commerce* and *regulate* have a different meaning under the Foreign Commerce Clause than they do under the Interstate Commerce Clause. As previously noted, Chief Justice Marshall indicated the general rule that they are understood as having the same meaning in the foreign and domestic context, saying: "Commerce, undoubtedly, is traffic, but it is something more:  it is intercourse. It describes the commercial intercourse between nations, and parts of nations, in all its branches, and is regulated by prescribing rules for carrying on that intercourse." *Gibbons*, 22 U.S. at 189–90. Unfortunately, however, there are no

13

Supreme Court opinions on whether the terms have distinct meetings in the context of regulation of the conduct of Americans abroad.

The Court's only decisions on the Foreign Commerce Clause have concerned the scope of the Clause with respect to conduct within the borders of the United States and, consequently, the relative powers of the federal and state governments under the Clause. Typical of the early opinions interpreting the Clause, in *Board of Trustees of University of Illinois v. United States*, 289 U.S. 48, 56 (1933), the Court rejected a claim that a university could not be required to pay customs duties on imported scientific apparatus because the school was an instrumentality of the State. *See id.* at 56–59. The Court emphasized the preeminence of federal power over states' rights in this field: "To permit the states and their instrumentalities to import commodities for their own use, regardless of the requirements imposed by the Congress, would undermine, if not destroy, the single control which it was one of the dominant purposes of the Constitution to create." *Id.* at 59. In that case there could be no question that the federal law—which imposed a customs duty on imported equipment—was a regulation of foreign commerce. The argument to the court was that there should be an exemption from that regulation for state entities. And the Court rejected the argument, noting the importance of not allowing variation among the States.

Fifty years later, in *Japan Line, Ltd. v. County of Los Angeles*, 444 U.S. 434 (1979), the Court considered not the powers of Congress, but the limits that the power given to Congress under the Foreign Commerce Clause *implicitly* places on the powers of the States in the absence of federal legislation—the so-called dormant Foreign Commerce

14

Clause. The State of California sought to assess an ad valorem property tax on cargo containers aboard Japanese ships temporarily docked in California's ports. *See id.* at 436–37. The Japanese owner of the containers objected that the State lacked the power to burden foreign commerce in this way. *See id.* at 437–38. The Court agreed, holding that the dormant Foreign Commerce Clause vests in the federal government the exclusive power to regulate commerce with foreign nations and forbids the tax. *See id.* at 453–54.

There was no question that the activity at issue in *Japan Lines* was regulation of foreign commerce. The question was the extent to which the States shared this regulatory power with the federal government. What the Court held was that the dormant Foreign Commerce Clause limited the powers of States to regulate foreign commerce more than the Interstate Commerce Clause limits the powers of States to regulate interstate commerce. Indeed, the Court assumed that the California tax would be lawful if applied to goods transported in interstate commerce. Under the dormant Interstate Commerce Clause test set forth in *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274 (1977), a tax does not impose an impermissible burden on interstate commerce if it "'is applied to an activity with a substantial nexus with the taxing State, is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to the services provided by the State.'" *Japan Line,* 441 U.S. at 444–45 (quoting *Complete Auto,* 430 U.S. at 279). The Court said, however, that "two additional considerations" are at play under the Foreign Commerce Clause. *Id.* at 446. One is the imperative, mentioned in *Board of Trustees*, 289 U.S. at 59, that the country "speak with one voice when regulating commercial relations with foreign governments." *Japan Line*, 441 U.S. at 449 (internal

15

quotation marks omitted). State taxes on foreign commerce could generate international disputes and result in retaliation against American instrumentalities present in foreign jurisdictions. *See id.* at 450. The other consideration is that the "fair apportionment" component of the *Complete Auto* test cannot be enforced in the international context. *See id*. at 446. That test can prevent multiple taxation of instrumentalities in interstate commerce because the Supreme Court can "enforce full apportionment by all potential taxing bodies." *Id*. at 447. In the international sphere, however, there is no "authoritative tribunal capable of ensuring that the aggregation of taxes is computed on no more than one full value." *Id.* at 447–48. "[N]either [the] Court nor this Nation can insure full apportionment when one of the taxing entities is a foreign sovereign." *Id.* at 447; *see* Anthony Colangelo, The Foreign Commerce Clause, 96 Va. L. Rev. 949, 966–69 (2010) (analyzing *Japan Line*).

One sentence in *Japan Line* requires careful analysis. In discussing the need for national uniformity with respect to foreign commerce, the Court said, "Although the Constitution, Art. I, § 8, cl. 3, grants Congress power to regulate commerce 'with foreign Nations' and 'among the several States' in parallel phrases, there is evidence that the Founders intended the scope of the foreign commerce power to be the greater." *Id.* at 448. The government's brief points to this sentence in support of its argument that congressional power under the Foreign Commerce Clause is "plenary." But the sentence must be read in context. The Court did not say that the term *commerce* has a broader meaning in the foreign-commerce context than it does in the interstate-commerce context. Nor did it say that the term *regulate* has a broader meaning in the former context. Nor

16

did the *Japan Line* opinion have occasion to consider congressional power to regulate the conduct of Americans abroad. Indeed, the question was not the *extent* of congressional power; no one was arguing about whether Congress could pass legislation imposing taxes like those imposed by California, or even authorize states to impose such taxes. Rather, the question was the *exclusivity* of congressional power: Could California, in the absence of federal regulation, impose its own regulations? The one-voice principle in Foreign Commerce Clause jurisprudence does not expand congressional power. It does not add a megaphone to magnify the voice of Congress and permit it to enact legislation that it would not otherwise be permitted to enact. Rather, it is a restriction on the States. It silences them so that only the voice of the national government is heard on international matters.

This construction of the meaning of the comment in *Japan Lines* is consistent with the "evidence" that the Court referred to in its footnote. *See id.* at 448 n.12. The footnote cites to Federalist No. 42, which discusses the powers granted the federal government to "regulate the intercourse with foreign nations," such as the powers to make treaties, to send and receive ambassadors, and to regulate foreign commerce. The Federalist No. 42, at 231 (Madison) (E.H. Scott ed., 1898). The essay states: "This class of powers forms an obvious and essential branch of the federal administration. If we are to be one nation in any respect, it clearly ought to be in respect to other nations." *Id.*

This passage is certainly support for the exclusivity of federal authority noted in *Japan Line*, but it has no relevance to our case.[5]

The Court's footnote also cites a law-review article as "concluding, after an exhaustive survey of contemporary materials:  'Despite the formal parallelism of the grants, there is no tenable reason for believing that anywhere nearly so large a range of action was given over commerce "among the several states" as over that "with foreign nations."'"  441 U.S. at 448 n.12 (quoting Abel, *supra* at 475).  Nothing in the article, however, even hints at the possibility that the Foreign Commerce Clause could be used to govern noncommercial conduct of Americans abroad.  The quotation from the Abel article is the conclusion of a discussion confirming the accuracy of Madison's recollection of the Convention decades afterwards, in which he "explicitly negatives the suggestion that the [Interstate Commerce Clause] was designed to have as wide an operation as the companion grant with regard to foreign commerce, and assigns to it instead merely 'a negative and preventive' function, to control state-created discriminations and preferences."  Abel at 469 (quoting Letter of February 13, 1829, to J. C. Cabell, as quoted in 3 Farrand 478).  In other words, Abel was saying that the

---

[5]  The essay also notes the role played by the Interstate Commerce Clause in facilitating foreign commerce:  "[I]t may be added, that without this supplemental provision [the Interstate Commerce Clause], the great and essential power of regulating foreign commerce would have been incomplete and ineffectual.  A very material object of this power was the relief of the States which import and export to other States, from the improper contribution levied on them by the latter."  The Federalist No. 42 at 235.  An 1829 letter from James Madison cited in the *Japan Line* footnote also states this purpose for the Interstate Commerce Clause.  Again, the point being made is the need for exclusive federal power.

Framer's view, totally contrary to current doctrine, was that the Interstate Commerce Clause was not considered as a grant of affirmative legislative power to regulate interstate commerce, but as a means to constrain state interference with such commerce. *See id.* at 468–75; *see also id.* at 471 ("There is thus not a single occasion in the proceedings of the convention itself where the grant of power over commerce between the states was advanced as the basis for independent affirmative regulation by the federal government. Instead, it was uniformly mentioned as a device for preventing obstructive or partial regulations by the states."). Moreover, the Abel article points out the limited scope that the Founders gave to the term *commerce* even in the foreign-commerce context: "These three large classes of subjects—fiscal regulation [that is, duties] as to imports and exports, navigation, 'mercantile' enterprises—are the only ones that there is any evidence for believing were thought of by any one as embraced within 'commerce' or affected by the grant of power to regulate it." Abel, *supra* at 465; *see also id.* at 464 (emphasizing the narrow notion of mercantile (or merchant) enterprises at the time of the Convention, stating that the merchant's "activities conform nicely to those of the present-day importer, commission house, and wholesale firm, with just a dash of the commodity exchange; they hardly embrace those of the jobber, the hawker, or the retailer, who to us is the merchant par excellence."). What we now consider to be the scope of the interstate-commerce power surely exceeds the Founders' conception of the foreign-commerce power. *See id.* at 478 ("Today [that is, 1941] we are accustomed to think of the arteries of commerce, the highways and the inland streams, harbors, bridges, and the

19

like, as within the ambit of congressional power under the commerce clause. This is not the way the framers of the constitution looked at the matter.").[6]

The panel opinion suggests that the text of the Commerce Clause indicates that power under the Foreign Commerce Clause exceeds that under the Interstate Commerce Clause. *See* Maj. Op. at 27–28. It notes that the Clause speaks of commerce "*with* foreign Nations" but "*among* the several States." But the difference in prepositions indicates the opposite. If the Clause permitted regulation of commerce "*among* foreign nations"—so that the two clauses used the same preposition—then Congress would be empowered to regulate commerce among France, England, and Italy, even if the United States were not involved at all. Thus, use of the preposition *with* instead of the preposition *among* obviously *limits* the extent of the Foreign Commerce Clause. *See* Colangelo *supra* at 970–71 (explaining the difference between the uses of the two prepositions in the Commerce Clause).[7]

In short, the greater-power statement by the Supreme Court in *Japan Line* should not be overread. The statement was made in the context of the assertion that the need for national uniformity under the Foreign Commerce Clause could require greater limitations

---

[6] The *Japan Line* footnote also cited two student notes that do not affect the analysis.

[7] I am perplexed by the statement: "'Among' in the [Interstate Commerce Clause] restrains Congress in regulating intrastate matters—a constraint not present in the [Foreign Commerce Clause]." Maj. Op. at 27. Since the Foreign Commerce Clause requires that the commerce be that of a foreign country *with* the United States, it obviously restrains the application of that Clause within a foreign country.

20

on state action than would the Interstate Commerce Clause alone.  As Justice Thomas has

observed:

> This Court's statements about the comparative breadth of the Foreign
> Commerce Clause are of questionable relevance where the issue is
> Congress' power to regulate, or even criminalize, conduct within another
> nation's sovereign territory. . . .  [E]ven if the foreign commerce power
> were broader than the interstate commerce power as understood at the
> founding, it would not follow that the foreign commerce power is broader
> than the interstate commerce power as this Court now construes it.

*Baston v. United States*, 137 S. Ct. 850, 852 (2017) (Thomas, J., dissenting from denial of

certiorari).

This is not to say that national powers under the Foreign Commerce Clause and

the Interstate Commerce Clause must be identical.  After all, *Japan Line* makes clear that

they are not.  When it comes to state taxation of commerce, there are "plain intelligible

cause[s]," *Gibbons*, 22 U.S. at 194, why States must be more limited in taxing foreign

commerce than in taxing interstate commerce.  For one thing, there is the need for the

nation to speak with one voice in relations with other countries.  That "cause," however,

has no purchase in this case.  The statutory provision under which Defendant was

convicted was hardly animated by any perceived need to prevent the various States from

engaging in conflicting policies toward foreign nations.

The panel opinion also suggests that some interstate-commerce doctrine—in

particular, the gloss presented in *Lopez* and *Morrison*—does not apply because the limits

on interstate-commerce power in that doctrine reflect concerns for the sovereignty of the

States, concerns not present in foreign-commerce doctrine.  But surely there is no reason

to define the terms *commerce* and *regulate* more broadly in the foreign-commerce

21

context than in the interstate-commerce context. And the majority's approach overlooks a key principle underlying *Lopez* and *Morrison*: The Court's concern was not just that an overbroad conception of the interstate-commerce clause would give the federal government authority that could override police powers held by the States; it also expressed a fundamental concern that an overbroad conception would give the federal government general police powers, contrary to the constitutional framework of a federal government of limited power. *See, e.g.*, *Lopez*, 514 U.S. at 564 ("if we were to accept the Government's arguments, we are hard pressed to posit any activity by an individual that Congress is without power to regulate"); *id.* at 566 ("The Constitution . . . withhold[s] from Congress a plenary police power that would authorize enactment of every type of legislation."); *id.* at 567 ("To uphold the Government's contentions here, we would have to pile inference upon inference in a manner that would bid fair to convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States."); *see also Nat'l Fed'n of Indep. Bus.*, 567 U.S. 519, 535–36 (Roberts, C.J., writing separately) ("This case concerns two powers that the Constitution does grant the Federal Government, but which must be read carefully to avoid creating a general federal authority akin to the police power.").

The real danger lies in overbroad application of the third type of regulation under the Commerce Clause: the regulation of activities that substantially affect commerce. Given the reality that in modern times every activity can be said to have *some* effect on commerce, courts must set reasonable limits on the meaning of "substantial effect" or concede that the vision of a Constitution of limited powers, *see, e.g.*, U.S. Const. amend.

22

X, is a mirage and anything can be justified under the Commerce Clause. The power under the Foreign Commerce Clause is one of the *limited* powers granted to Congress by the Constitution. Courts should not construe it in a way that would amount to ceding to Congress a general police power over Americans with respect to all conduct beyond our shores.

Unlike the Supreme Court doctrine that the Foreign Commerce Clause embodies the concept that the country should speak with one voice in foreign affairs, which is firmly supported by evidence from the Founding, there is nothing—at least nothing brought to my attention or that I have found—suggesting that the Framers held any idea remotely like the possibility that the Foreign Commerce Clause would provide plenary power to police the behavior of Americans in foreign countries. Rather, the evidence is to the contrary. As Chief Justice Marshall explained:

> The jurisdiction of the nation within its own territory is necessarily *exclusive* and absolute. It is susceptible of no limitation not imposed by itself. Any restriction upon it, deriving validity from an external source, would imply a diminution of its sovereignty to the extent of the restriction, and an investment of that sovereignty to the same extent in that power which could impose such restriction.
> All exceptions, therefore, to the full and complete power of a nation within its own territories, must be traced up to the consent of the nation itself. They can flow from no other legitimate source.

*The Schooner Exch. v. McFaddon*, 11 U.S. 116, 136 (1812) (emphasis added). And specifically with respect to trade, Alexander Hamilton wrote the following a few years after ratification of the Constitution:

> Congress . . . may regulate by law our own Trade and that which foreigners *come* to carry on with us, but they [that is, Congress] cannot regulate the Trade which we may *go* to carry on in foreign countries, they

23

can give to us no rights, no privileges there. This must depend on the will and regulation of those countries; and consequently it is the province of the power of Treaty to establish the rule of commercial intercourse *between* foreign nations and the U[nited] States. The Legislature may regulate our own Trade but Treaty only can regulate the mutual Trade between our own and another Country.

Alexander Hamilton, *The Defence* No. XXXVI (Jan. 2, 1796), in 20 The Papers of Alexander Hamilton (Harold C. Syrett ed. 1974), available at http://founders.archives.gov/documents/Hamilton/01-20-02-0002[8]; *see Al-Maliki*, 787 F.3d at 793 ("[A]n unbounded reading of the Foreign Commerce Clause allows the federal government to intrude on the sovereignty of other nations—just as a broad reading of the Interstate Commerce Clause allows it to intrude on the sovereignty of the States."), *cert. denied*, 136 S. Ct. 204 (2015).

These views of the exclusivity of sovereign jurisdiction are overstated, at least under current international law. I recognize that international law now generally permits a nation "to prescribe law with respect to . . . the activities, interests, status, or relations of its nationals outside as well as within its territory." Restatement (Third) of the Foreign

---

[8] The panel opinion points to an additional passage from earlier in Hamilton's essay: "[A nation's] power to make laws . . . acts compulsively upon all persons, whether foreigners or Citizens, and upon all things, within its territory, and it acts in like manner upon its own citizens and their property without its territory in certain cases and under certain limitations. But it can have no obligatory action whatsoever upon a foreign nation or any person or thing within the jurisdiction of such foreign Nation." *The Defence*. The panel opinion reads this passage as permitting prosecution for acts in another country so long as the prosecution occurs here. *See* Maj. Op. 34 n.17. This is not an unreasonable interpretation if the passage is read in isolation, although such a prosecution would seem to contradict the notion expressed by Hamilton that a nation cannot impose obligations on someone (that is, on his or her conduct) while in a foreign jurisdiction. But in any event, any ambiguity in this passage is resolved by the later passage quoted in the above text, which says that Congress "cannot regulate the trade which we may *go* to carry on in foreign countries." *The Defence*.

Relations Law of the United States § 402 (1986); *see United States v. Mitchell*, 553 F.2d 996, 1001 (5th Cir. 1977). *But see* Restatement (Third) §403(1) ("a state may not exercise jurisdiction to prescribe law with respect to a person or activity having connections with another state when the exercise of such jurisdiction is unreasonable"); Colangelo *supra* at 1035–37. But that is beside the point that is relevant here. This proposition of international law does not distinguish the Foreign Commerce Clause from the Interstate Commerce Clause. International law would permit the federal government to enact the statutes struck down in *Lopez* and *Morrison*. The question is what our Constitution permits. And the statements by Chief Justice Marshall and Alexander Hamilton, together with the absence of any evidence that the Foreign Commerce Clause was conceived as providing congressional authority to govern all (or any?) conduct in foreign nations, strongly suggest that the sovereignty of foreign governments was as much assumed with respect to the Foreign Commerce Clause as was state sovereignty with respect to the Interstate Commerce Clause. (It should also be noted that in one respect the sovereignty of foreign nations was entitled to greater consideration—namely, the States, by ratifying the Constitution, had voluntarily ceded some of their sovereignty to the federal government.)

Indeed, *Japan Line* based its limitations on state power imposed by the Foreign Commerce Clause in part on the recognition of the limits of the federal government's power in other countries. When foreign commerce is taxed by the States, the Supreme Court cannot prevent multiple taxation by requiring apportionment of the taxes by the sovereignties imposing them, as the Court can when only interstate commerce is

25

involved, because the Court has no authority over foreign governments. *See* 441 U.S. at 447–48. And for the same reason, the federal government cannot prevent foreign nations from retaliating when the States impose such taxes. S*ee id.* at 450. Federal power under the Foreign Commerce Clause should be construed with consideration of the sovereign power of other nations just as federal power under the Interstate Commerce Clause is constrained by state sovereignty. *See Al-Maliki*, 787 F.3d at 793; Anthony J. Colangelo, *The Foreign Commerce Clause*, 96 Va. L. Rev. 949, 971–83 (2010) (identifying the "Foreign Sovereignty Concern" as a limit on congressional power under the Foreign Commerce Clause).

Further, the Tenth Amendment—"The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people"—emphasizes that exceeding power under the Foreign Commerce Clause infringes on the rights of the people. *See Al-Maliki*, 787 F.3d at 793 ("[A]n overbroad interpretation of the Foreign Commerce Clause allows the government to intrude on the liberty of individual citizens. And that seems at least as wrong as a reading of the Commerce Clause that allows the government to intrude on the States. *See* U.S. Const. amend. X (reserving power to the States 'or to the people.'").

I should emphasize that the point I am making is a limited one. I am not saying that the Constitution forbids the exercise of any power over conduct in other nations. For one thing, constitutional provisions other than the Foreign Commerce Clause can be the source of such power. And my view does not totally foreclose the exercise of such power under the Foreign Commerce Clause, even as authority for other provisions of the

PROTECT Act. For example, what I am saying does not call into question the constitutionality of the prohibition on travel to a foreign country with the intent to engage in illicit sexual conduct (the charge Defendant was acquitted of) or the prohibition on engaging in *commercial* illicit sexual conduct after travel to a foreign country. I am merely rejecting the notion that because the Foreign Commerce Clause overrides state sovereignty, the power under the Clause to regulate conduct in foreign nations is unconstrained.

To summarize, absent some "plain, intelligible cause"—such as the need for the nation to speak with one voice in foreign affairs or the limits of national power in a foreign country—I shall assume that the language "to regulate commerce" has the same meaning in the Foreign Commerce Clause as in the Interstate Commerce Clause. In particular, I borrow jurisprudence regarding the Interstate Commerce Clause in two respects. First, since the power of Congress under both that clause and the Foreign Commerce Clause is "[t]o regulate Commerce," I can adopt the Interstate Commerce Clause doctrine interpreting that language to encompass three types of regulation: regulation of the channels of commerce, regulation of the instrumentalities of commerce, and regulation of activities that substantially affect commerce. *See Gonzales*, 545 U.S. at 16 ("Cases . . . have identified three general categories of regulation in which Congress is authorized to engage under its commerce power"); *United States v. Clark*, 435 F.3d 1100, 1118 (9th Cir. 2006) (Ferguson, J., dissenting) ("A fairer understanding of the tri-category framework is that it has evolved not only in response to federalism concerns that courts have read into Congress's Interstate Commerce power, but also to give content to

27

what it means generally '[t]o regulate Commerce,' art. I, § 8, cl. 3." (brackets in original)). Other courts and judges have done the same when evaluating congressional enactments under the Foreign Commerce Clause. *See Bollinger*, 798 F.3d at 215 ("We agree that the *Lopez* categories provide a useful starting point in defining Congress's powers under the Foreign Commerce Clause."); *Pendleton*, 658 F.3d at 308 (analyzing constitutionality of PROTECT Act provision under "*Lopez*'s 'time-tested' [Interstate Commerce Clause] framework" since the "Supreme Court has not yet held that Congress has greater authority to regulate activity outside the United States than it does within its borders"); *Clark*, 435 F.3d at 1118 (Ferguson, J., dissenting) (criticizing majority for departing from Interstate Commerce Clause framework in resolving issue under Foreign Commerce Clause); *United States v. Reed*, No. CR 15-188 (APM), 2017 WL 3208458, at *7 (D.D.C. July 27, 2017) ("Given the ambiguous contours of this constitutional power and the dearth of precedent in this jurisdiction, this court will look—as others have done—to the well-known Interstate Commerce Clause framework to analyze whether Section 2423(c) is a constitutional exercise of Congress' Commerce Power."); *cf. United States v. Baston*, 818 F.3d 651, 668 (11th Cir. 2016), *cert. denied*, 137 S. Ct. 850 (2017) (upholding statute on assumption "that the Foreign Commerce Clause has the same scope as the Interstate Commerce Clause"); *United States v. Bredimus*, 352 F.3d 200, 204–08 (5th Cir. 2003) (analyzing 18 U.S.C. § 2423(b) foreign-commerce issue under framework of interstate-commerce case law, but stating that under *Japan Line* greater deference is owed to regulation of foreign commerce); *United States v. Homaune*, 898 F. Supp. 2d 153, 159 (D.D.C. 2012) (upholding statute on assumption that the "Foreign Commerce

28

Clause is at least as broad as the more familiar Interstate Commerce Clause," citing *Japan Line*).

Second, I adopt the limiting principle employed by the Court in the interstate-commerce context that the power conferred by the Clause cannot be construed so broadly as to encompass everything that can somehow be causally connected to commerce. Such a construction would be contrary to any notion of the Constitution as the source of only enumerated powers. *See Morrison*, 529 U.S. at 615–19; *Lopez*, 514 U.S. at 566 ("The Constitution . . . withhold[s] from Congress a plenary police power"); *see also Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 554 (2012) (separate opinion of Roberts, C.J.) ("[O]ur cases have 'always recognized that the power to regulate commerce, though broad indeed, has limits.'" (quoting *Maryland v. Wirtz,* 392 U.S. 183, 196 (1968)); *id.* at 536 (Congress's power over commerce "must be read carefully to avoid creating a general federal authority akin to the police power."). In the contemporary world, where everything can be said to be connected in some way to international commerce, the risk of using the Foreign Commerce Clause to justify plenary police powers (not just at home, but abroad as well) is every bit as great as the risk of using the Interstate Commerce Clause for the same purpose. Thus, when I turn to congressional power under the Foreign Commerce Clause to enact the third category of regulation—regulation of activities that substantially affect commerce—I will keep in mind the Supreme Court's conception of "substantially" to preclude regulation of activities whose connection to commerce is too indirect.

### III. Application of Foreign Commerce Clause to This Case

I now proceed to consider whether § 2423(c), as applied to noncommercial illicit sexual conduct, can be justified under the Foreign Commerce Clause as one of the three types of permissible regulation.

### A. Channels of Commerce

As discussed at length earlier in this opinion, the Commerce Clause grants Congress the authority "to keep the channels of interstate commerce free from immoral and injurious uses." *Caminetti*, 242 U.S. at 491; *see Perez*, 402 U.S. at 150 ("The Commerce Clause reaches . . . the use of channels of interstate or foreign commerce which Congress deems are being *misused*." (emphasis added)). Under this authority the Supreme Court has affirmed bans on interstate transportation of women who are to be put to immoral purposes, *Caminetti*, 242 U.S. at 483; wives for the purpose of polygamy, *see Cleveland*, 329 U.S. at 18; kidnapped persons, *see Perez*, 402 U.S. at 150; stolen property, *see id.*; or lottery tickets, *see Lottery Case*, 188 U.S. at 354–55. In these cases the person or thing barred from interstate commerce was tainted by either prior immoral conduct or the intent to engage in such conduct upon completion of the journey.

That channels authority does not extend to the conduct for which Defendant was convicted. I can assume that it extends to the conduct for which the jury found Defendant *not* guilty—traveling in [foreign commerce] *with the intent to commit* illicit sexual conduct. But absent that intent, Defendant could not be distinguished from any ordinary international traveler. The channels of foreign commerce were free of immoral and injurious uses since his intent was not found to be corrupt. He was not tainted at the

30

time of travel. *Cf. Patton*, 451 F.3d at 621 n.3 ("[T]he statute [in *Caminetti*] does not criminalize the transportation of persons who happen, after crossing state lines, to become prostitutes."); *Clark*, 435 F.3d at 1120 (Ferguson, J., dissenting) ("The mere act of boarding an international flight, without more, is insufficient to bring all of [a person's] downstream activities . . . within the ambit of Congress's Foreign Commerce power.").

The government nevertheless suggests that this court is bound to hold that the statutory provision before us constitutes channels regulation because of our conclusion in *United States v. Hinckley,* 550 F.3d 926, that the Sex Offender Registration and Notification Act (SORNA) can be upheld as regulation of the channels of commerce. The rationale for SORNA is that convicted sex offenders pose a particular danger to the public, the public needs to be warned of their proximity, and they should not be permitted to misuse the channels of interstate commerce to move from the state of conviction to another state to avoid this publicity. Under SORNA, sex offenders are not absolutely prohibited from interstate travel, but they can do so only if they register promptly upon establishing a new residence.

SORNA is a comfortable fit as channels regulation. The person subject to regulation is a person who can be identified while in the channels of commerce—the person has been convicted of a sexual offense. Such persons can be considered tainted things traveling in the channels of interstate commerce. And the SORNA registration requirement is an incidental condition for permitting such persons to travel in those channels. *See United States v. Anderson*, 771 F.3d 1064, 1070 (8th Cir. 2014) ("[T]he

31

registration requirements of [SORNA] are part of the constitutional power Congress has to punish sex offenders who cross state lines. Because Congress has the power to punish sex offenders across state lines, Congress is able to exercise the 'narrow' and 'incidental' power of requiring those sex offenders to register." (citation omitted)). That is a very different situation from the statutory provision here, because the defendant traveling to a foreign country cannot be singled out for any prior misconduct or even any intent to commit misconduct in the future. *Hinckley* does not control this case.

The government has not offered any principled basis, or *any* basis for that matter, for upholding channels-of-commerce authority for Defendant's offense that would not permit Congress to subject an American to federal prosecution for *any* offense committed abroad. Congress could penalize an American who traveled abroad and committed fraud, gambled (even if lawful where conducted), or merely littered. The federal government would have plenary police power over all Americans anywhere in the world. This cannot be the product of a Constitution of limited powers. I respectfully disagree with the Third Circuit's reliance on the above-cited channel-of-commerce cases to sustain a similar conviction. *See Pendleton*, 658 F.3d at 311.

### B. Instrumentalities of Commerce and Persons or Things in Commerce

*Lopez* held that "Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities." 514 U.S. at 558. No court has affirmed the PROTECT Act on this ground. The government, however, argues

32

that Defendant was a person "in [foreign] commerce" and therefore subject to congressional regulation. But this argument is based on a misconception of what it means to be "*in* interstate [or foreign] commerce." What *Lopez* was speaking of was regulation governing persons or things while they are traveling. A law prohibiting robbing people riding on an interstate stagecoach or thefts of property from trains would be within this power. *See Patton*, 451 F.3d at 622 (suggesting that a proper statute under the Commerce Clause could "protect [an item] while it is moving in interstate shipment"). Our precedent notes that "[t]he illustrative cases for this category involve things actually being moved in interstate commerce, not all people and things that have ever moved across state lines." *Id*. Section 2433(c) is obviously not protecting Defendant while he is moving in foreign commerce, or protecting the instrumentalities of foreign commerce that he is using. *See id*.

Although we stated in passing in *Hinckley*, 550 F.3d at 940, that SORNA would be constitutional under this category of regulation of interstate commerce, we did not distinguish the category as applied in that context from the first category of regulation— regulation of the channels of commerce. And I have already explained how SORNA differs from § 2423(c) under the first category, so *Hinckley* is distinguishable on that score. I am reluctant to read the passing reference in *Hinckley* as a rejection of the more thorough analysis provided by *Patton* of the second category of regulation. *Cf. Auraria Student Hous. v. Campus Vill. Apartments*, 843 F.3d 1225, 1235 (10th Cir. 2016) (earlier circuit precedent ordinarily prevails over later decision).

33

## C.    Substantial Effects on Commerce

The final source of congressional authority over commerce is the power to regulate "activities that substantially affect interstate [or foreign] commerce." *Lopez*, 514 U.S. at 559. In analyzing this issue, it is first necessary to recognize that noncommercial sexual activity is not *commerce*. It is not "the buying, selling, production, or transportation of products or services, or any activity preparatory to it." *Patton*, 451 F.3d at 624–25. It is not even economic activity, which "refers to the production, distribution, and consumption of commodities." *Raich*, 545 U.S. at 25 (internal quotation marks omitted)); *see Patton* at 625 ("[I]n *Raich*, the [Supreme] Court interpreted the contours of the third category by reference to 'economics' rather than 'commerce,' and included the 'consumption of commodities' as well as their production and distribution within that definition."). Engaging in noncommercial nonconsensual sexual activity is no more an economic activity than the gender-motivated violence targeted by the statute held unconstitutional in *Morrison*. *See* 529 U.S. at 613 ("Gender-motivated crimes of violence are not, in any sense of the phrase, economic activity.").

The fact that noncommercial nonconsensual sexual activity is not economic activity is extremely important, probably dispositive, in determining whether it is subject to the third category of regulation of commerce. The Supreme Court thus far has upheld under the third category only regulation of economic activity. *See Raich*, 545 U.S. at 17 ("Our case law firmly establishes Congress' power to regulate purely local activities that are part of an economic 'class of activities' that have a substantial effect on interstate commerce.") The panel opinion cites *Raich* as a case in which the Court "upheld

34

congressional regulation of noncommercial activity." Maj. Op. at 52 n.21. But the Supreme Court opinion made clear that the activity, even if not commercial, was "economic." It distinguished earlier Court decisions overturning congressional legislation with the words: "Unlike those at issue in *Lopez* and *Morrison*, the activities regulated by the [Controlled Substances Act] are *quintessentially economic*." *Raich*, 545 U.S. at 25 (emphasis added).

To be sure, the term *illicit sexual conduct* in § 2423 does include economic, even commercial, activity. But the broad statutory definition of the term cannot change the nature of every activity within the definition. Suppose the Controlled Substances Act also prohibited jogging (because it can produce a runner's *high*). That would not place jogging within the "economic class of activities" of controlled substances and thereby allow the prohibition. *Cf. Sebelius*, 567 U.S. at 547–61 (Opinion of Roberts, C.J.) (failure to purchase medical insurance is not economic activity and cannot be regulated under the Commerce Clause despite effect on health-insurance market); *id*. at 646–48 (Scalia, J., joined by three other Justices in concurring on this issue) ("failure to engage in economic activity (the purchase of health insurance) is [not] subject to regulation under the Commerce Clause").

But even if noncommercial illicit sexual conduct could be regulated if it has a substantial effect on commerce, there is no reason to believe that it has such an effect. As noted earlier, the Supreme Court has examined three factors in conducting a substantial-effect analysis: the relation of the regulated activity to commerce; congressional findings about the activity's effects on commerce; and the presence in the statute of an express

35

jurisdictional element limiting the reach of the statute. *See Morrison*, 529 U.S. at 611–13. I now consider those factors.

### 1. Relation of Activity to Commerce

Noncommercial activity can affect commerce. The Supreme Court has recognized, for example, that if the activity involves a good that is identical to (fungible with) goods in commerce, regulation may be permissible. (Do not forget, though, that activity with respect to goods is "economic" activity. *See Raich*, 545 U.S. at 25.) In *Wickard*, Congress had authorized quotas on the production of wheat because the industry had been plagued by large surpluses that depressed prices. *See* 317 U.S. at 113, 125–28. A farmer who grew wheat in excess of the quota (to feed poultry and livestock on his farm, to use in making flour for home consumption, and for seeding the following year) challenged the quota, arguing that it regulated noncommercial conduct. *See id.* at 114, 118. But the Court upheld the quota as a permissible regulation to protect the price of a commodity because the aggregate effect of many farmers exceeding the quota would substantially affect the wheat market. *See id.* at 127–28. It reasoned that farmers who *grow wheat* in excess of the quota purely for home consumption are doing so instead of *buying wheat* on the market, thereby decreasing the demand for wheat and undermining Congress's goal of boosting the price. *See id.* at 128–29. "Home-grown wheat in this sense competes with wheat in commerce." *Id.* at 128. Congress therefore had the authority to regulate wheat grown "wholly for consumption on the farm" to protect the price of the commodity in commerce. *Id.* at 118.

Six decades later, the Supreme Court addressed a challenge to the federal ban on marijuana in the Controlled Substances Act (CSA). The CSA, said the Court, "regulates the production, distribution, and consumption of commodities for which there is an established, and lucrative, interstate market." *Raich*, 545 U.S. at 26. In particular, Congress had classified marijuana as a drug with a high potential for abuse and no accepted medical use, which made its manufacture, distribution, or possession a criminal offense. *See id.* at 14. The question was whether those prohibitions could encompass "the intrastate, noncommercial cultivation and possession of cannabis for personal medical purposes as recommended by a patient's physician pursuant to a valid California state law." *Id.* at 8 (internal quotation marks omitted). The Court answered the question affirmatively because Congress "had a rational basis for concluding that leaving home-consumed marijuana outside federal control would . . . affect price and market conditions." *Id.* at 19. Just like wheat grown for home consumption, marijuana cultivated for that purpose overhangs the market, making it likely that "high demand in the interstate market will draw such marijuana into the market." *Id.*

Relying on *Wickard* and *Raich*, the government argues that the PROTECT Act is within congressional power because it was enacted "to close the child-sex-tourism market." Aplee. Br. at 62. That rationale may well suffice with respect to the provision of the Act barring commercial sex. But the analogy to *Wickard* and *Raich* fails when it comes to the provision of the Act under which Defendant was convicted. The regulated activities in *Wickard* and *Raich* may not have been commerce, but they were economic. Defendant's illicit sexual conduct, in contrast, was not. To advance regulatory authority

37

from commerce to economic activity is one thing. The step from economic activity to noneconomic activity may be a step too far. *See Morrison*, 529 U.S. at 611 ("[I]n those cases where we have sustained federal regulation of intrastate activity based upon the activity's substantial effects on interstate commerce, the activity in question has been some sort of economic endeavor."); *id.* at 613 ("While we need not adopt a categorical rule against aggregating the effects of any noneconomic activity to decide these cases, thus far in our Nation's history our cases have upheld Commerce Clause regulation of intrastate activity only where that activity is economic in nature."). At the least, when the regulation of noneconomic activity is justified under the Commerce Clause on the ground that it substantially affects commerce, that justification cannot be based on "pil[ing] inference upon inference" in a way that threatens to make the Clause a source of a general police power. *Lopez,* 514 U.S. at 567. Tenuous connections are not "substantial." And one must keep firmly in mind that the Court has yet to find a substantial effect on commerce arising from noneconomic activity. *See Morrison*, 529 U.S. at 611, 613.

In any event, the government has not offered any reason to believe that control of noneconomic sex abuse will affect the market in commercial sex trafficking. When dealing with fungible commodities the connection is clear. *See Raich*, 545 U.S. at 19 ("In both cases, the regulation is squarely within Congress' commerce power because production of the commodity meant for home consumption, be it wheat or marijuana, has a substantial effect on supply and demand in the national market for that commodity.") But here there is no apparent connection. If data show that prosecutions of

noncommercial child sexual abuse reduce the incidence of commercial abuse, those data have not been presented to this court. I cannot agree with the unexplained view of the Fourth Circuit that "[i]t is eminently rational to believe that prohibiting the non-commercial sexual abuse of children by Americans abroad has a demonstrable effect on sex tourism and the commercial sex industry." *Bollinger*, 798 F.3d at 218. *Contra United States v. Bianchi*, 386 F. App'x 156, 163 (3d Cir. 2010) (Roth, J., dissenting) ("I find that there is no rational basis to conclude that an illicit sex act with a minor undertaken on foreign soil, perhaps years after legal travel and devoid of any exchange of value, substantially affects foreign commerce."); *Reed*, 2017 WL 3208458, at *12–13 (the connection is "too attenuated to rationally qualify as 'substantial.'"); *United States v. Park*, 297 F. Supp. 3d 170, 178–79 (D.D.C. 2018) (following *Reed*).

In upholding the regulations in *Wickard* and *Raich*, the Supreme Court was dealing with fungible commodities. *See Raich*, 545 U.S. at 26 ("Prohibiting the intrastate possession or manufacture of an *article of commerce* is a rational (and commonly utilized) means of regulating commerce in that product." (emphasis added)); *id.* at 18 ("Like the farmer in *Wickard*, respondents are cultivating, for home consumption, *a fungible commodity* for which there is an established, albeit illegal, interstate market." (emphasis added)). Home-grown wheat is essentially indistinguishable from wheat produced for commerce, and home-grown marijuana for medical purposes is essentially the same product as commercial marijuana. A "customer" could not distinguish the two products when eating or smoking them. Here, in contrast, the government has not suggested that sex tourists who prey on children are indifferent to whether their victims

39

are provided by commercial enterprises or they must seek out their victims at places like mission schools and assault the children on their own.

Nor is it enough simply to point to the substantial effect on commerce of a great deal of activity regulated by a statute and then justify regulation of additional activity that is pasted into the statute on the ground that it is "part of a larger regulation of economic activity." Maj. Op. at 40, 46 (internal quotation marks omitted). The fully stated proposition is that conduct that otherwise could not be regulated can be regulated if it is "an essential part of a larger regulation of economic activity, *in which the regulatory scheme could be undercut unless the intrastate activity were regulated*." *Lopez,* 514 U.S. at 561 (emphasis added). *Accord Raich*, 545 U.S. at 24–25. For example, the Court in *Wickard* "had no difficulty concluding that Congress had a rational basis for believing that, when viewed in the aggregate, leaving home-consumed wheat outside the regulatory scheme would have a substantial influence on price and market conditions." *Raich*, 545 U.S. at 19. The conclusion is common sense, even obvious. In addition, the record in that case "made it clear that the aggregate production of wheat for [noncommercial] use on farms had a significant impact on market prices." *Id.* at 20. Likewise in *Raich* there were findings by Congress that in effect "established the causal connection between the production [of marijuana] for local use and the national market." *Id.* As the Court said, "that the . . . exemptions [sought by the respondents] will have a significant impact on both the supply and demand sides of the market for marijuana . . . is readily apparent." *Id*. at 30; *see id.* at 22 ("[W]e have no difficulty concluding that Congress had a rational

40

basis for believing that failure to regulate the intrastate manufacture and possession of marijuana *would leave a gaping hole in the CSA*." (emphasis added)).

Translating that precedent to the case before us, regulation of the conduct at issue here is proper only if such regulation is "an essential part" of the regulation of commercial sex tourism because failure to control noncommercial illicit sexual conduct would "undercut" that regulation. Yet neither the government brief nor the panel opinion explains how this is the case. When products are fungible, the connection is commonsensical. But the tie between commercial sex with children and noncommercial nonconsensual sexual assault is a mystery. Nor is the mystery resolved by any findings by Congress, the subject to which I now turn.

### 2. Congressional Findings

Congressional findings about the effects of the prohibited activity on commerce can inform the analysis. *See Lopez*, 514 U.S. at 562. But they are not dispositive. For example, in *Morrison* the Court ruled that the statute providing a civil remedy to victims of gender-motivated violence was unconstitutional despite "numerous findings regarding the serious impact that gender-motivated violence has on victims and their families." 529 U.S. at 614. Those findings, however, relied on the types of attenuated effects between violence and commerce—violence deters victims from traveling interstate and engaging in interstate businesses, diminishes national productivity, increases medical and other costs, and decreases both supply of and demand for interstate products—that the Court had previously rejected as insubstantial because recognizing such tenuous effects would eliminate limits on congressional power. *See id.* at 615 ("Congress' findings are

41

substantially weakened by the fact that they rely so heavily on a method of reasoning that we have already rejected as unworkable if we are to maintain the Constitution's enumeration of powers.").

The panel opinion discusses at length the long history of federal legislation governing interstate and international travel for sex offenses. The great bulk of that history is irrelevant because it does not speak to the specific regulation at issue here. *See Lopez*, 514 U.S. at 563 ("[I]mportation of previous [legislative] findings to justify [the challenged statutory provision] is especially inappropriate here because the prior federal enactments or Congressional findings do not speak to the subject matter of [the provision] or its relationship to interstate commerce." (original brackets and internal quotation marks omitted)). Moreover, Congress made no findings when adopting the PROTECT Act. Congress did do so, however, in debating its failed precursor, the Sex Tourism Prohibition Improvement Act of 2002 (STPIA). And I will assume that a court can consider those findings in evaluating the constitutionality of the PROTECT Act. When considering STPIA, the House Judiciary Committee reported the following:

> Many developing countries have fallen prey to the serious problem of international sex tourism. According to the National Center for Missing and Exploited Children, child-sex tourism is a major component of the worldwide sexual exploitation of children and is increasing. There are more than 100 web sites devoted to promoting teenage commercial sex in Asia alone. Because poor countries are often under economic pressure to develop tourism, those governments often turn a blind eye toward this devastating problem because of the income it produces. Children around the world have become trapped and exploited by the sex tourism industry.
> There would be no need for a sex tourism statute if foreign countries successfully prosecuted U.S. citizens or resident aliens for the child sex crimes committed within their borders. However, for reasons ranging from ineffective law enforcement, lack of resources, corruption, and generally

42

immature legal systems, sex tourists often escape prosecution in the host countries. It is in those instances that the United States has an interest in pursuing criminal charges in the United States.

The Justice Department, Federal law enforcement agencies, the State Department and other U.S. entities expend significant resources assisting foreign countries most afflicted with sex tourism to improve their domestic response to such criminal offenses. Our assistance encompasses informal as well as formal training of foreign law enforcement officers and prosecutors in the investigation and prosecution of sex tourism crimes. By and large these countries reach out to the United States for help and some even blame the United States for the problem, "arguing" that many of the sex tourists are American. Some of the foreign or "host" countries experiencing significant problems with sex tourism, such as Nicaragua, Costa Rica, Thailand and the Philippines, have requested that the United States act to deal with this growing problem.

Current law requires the Government to prove that the defendant traveled to a foreign country with the intent to engage in sex with a minor. H.R. 4477 eliminates the intent requirement where the defendant completes the travel and actually engages in the illicit sexual activity with a minor. The bill also criminalizes the actions of sex tour operators by prohibiting persons from arranging, inducing, procuring, or facilitating the travel of a person knowing that such a person is traveling in interstate or foreign commerce for the purpose of engaging in illicit sexual conduct with a minor. This legislation will close significant loopholes in the law that persons who travel to foreign countries seeking sex with children are currently using to their advantage in order to avoid prosecution.

H.R. Rep. 107-525, at 2–3 (2002).

What is notably missing from these findings is any statement, much less evidence, regarding the impact of noncommercial illicit sexual activity by international travelers on commercial illicit sexual activity. While the above findings may support the constitutionality of a ban on commercial sex acts with children in foreign countries, they say nothing about the effects on foreign commerce of *noncommercial* nonconsensual molestation of children abroad. There were no findings that noncommercial offenses affect the child-sex market, or even that Congress cannot adequately control commercial

43

offenses unless it also prohibits noncommercial offenses.  It is as if when Congress enacted § 2423(c) to eliminate the requirement that a defendant travel in interstate commerce *with the intent to engage in illicit sexual conduct*, it was so focused on those who engage in commercial illicit sexual conduct that it overlooked the impact of the change on the prohibition of noncommercial illicit sexual conduct.

In its congressional-findings argument the government also relies on the Optional Protocol to the Convention on the Rights of the Child regarding the Sale of Children, Child Prostitution and Child Pornography, stating that "[t]he PROTECT Act was . . . passed as part of the United States' obligation under the Optional Protocol."  Aplee. Br. at 60.  The government apparently seeks to impute the reasons that the United States ratified that treaty to Congress's decision to enact the PROTECT Act.  (It does not argue that any part of the PROTECT Act was enacted under the authority of the Constitution's Treaty Clause, U.S. Const. art. II, § 2, cl. 2.)  I question whether one should consider the Optional Protocol in this context because Congress never mentioned it in the texts or legislative histories of the PROTECT Act or STPIA.  But even if one were to do so, the government's reliance would be misplaced.  The Optional Protocol covers only commercial sex offenses against children; it says nothing about the effects of noncommercial sex offenses on foreign commerce.  *See Reed*, 2017 WL 3208458, at *16 ("The Optional Protocol calls on States Parties to create and enforce laws that prohibit the exploitation of children *for commercial gain*." (emphasis added)).

Thus, the congressional findings "do not speak to the subject matter of [the provision under which Defendant was convicted] or its relationship to [foreign]

44

commerce." *Lopez,* 514 U.S. at 563 (brackets and internal quotation marks omitted)).

This is not an inconsequential matter. Although congressional findings are not necessary to support commerce-clause legislation, they can be significant, "particularly when the connection to commerce is not self-evident." *Raich,* 545 U.S. at 21. Here, the connection is not self-evident. Without congressional findings, I cannot see how prevention of noncommercial sexual assault on children would substantially affect commercially provided sex abuse. *See Lopez,* 514 U.S at 563 ("[T]o the extent that congressional findings would enable us to evaluate the legislative judgment that the activity in question substantially affected interstate commerce, even though no such substantial effect was visible to the naked eye, they are lacking here.")

### 3. Express Jurisdictional Element

There remains the one factor that could support congressional power to punish Defendant's offense under the substantial-effects rationale: "travel[ing] in foreign commerce or resid[ing], either temporarily or permanently, in a foreign country" is an express element of 18 U.S.C. § 2423(c). *See United States v. Jeronimo-Bautista*, 425 F.3d 1266, 1269 (10th Cir. 2005) (asking "whether the statute's reach was limited by an express jurisdictional element"). "A jurisdictional hook is not, however, a talisman that wards off constitutional challenges." *Patton*, 451 F.3d at 632. What the Supreme Court has said is that "a jurisdictional element *may* establish that the enactment is in pursuance of Congress' regulation of interstate commerce." *Morrison*, 529 U.S. at 612 (emphasis added). As we stated in *Patton*, "The ultimate inquiry is whether the prohibited activity has a substantial effect on interstate [or foreign] commerce, and the presence of a

45

jurisdictional hook, though certainly helpful, is neither necessary nor sufficient." 451 F.3d at 632. Our opinion, *see id.*, endorsed similar views expressed by other circuits: *United States v. Maxwell*, 446 F.3d 1210, 1218 (11th Cir. 2006) ("[W]here a jurisdictional element is required, a meaningful one, rather than a pretextual incantation evoking the phantasm of commerce, must be offered." (brackets, citation, and internal quotation marks omitted)); *United States v. Holston*, 343 F.3d 83, 88 (2d Cir. 2003) (expressing unwillingness to rely solely on "the mere existence of jurisdictional language purporting to tie criminal conduct to interstate commerce"); *United States v. Rodia*, 194 F.3d 465, 472–73 (3d Cir. 1999) (rejecting a "hard and fast rule that the presence of a jurisdictional element automatically ensures the constitutionality of a statute").

In my view, the jurisdictional hook here does not do the trick. I have already expressed why I believe that the government has not shown any connection between noncommercial illicit sexual conduct committed by Americans who traveled abroad and commercial illicit sexual conduct (the only type of "commerce" that it would allegedly affect). More important are the ramifications of relying on this jurisdictional hook. I do not see, nor has the government provided, a principled way to distinguish the use of this hook to justify the statutory provisions under which Defendant was convicted from the use of an identical hook that would permit Congress to prohibit any misconduct by Americans abroad, from gambling (even if lawful in the country where conducted) to jaywalking. All that would be needed is to add the hook that the defendant had traveled in foreign commerce. At the least there should be *evidence* or a congressional finding,

46

not just speculation, of a direct, not "attenuated," effect on commercial activity. *Morrison*, 529 U.S. at 615.

True, *Patton* recognized the tension between the analysis of the Interstate Commerce Clause in *Lopez* and *Morrison* and the Supreme Court's decision in *Scarborough v. United States*, 431 U.S. 563, 565 (1977), "which held that Congress intended a felon-in-possession statute to prohibit possession of any firearm that had moved in interstate commerce," *Patton,* 451 F.3d at 634. *Scarborough* implicitly accepted that such a prohibition was constitutional. *See id.* Feeling bound by *Scarborough*, this court upheld the constitutionality of a statute that prohibited "the intrastate possession by a felon of a bulletproof vest, in the absence of any commercial transaction or any evidence of a connection to commercial activity other than the fact that, before it was lawfully purchased by the defendant, the vest had been sold across a state line," even though the prohibition could not be justified under the Supreme Court's "three-part test for determining the reach of the Commerce Clause." *Id.* at 618–19.

But *Scarborough* cannot be extended so far as to encompass the statute before us. The jurisdictional hook in *Scarborough* was interstate travel by a commodity, not by a person, and certainly not by a person like Defendant—who had not engaged in any activity before or during the travel that would distinguish him or her from any other person. If *Scarborough* stands for the proposition that the Interstate Commerce Clause authorizes Congress to prohibit any activity occurring after personal travel in interstate commerce, then it provides a general police power to the federal government that would

47

erase the "distinction between what is truly national and what is truly local." *Lopez*, 514 U.S. at 567–68. I am confident that such a result was not the teaching of *Scarborough*.

To sum up, there can be little question that a statutory provision otherwise identical to the one on which Defendant was convicted could not pass muster under the Interstate Commerce Clause if travel in interstate commerce were substituted for travel in foreign commerce. He did not engage in economic activity, and there is no reason to believe that activity like his has a substantial effect on commerce. Nor can the provision be upheld under the Foreign Commerce Clause merely on the unfocused proposition that congressional power under that clause is greater than the power provided by the Interstate Commerce Clause. To uphold the provision, the Foreign Commerce Clause would need to be interpreted to confer congressional power to regulate all conduct of Americans while abroad. Nothing suggests that the Framers had any such concept of the Clause; on the contrary, the evidence suggests that such power would seem most strange to them. Moreover, such a power would be wholly inappropriate under a Constitution of conferred, limited power.

I therefore would hold that the statutory provisions under which Defendant was convicted cannot be justified under the Foreign Commerce Clause. At the very least, § 2423(c) is unconstitutional as applied in this case. Not only is it uncontroverted that Defendant was not a sex tourist, he was not even a tourist. The government does not suggest that he had any tie to commercial sex trafficking. The connection between his kind of offense and sex tourism is far too attenuated to support regulation under the Foreign Commerce Clause.

I agree with Judge Ferguson: "The sexual abuse of children abroad is despicable, but we should not, and need not, refashion our Constitution to address it." *Clark*, 435 F.3d at 1117 (9th Cir. 2006) (Ferguson, J., dissenting); *see Reed*, 2017 WL 3208458, at *11, *19 (holding § 2423(c) unconstitutional as applied to a defendant who molested his daughter while residing abroad); *Park*, 297 F.Supp.3d at 178–79 (following *Reed*); *see also Al-Maliki*, 787 F.3d at 792–94 (upholding this portion of the statute on plain-error review, but suggesting that the panel majority would have held it unconstitutional if the issue had been preserved); *United States v. Bianchi*, 386 F. App'x 156, 163 (3d Cir. 2010) (Roth, J., dissenting) ("I find that there is no rational basis to conclude that an illicit sex act with a minor undertaken on foreign soil, perhaps years after legal travel and devoid of any exchange of value, substantially affects foreign commerce."); *cf. Baston*, 137 S. Ct. at 850 (Thomas, J., dissenting from denial of petition for certiorari in criminal prosecution under Foreign Commerce Clause) ("We should grant certiorari and reaffirm that our Federal Government is one of limited and enumerated powers, not the world's lawgiver."); Colangelo *supra* at 1039–40 (doubting the constitutionality of § 2423(c) with respect to noncommercial sexual abuse of minors).

The Supreme Court has provided little, if any, guidance regarding congressional power under the Foreign Commerce Clause to regulate the conduct of Americans abroad. If the Court believes that it is appropriate to cabin that power, this may be as good a vehicle as any to convey the message.

For the above reasons, I respectfully dissent.